UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) Case No. 1:21-mj-00071 |
| LISA MARIE EISENHART | ) <br> ) <br> ) |

**DEFENDANT'S CORRECTED MOTION TO RESCIND STAY OF RELEASE ORDER OR TO CONDUCT AN IMMEDIATE REVIEW OF HER DETENTION**

NOW COMES Defendant Lisa Marie Eisenhart, by and through undersigned appointed counsel, and hereby moves this Court to rescind its January 26, 2021 Order [Docket #7] staying the decision by U.S. Magistrate Judge Jeffrey S. Frensley of the U.S. District Court for the Middle District of Tennessee that had ordered Ms. Eisenhart released on bail with conditions, because this stay order is invalid as unconstitutionally granted in violation of Ms. Eisenhart's procedural due process rights.  If the Order is not rescinded, Ms. Eisenhart moves this Court to schedule an immediate hearing to conduct the Government's requested review Judge Frensley's bail decision, without awaiting Ms. Eisenhart's custodial transportation to the District of Columbia.  Ms. Eisenhart is entitled to a prompt review of her detention, rather than being forced to continue to wait for that hearing in extended detention, and she is willing to conduct this hearing via videoconference from the jail in which she is currently housed.[1]

**BACKGROUND**

On January 15, 2021, Ms. Eisenhart was charged in this District, along with her son, Eric Gavelek Munchel, in a Criminal Complaint that alleged various crimes in connection with their activities at the U.S. Capitol on January 6, 2021.

---

[1] If this hearing is scheduled, this Court's Transport Order [Docket #9] should be stayed until after the hearing is completed, to ensure Ms. Eisenhart is not moved out of her current jail where such videoconferencing is available.

1

In particular, the Complaint alleged these two defendants conspired to violate 18 U.S.C. § 231(a)(3) (Civil Disorders), 18 U.S.C. § 1752(a) (Restricted Building or Grounds), and 40 U.S.C. § 5104(e)(2), (Violent Entry or Disorderly Conduct), committed substantive violations of the same, and aided and abetted the commission of these charges, in violation of 18 U.S.C. § 2:

> Specifically, on or about January 6, 2021 … [a]s the Congress was engaged in the official business of certifying the electoral college vote, EISENHART and MUNCHEL knowingly and willfully joined a mob of individuals to forcibly enter the U.S. Capitol with the intent to cause a civil disturbance designed to impede, disrupt and disturb the orderly conduct of business by the United States House of Representatives and the United States Senate.

Complaint ¶ 3. Additional factual details of the allegations are detailed in the Complaint, including photographs of Defendants and descriptions of their activities in advance of January 6, 2021 and at the U.S. Capitol that day, plus later reports contained in the press and social media. These facts would later be adopted and supplemented at the Defendants' detention hearings held in the Middle District of Tennessee, as described in greater detail below.

After January 6, and following the wide publication of a photograph allegedly showing Eric Munchel inside the U.S. Senate Gallery carrying plastic zip ties, it became apparent to these Defendants that they may be criminal charged. Despite being obvious suspects, they maintained contacts with law enforcement. On January 10, 2021, Eric Munchel self-surrendered to the FBI in Nashville after being made aware of an outstanding arrest warrant. Ms. Eisenhart, who had returned to her home in Georgia, also spoke to the FBI on January 10, 2021, via telephone. Ms. Eisenhart thereafter maintained regular contact with the FBI, and advised them of her plans to visit Tennessee. After being advised by the FBI that an amended Criminal Complaint had charged her as well, Ms. Eisenhart also self-surrendered to the FBI in Nashville, on January 16.

On January 19, Ms. Eisenhart made her initial appearance in the Middle District of Tennessee, and was appointed counsel. Despite the self-surrenders, the Government sought the pretrial detention of both Eric Munchel and Ms. Eisenhart. For Ms. Eisenhart, a preliminary and detention hearing was set for January 25. On January 22, the Government filed a Memorandum in Support of its position that Ms. Eisenhart should be detained. Ms. Eisenhart's appointed counsel later filed a Response, explaining in considerable detail why detention was not authorized based on the charges filed against Ms. Eisenhart, and was otherwise unwarranted.

A lengthy preliminary and detention hearing in Ms. Eisenhart's case then took place before U.S. Magistrate Judge Frensley on January 25.[2] After hearing from witnesses presented by both the prosecution and defense, reviewing various exhibits, and taking a recess to personally view a 50-minute videotape of the Defendants' activities leading up to and occurring inside the U.S. Capitol on January 6 – video extracted from a phone strapped onto Eric Munchel during the day's events, which had been recovered and produced by the FBI – Judge Frensley found probable cause, but declared that pretrial detention of Ms. Eisenhart was unwarranted. His ruling was a considered one, and included substantial factual findings in support of his conclusion that release under certain very strict (and specified) conditions was appropriate.

Judge Frensley's ruling began by addressing the threshold question of whether the criminal charges filed against Ms. Eisenhart were even of a type that could legally authorize pretrial detention based on dangerousness, since the charged statutes, when viewed categorically, did not contain violence as an element of the offense. He rejected that argument, but then said that this issue was "a relatively close call," and that "Mr. Farmer's objections are preserved and

---

[2] A separate preliminary and detention hearing was held for Eric Munchel on January 22, 2021.

he can advance those as he sees fit, if necessary, in subsequent proceedings." Tr. at 147-48.[3]
Mr. Farmer's Response which had raised this objection is attached as Exhibit A, and its citations
and legal arguments (pp.3-6) are incorporated herein.

Having determined that Ms. Eisenhart *could* be detained, Judge Frensley next turned to
whether she *should* be detained. He first noted how Ms. Eisenhart, a registered nurse for 30
years, "does not have a significant criminal record … does not have any history of not appearing
for any court proceedings, of violating any conditions of release," and "more importantly," the
"undisputed" evidence "that upon learning that she was potentially … subject to arrest, Ms.
Eisenhart made daily contact with the FBI to determine whether she was being sought …
including when she was advised, finally, that there were charges against her, and she thereafter
reported and turned herself in, surrendered on those charges." Tr. at 151-52. "[T]he Court does
not believe that Ms. Eisenhart poses a significant risk of flight…. So the Court finds that flight
does not provide a basis for Ms. Eisenhart's continued detention." Tr. at 152.[4]

On the issue of dangerousness ("whether or not there are conditions of release that will
reasonably assure the safety of the community in this particular case"), Judge Frensley similarly
found the Government's evidence insufficient to justify detention. There had been considerable
briefing presented on this issue, and Judge Frensley's factual findings were rather extensive, Tr.
at 153-59 as he explained in considerable detail how at least certain troubling allegations made
by the Government in its pleadings had simply not been borne out by the evidence. *See, e.g.,* Tr.
at 157-58 (specifically referencing the Government's detention motion's claim that Ms.
Eisenhart had been "following after two Capitol police officers" and noting how "these
allegations on their face seem very serious and very significant," but that "upon questioning the

---

[3] "Tr." refers to the Transcript from the January 25, 2021 preliminary/detention hearing held for Ms. Eisenhart, in *United States v. Eisenhart*, Case No. 3:21-mj-2679 (M.D. Tenn.). The full Transcript can be provided upon request.
[4] The hearing had revealed that Ms. Eisenhart has never owned a passport or ever been outside of the United States.

government conceded that the evidence doesn't suggest or support a theory that Ms. Eisenhart was giving chase to these Capitol police officers. In fact, it doesn't support the contention that she even had any idea that those officers were there.").

To be clear, Judge Frensley at several points went out of his way to clarify that he was in no way condoning the activities of Ms. Eisenhart on January 6, calling the actions of the U.S. Capitol rioters that day "shocking" and "disturbing." E.g., Tr. at 160, 162. "But everything that Ms. Eisenhart did on January the 6th I can address through conditions of release. And that's what the law requires me to do. The law requires me to impose the least restrictive conditions that I can impose in order to reasonably assure her appearance at court proceedings and the safety of the community." Tr. at 160. His decision was a thoughtful and considered one:

> We witnessed an attack on the Capitol that many of us could never have imagined. The sight of confederate flags in the Capitol and antisemitic messaging is unthinkable. Understandably, people are angry and they're scared by what they saw. They feel like the rioters attacked our constitution and our democracy, and they rightfully want accountability for that.
>
> However, the time for accountability for that conduct is not what's before the Court…. [M]y decision to detain or not to detain is not to be based on whether or not I think Ms. Eisenhart is guilty of the crimes for which she has been accused….
>
> Protecting the rights of the accused is often difficult and unpopular. But when we disregard those rights based on anger and fear, we damage the very constitution and democracy that we seek to protect….
>
> Even as I talk about the events on January the 6th and what happened at the Capitol, I feel my own emotion in dealing with this issue. But that's why it's so important to make decisions based only on the law and the evidence….
>
> Based on the laws and the evidence in this case, the court finds that there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community.

Tr. at 162-63. Judge Frensley then authorized Ms. Eisenhart's release, but only under extremely stringent conditions – including several far exceeding standard conditions: requirements of home confinement and location monitoring, supervision by a third-party custodian (who had appeared in the court proceeding and committed to assume responsibility to report any bond violations), limits on travel to Washington, D.C. or any unauthorized travels outside the continental United States, and submission to psychiatric treatment as ordered by U.S. Pretrial Services.[5]

Following this decision, the Government asked for a three-day stay so that it could appeal. Ms. Eisenhart's counsel submitted that a stay until "Thursday at 1 o'clock is entirely too long," since "I don't think it's appropriate to keep Ms. Eisenhart incarcerated while that happens." Tr. at 169-70. The Court agreed that "a delay till Thursday is unnecessary, given the circumstances here," but granted the Government a stay "till 5 o'clock tomorrow." Tr. at 171.

That next day, the Government filed its Motion for Emergency Stay and for Review of Release Order in this Court. [Docket #6]. Ms. Eisenhart' Tennessee counsel advises that he did not see or learn of this pleading until after this Court had already issued the Order granting the Government's stay request.[6] The Motion also was not served on Ms. Eisenhart before the ruling. No counsel was appointed to Ms. Eisenhart in this District (where Mr. Farmer is not licensed to practice) to seek a hearing on this Emergency Motion or to otherwise help her respond.

This filing was thus, as a practical matter, an *ex parte* submission to the Court by the Government, against a Defendant unable to respond, directly or through any counsel, before a

---

[5] Judge Frensley also noted that his decision was "not an outlier in finding that release is appropriate" here – since other protesters – such as Larry Brock, "who was observed on the floor of the Senate with combat gear on, including a combat helmet, who was holding zip ties and who also made similar statements to those asserted by Ms. Eisenhart" – had similarly been granted pretrial release: Brock had been granted bail with special conditions by a federal judge in Texas, and "the government, to my knowledge, has not appealed that decision." Tr. 159-60.
[6] The original version of this filing stated that the Motion had not been emailed to Mr. Farmer until after this Court issued its Order. Mr. Farmer recently contacted undersigned counsel to clarify this – the Motion apparently was emailed to him shortly before the ruling, but he was apparently out of the office and did not see it until after its relieve had been granted. This description is corrected above. Undersigned counsel apologizes for the earlier error.

decision issued.  The Government's Motion also proffered arguments and factual claims not accepted (and in some instances rejected) by U.S. Magistrate Judge Frensley.[7]  Although Ms.

---

[7] In stark contrast to the Government's bullet-point listings submitted to this Court on p.5 of its Motion, here is what Magistrate Judge Frensley *actually* found, after hearing and carefully considering the evidence first-hand:

> According to the government, she had the motive, opportunity and means to fight on January the 6th; however, the evidence in this case suggests that she didn't do that.  She entered the Capitol unlawfully, but she didn't appear to fight her way into the Capitol, other than fighting her way through the crowd.  She walked through an unsecured door, past law enforcement, none of whom said to her to stop or turn around or not go in.  She went into the Capitol.  It appears clear from the video evidence that the Court's reviewed that there was no grand master plan that she was a part of in advance of that.
>
> The government's admitted they have no evidence of her making any plans to storm the Capitol before the circumstances and events of January the 6th.  There is no evidence or record of her having ever engaged in any prior conduct of a similar nature to that.
>
> While she was in the Capitol, there's conversation between her and her son at which point her son says, what's the plan here, what are you going to do, words to that effect….  If there had been a plan, then certainly there would be no need to have asked these questions.
>
> The possession of the zip ties seems to be clearly by chance.  Everyone's acknowledged that she didn't bring the zip ties into the Capitol.  She found them in the cabinet and took that from inside the Capitol itself.
>
> Her motives and intent with the zip ties are far from clear in this case.  The court's heard evidence contemporaneous with the events when speaking with other alleged insurgents that Ms. Eisenhart made the statements that she was just trying to keep them from bad people or words to that effect.
>
> She certainly didn't tell those insurgents that she had any intent to use those zip ties to capture or take hostage or take any other action against anybody, quite frankly.  And again, there's no evidence that in advance of having gone in there that that was her intention to do so….
>
> So the Court's not convinced that her picking up the zip ties is anything that's consistent with any sort of grand plan in advance to fight or die in this case.  Likewise, there's no evidence that she was engaged in any assaultive behavior while she was in the Capitol.  The Government concedes that they have no evidence at this time that she exercised physical violence against anyone, law enforcement, members of Congress, staff of the Congress, other insurgents or anyone for that matter….
>
> Similarly, the government suggested that Ms. Eisenhart and her son had or at least had access to weapons more dangerous than a Taser gun, but, again, rather than take those weapons that one might use to die and fight into the Capitol, Ms. Eisenhart and her son apparently left any weapons they had, other than the Taser gun, outside the Capitol.  This undercuts the government's suggestion of her stated intent. Tr. at 154-57.

7

Eisenhart's Tennessee counsel had filed a written Response brief, taking issue with similar factual assertions previously made by the Government, that filing (Exhibit A) was also never filed or referenced by the Government in this Court.

Without a hearing or appointment of counsel to Ms. Eisenhart, this Court granted the Government's emergency stay request. Ms. Eisenhart has now been detained ever since. Despite this Court's Transport Order directing that Ms. Eisenhart be transported to the District of Columbia for further proceedings in this matter "forthwith," Ms. Eisenhart has not been moved at all from the Kentucky federal contract jail that services the Middle District of Tennessee. She has remained in custody over a week since Judge Frensley determined that she should properly be freed on conditional release. No Court hearing in this District has yet been scheduled.

### A. The Stay Extending Ms. Eisenhart's Detention Violated Procedural Due Process

The circumstances surrounding the Government's demand for a stay of Ms. Eisenhart's release, and adoption of its proposed Orders, violated Ms. Eisenhart's procedural due process. And to the extent that its proposed Order relied on 18 U.S.C. § 3145(a)(1) for the purpose of obtaining a stay "until an appeal is resolved," it was unconstitutional as applied in this case.

Among the most fundamental aspects of due process in our criminal judicial system are basic principles of notice, the right to counsel, and an adversary system. All three were lacking in this context. The manner in which the Government's Motion was granted was deficient.

First, "notice" was practically nonexistent. The Motion for Emergency Stay and for Review of Release contains a Certificate of Service that does not *actually certify* any service, but instead merely states that "I *will* provide a copy … to the *Federal Public Defendant* [sic] in the Middle District of Tennessee, *which is currently representing the defendant in proceedings before that court*." (emphasis added). No date or time is even suggested therein for this future

service. And in reality, this referenced Federal Public Defender did not represent Ms. Eisenhart at all – since that office represented Eric Munchel instead. While it now appears that a copy of the motion was apparently emailed to Ms. Eisenhart's lawyer, Mr. Farmer, shortly before this Court's rulings issued, he did not see it until after this Court had issued its Orders, and in any event he had no authority to appear on her behalf anyway, in the District of Columbia. Ms. Eisenhart herself was also never served.

In civil jurisprudence, the need for emergency actions arises most frequently in the area of temporary restraining orders. Yet even in that far less constitutionally protected area, some fair notice is required: "The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if specific facts in an affidavit or a verified complaint clearly shows that immediate immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, *and* the movant's attorney *certifies in writing any efforts made to give notice and the reasons why it should not be required.*" Fed. R. Civ. P. 65(b)(1) (emphasis added). Here by contrast, no meaningful notice was provided to the defense side before the Government achieved its desired Order restraining Ms. Eisenhart's court-ordered liberty.

Because neither Ms. Eisenhart nor her Tennessee counsel saw this filing when made, she was also deprived of "counsel" on this motion. Even if he had seen it sooner, Mr. Farmer is not licensed to appear in D.C., and no one apparently attempted to inquire if Ms. Eisenhart wanted or should receive at that time similar appointed counsel in this District on this Motion before it got decided, despite her previously-demonstrated qualification for court-appointed counsel in

9

Tennessee – and the reality that any decision made on the Government's motion would obviously determine her immediate liberty for the foreseeable future.[8]

Finally, because of the limited notice and Ms. Eisenhart's lack of counsel in D.C., there was no "adversary" proceeding either. Instead, as a practical matter this Motion was presented by the Government on an *ex parte* basis. And it was apparently quickly decided in that manner as well, with the Court signing onto the Government's summary proposed Order, which makes no findings (much less clear and convincing ones) to justify Ms. Eisenhart's continued detention.

The aforementioned proceedings did not comport with procedural due process. In *United States v. Salerno*, 481 U.S. 739 (1987), the U.S. Supreme Court examined a challenge to the Bail Reform Act of 1984's provisions allowing pretrial detention "if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure … the safety of any other person and the community.'" *Id.* at 741. *Salerno* rejected the *facial* constitutional challenge raised in that case, but only because it noted how the Act "provides the arrestee with a number of procedural safeguards." *Id.* at 742:

> He may request the presence of counsel at the detention hearing, he may testify and present witnesses in his behalf, as well as proffer evidence, and he may cross-examine other witnesses appearing at the hearing. If the judicial officer finds that no conditions of pretrial release can reasonably assure the safety of other persons and the community, he must state his findings of fact in writing, and support his conclusion with "clear and convincing evidence. The judicial officer is not given unbridled discretion in making the detention determination…. And [s]hould a judicial officer order detention, the detainee is entitled to expedited appellate review of the detention order.

*Id.* at 742-43 (citations omitted).

---

[8] Undersigned counsel was not approached to represent Ms. Eisenhart until another five days passed, and he received an email on Sunday, January 31, requesting that he accept this CJA appointment. As soon as conflicts cleared, undersigned counsel entered an appearance on Monday, February 1, and he is now filing this motion at his first opportunity after acquainting himself with the necessary facts and background.

Significantly for our purposes here, the Supreme Court upheld the Bail Reform Act in *Salerno* only after pointedly noting how "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." The majority seemed to openly acknowledge "[t]he fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances," but found this "insufficient to render it wholly invalid." *Id.* at 745. *See also id.* at n.3 ("We intimate no view on the validity of any aspects of the Act that are not relevant to respondents' case. Nor have respondents claimed that the act is unconstitutional because of the way it was applied to the particular facts of their case."). Nevertheless, the Court noted its understanding, among other things, that "[t]he arrestee is entitled to a prompt detention hearing," *id.* at 747, that "[d]etainees have a right to counsel at the detention hearing," *id.* at 751, and that "[i]n a full-blown adversary proceeding, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person" *id.* at 750 (citations omitted on all).

In upholding the Bail Reform Act against a facial constitutional challenge, *Salerno* openly stressed that, "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception…. The numerous procedural safeguards detailed above must attend this adversary hearing." *Id.* Because Ms. Eisenhart *has now been detained for over a week of her life* as a result of this Court's Order granting a Stay, which was entered without several of these key foundational procedural safeguards outlined in *Salerno*, the Bail Reform Act's provisions, and 18 U.S.C. § 3145 in particular, have been applied to her in an unconstitutional manner, and the Order granting a Stay should be immediately rescinded.

### B. If the Stay is Not Rescinded, an Immediate Hearing Should be Held

Even if this Court's Order staying Ms. Eisenhart's release might somehow pass constitutional muster because of its presentment to the Court on an emergency basis (even though the Government had not satisfied even civil TRO standards), it is axiomatic that an Order entered under such limited process should be temporary, and that a hearing in which full due process would be afforded should be held as soon as possible, given Ms. Eisenhart's liberty interests. Perhaps recognizing this principle, the Transport Order issued by this Court instructed the U.S. Marshal's Service to "transport the defendant forthwith from the Middle District of Tennessee to the District of Columbia for further proceedings in this manner." [Docket #9]. But despite this "forthwith" directive, the reality is that Ms. Eisenhart has not been moved at all. Over a week later, she still remains in the very same jail as when that Transport Order issued.

Bureaucratic inertia is not a viable basis for detention. As *Salerno* noted, liberty is the norm; it is continued detention that must be justified. Ms. Eisenhart cannot fairly continue to be detained based on an *ex parte* Order issued without the findings of flight risk or dangerousness necessary to justify any extended period of detention. The expectations of imminency attendant to a person detained without bail while awaiting such findings – including those identified in *Salerno*, that "[t]he arrestee is entitled to a prompt detention hearing," and that "the detainee is entitled to expedited appellate review of the detention order" – must be honored. It is not acceptable for this defendant to simply sit in jail for days or even weeks awaiting transportation despite this Court's "forthwith" directive.

Nor is there any practical reason why this issue must await Ms. Eisenhart's physical transfer into the District of Columbia. During this COVID-19 pandemic, bail hearings in this District are regularly being conducted via videoconference rather than in the Courthouse itself, and the jail where Ms. Eisenhart is located offers videoconferencing options. Rather than

delaying Ms. Eisenhart's detention hearing further, undersigned counsel moves this Court to schedule an immediate hearing (at the first available opportunity) which could then be held via videoconference.  Ms. Eisenhart has informed undersigned counsel that she will consent to a remote detention hearing if she can participate via videoconference from her current jail facility. If such a hearing is scheduled, the U.S. Marshal's Service should be advised not to move Ms. Eisenhart from her current detention center until after this hearing has been completed.

Accordingly, and for the reasons set forth above, Ms. Eisenhart moves this Court to rescind its previous Order granting a stay of her pretrial release on conditions as directed by U.S. Magistrate Judge Frensley of the U.S. District Court for the Middle District of Tennessee.  If that stay is not rescinded, Ms. Eisenhart moves this Court for an immediate hearing on the merits of whether she should be granted pretrial release, with Ms. Eisenhart willing to participate via videoconference from her current jail, if that will accelerate the scheduling of such a hearing.

Dated   Washington, D.C.                     Respectfully submitted,
        February 4, 2021

                                             ___/s/  Gregory S. Smith_____
                                             Gregory S. Smith (D.C. Bar #472802)
                                             Law Offices of Gregory S. Smith
                                             913 East Capitol Street, S.E.
                                             Washington, D.C.  20003
                                             Telephone: (202) 460-3381
                                             Facsimile: (202) 330-5229
                                             Email: gregsmithlaw@verizon.net