UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

Case No. 1:21-cr-118-RCL

ERIC GAVELEK MUNCHEL and
LISA MARIE EISENHART,
*Defendants*.

## MEMORANDUM OPINION

On January 6, 2020, a large mob stormed and breached the United States Capitol. Shortly thereafter, the government charged defendants Eric Gavelek Munchel and Lisa Marie Eisenhart with offenses stemming from their alleged participation in the January 6 events. Both defendants were subsequently arrested in Nashville, Tennessee. Following separate hearings in the Middle District of Tennessee, a magistrate judge ordered both defendants released pending trial over the government's objections. The Court temporarily stayed the release orders, ordered the defendants transported to this District, and arraigned the defendants on a grand jury indictment. Now before the Court is the government's oral motion for pretrial detention.

For the reasons stated below, the Court concludes that no condition or combination of conditions of release will reasonably assure the safety of the community if it releases the defendants pending trial. Therefore, it will **GRANT** the government's motion and **ORDER** the defendants detained pending trial.

## I.   BACKGROUND

### A. Factual Background

Munchel is a thirty-year-old resident of Nashville. He is Eisenhart's son. He is currently unemployed, but previously worked for Brewhouse South and Kid Rock's Big Ass Honky Tonk and Rock 'N' Roll Steakhouse. Munchel has twice been convicted for possession of marijuana in

Georgia state courts. He once failed to appear in court during the proceedings in his most recent conviction, but Munchel's counsel represented—and the government accepted—that Munchel did not receive notice of the hearing and promptly corrected his omission. *See* Hr'g Tr. 83:2–8, 129:10–12, 148:24–149:2, No. 3:21-mj-2668 (M.D. Tenn. Jan. 22, 2021), ECF No. 19-1 ("Munchel Tr.).

Eisenhart is a fifty-six-year-old resident of Woodstock, Georgia. She is Munchel's mother. She works as a traveling nurse for Cross Country Nurses and has been employed as a nurse for approximately thirty years. Eisenhart has no criminal history.

### 1. Preparations

Angry over the 2020 Presidential election, Munchel and Eisenhart traveled to Washington, D.C. on January 4, 2021 to attend a "stop the steal" rally. Hr'g Tr. 64:16–19, No. 3:21-mj-2679 (M.D. Tenn. Jan. 25, 2021) ("Eisenhart Tr."). Munchel and Eisenhart have asserted that they decided to travel to Washington at the last moment, and the government has not refuted that assertion. Munchel Tr. 35:12–16p. They brought with them a pair of tactical vests, which can be worn over regular clothing to provide protection and carry items, *see* Eisenhart Tr. 54:6–22, and Munchel brought a taser and a knife, *id.* at 36:21–23 (taser); Munchel Tr. 109:12–15 (knife).

Munchel and Eisenhart arrived in Washington on January 5 and checked into a hotel. *See* Eisenhart Tr. 32:15–18. On the evening of January 5, Metropolitan Police officers stopped Munchel and inquired about the taser he was carrying in a holster; Munchel had a polite interaction with them, and they allowed him to keep his taser. Munchel Tr. 36:9–38:23; Munchel Ex. 2.

### 2. The Capitol Insurrection

On January 6, Munchel and Eisenhart attended President Trump's rally and then marched to the Capitol. *See* Munchel Tr. 39:4–40:13. Munchel and Eisenhart wore the tactical vests. *See*

Gov't Appeal Ex. 3, ECF No. 3 at 7.  Munchel carried a taser, holstered on his right hip.  Munchel

Tr. 26:13–20; *see also* Gov't Appeal Ex. 5, ECF No. 3 at 8.  He also wore an iPhone in his vest

and filmed a 50-minute long video on the device.  Munchel Tr. 40:19–41:14.

      As they approached the Capitol, Munchel and Eisenhart pushed through the crowd.  *See*

Munchel iPhone Video.  They met members of the Oath Keepers militia, and Munchel bumped

fists with one of the militiamen.  *See id.*  Eisenhart then told Munchel, "We're going straight to

federal prison if we go in there with weapons."  *See id.*  Munchel responded that he would not go

into the Capitol, but Eisenhart suggested that they stash "'em" in their backpacks.  *See id.*  Munchel

removed a fanny pack and put it in a tactical bag, which he stashed outside the Capitol.  *See id.*

Munchel admits that he stashed a knife *,see* Munchel Tr. 109:12–15; the reference to federal prison

and plural weapons suggests he may have put other, more dangerous, weapons in the bag as well.

And he kept his taser holstered on his hip.  Eisenhart Tr. 43:7–11.  Eisenhart then encouraged him

to enter the Capitol, saying "the [tear] gas isn't bad."  *See* Munchel iPhone Video.

      Having apparently partially disarmed themselves, Munchel and Eisenhart again pushed

towards the Capitol.  *See id.*  Eisenhart encouraged a man who claimed to have "punched two of

them in the face," telling him "[w]hile everyone else is on their couch, you guys are training, and

getting ready for it."  *See id.*  Munchel told another member of the crowd that he is "fucking ready

to fuck shit up" and that "we're not playing fucking nice no god damn more".  *See id.*  And when

Eisenhart heard a report that Congress was "shut down" by tear gas she exclaimed that "they got

tear-gassed, motherfuckers" and proclaimed it her "best day to know they got tear-gassed."  *See*

*id.*  In front of the Capitol, Munchel told Eisenhart that this is "probably the last time I'll be able

to enter the building with armor and . . . fucking weapons."  *See id.*

Munchel and Eisenhart breached the Capitol. *See id.* After they have been in the building for several minutes, they spotted plastic handcuffs. *See id.* Munchel shouts "Zip ties! I need to get me some of those motherfuckers." *See id.* Munchel and Eisenhart took a handful and carried the plastic handcuffs into the Senate gallery. *See id.* After leaving the gallery, Eisenhart told Munchel not to carry the plastic handcuffs, concluding that they "need[ed] to get them out of [their] hands." *See id.* Later, Munchel took some home with him to Tennessee. *See* Munchel Tr. 16:15– 17:5. While in the Capitol and after she left, Eisenhart claimed that she took the plastic handcuffs to keep them away from "bad actors." Eisenhart Tr. 46:1–7; *see* Munchel iPhone Video.

At one point, Munchel and Eisenhart entered the gallery above the Senate chamber. *See* Munchel iPhone Video. Both stepped over a railing that separated portions of the gallery. *See id.* Eisenhart chanted "Treason! Treason!" *Id.* And before he left the gallery, Munchel looked down at the dais and said, "I want that fucking gavel," referring to the Senate's priceless ivory artifact. *See id.*; *see also* U.S. Senate, *The Senate's New Gavel*, https://www.senate.gov/artandhistory/ history/minute/The_Senates_New_Gavel.htm. Munchel made no effort to steal the gavel. *See* Munchel iPhone Video.

As they moved through the Capitol, Munchel followed Eisenhart. *See* Munchel iPhone Video. He asked his mother what she hoped to accomplish while there. *See id.* And he eventually encouraged her to leave the Capitol. *See id.* But he never disapproved of her actions. Munchel Tr. 75:17–22.

The record contains no evidence indicating that, while inside the Capitol, Munchel or Eisenhart vandalized any property or physically harmed any person. *See* Munchel Tr. 45:3–8, 49:1–17; Eisenhart Tr. 35:6–15, 36:11–15.

**3. Aftermath**

After Munchel and Eisenhart left the Capitol, a Metropolitan Police officer stopped Munchel and seized his taser. Munchel Tr. 26:25–27:10.

In the aftermath of the insurrection, Munchel and Eisenhart boasted to the media. Eisenhart told *The Times* (of London) that:

> This country was founded on revolution. If they're going to take every legitimate means from us, and we can't even express ourselves on the internet, we won't even be able to speak freely, what is America for? I'd rather die as a 57-year-old woman than live under oppression. I'd rather die and would rather fight.

Laura Pullman, *Trump's Militias Say They Are Armed and Ready to Defend Their Freedoms*, *The Times* (of London) (Jan. 10, 2021), https://www.thetimes.co.uk/article/trumps-militias-say-they-are-armed-and-ready-to-defend-their-freedoms-8ht5m0j70. Munchel too justified the events of January 6, saying:

> We wanted to show that we're willing to rise up, band together and fight if necessary. Same as our forefathers, who established this country in 1776.
>
> . . .
>
> It was a kind of flexing of muscles. The intentions of going in were not to fight the police. The point of getting inside the building is to show them that we can, and we will.

*Id.*

Munchel and Eisenhart returned to Tennessee, and Eisenhart continued on to her home in Georgia. *See* Eisenhart Tr. 11:23–12:1.

Upon returning home, Munchel gave the iPhone he wore into the Capitol to a friend for safekeeping. Munchel Tr. 21:17–23:7. He also confirmed to the friend that he was the person pictured in an image of a man jumping a railing in the Senate gallery. *Id.* at 111:12–18; *see also* Gov't Appeal Ex. 1, ECF No. 3 at 6. Aware that he had been identified in social media posts

as a participant in the events at the Capitol, Munchel left his home and stayed with friends for several days.  Munchel Tr. 104:21–105:24.  He also deactivated his Facebook account.

On the morning of January 10, FBI agents executed a search warrant at the apartment Munchel shares with his brother.  Munchel Tr. 14:23–15:3, 15:15–18.  The agents found a tactical vest with patches matching the vest Munchel wore on January 6, "four or five" sets of plastic handcuffs, fifteen firearms (including a sniper rifle and multiple assault rifles), a drum magazine, and a large quantity of loaded magazines.  *Id.* at 16:9–19:10.  Munchel has a license to carry those weapons.  *Id.* at 65:4–23.

After Eisenhart became aware that she was the target of a criminal investigation, she spoke with a local FBI agent every day to determine whether a warrant had been issued for her arrest.  Eisenhart Tr. 56:11–19, 75:12–24.

**B. Procedural History**

Magistrate Judge G. Michael Harvey originally approved a complaint charging Munchel with entering a restricted building without lawful authority, *see* 18 U.S.C. § 1752(a), and violent entry on Capitol grounds, *see* 40 U.S.C. § 5104(e)(2).  On January 15, Magistrate Judge Zia M. Faruqui subsequently issued a new complaint charging both Munchel and Eisenhart with unlawful entry and violent entry in addition to civil disorder, *see* 18 U.S.C. § 231(a)(3), and conspiracy, *see* 18 U.S.C. § 371.  And, on February 12, a grand jury returned an indictment charging Munchel and Eisenhart with obstruction of an official proceeding, *see* 18 U.S.C. §§ 1512(c)(2), (k), unlawful entry, violent entry, and aiding and abetting violent entry, *see* 18 U.S.C. § 2.

Munchel surrendered to the FBI in Tennessee, which arrested him on a warrant supported by the first complaint.  After Munchel's arrest, the government sought pretrial detention of Munchel.  Magistrate Judge Jeffrey S. Frensley denied the motion and released Munchel subject

to a number of conditions. *See* Order Setting Conditions of Release, No. 3:21-mj-2668 (M.D. Tenn. Jan. 22, 2021) (restricting travel, prohibiting possession of firearms and contact with co-defendants, requiring weekly contact with pretrial services, imposing home detention, and imposing other conditions). Relying on Munchel's voluntary surrender to the FBI and limited criminal history, Judge Frensley held that Munchel did not pose a flight risk. *See* Munchel Tr. 175:20–178:3. Concluding that Munchel was not violent and that he "respected" law enforcement, Judge Frensley also held that Munchel did not pose an unmitigable threat to the community. *See id.* at 181:12–182:21.

Eisenhart surrendered to the FBI in Tennessee, which arrested her on a warrant supported by the second complaint. The government also sought pretrial detention of Eisenhart. Judge Frensley again denied the motion and conditionally released Eisenhart. *See* Order Setting Conditions of Release, No. 3:21-mj-2679 (M.D. Tenn. Jan. 25, 2021) (restricting travel, prohibiting possession of firearms and contact with co-defendants, requiring weekly contact with pretrial services, imposing home detention, and imposing other conditions). Based on Eisenhart's lack of criminal history, her pre-arrest contact with the FBI, and her self-surrender to the FBI, Judge Frensley concluded that Eisenhart did not pose a flight risk. *See* Eisenhart Tr. 151:14–152:20. Judge Frensley also held that the government did not meet its burden to show that Eisenhart posed a danger to the community. *See id.* at 161:18–21.

Judge Frensley briefly stayed each of his release orders, *see id.* at 171:17–20; Munchel Tr. at 198:24–199:4, and the government promptly appealed both orders, *see* ECF Nos. 3, 6. Chief Judge Beryl A. Howell stayed both release orders pending appeal, *see* ECF Nos. 4, 7, and ordered both defendants transported to this District, ECF Nos. 5, 8, 9. Chief Judge Howell granted the

government's motions almost immediately after they were filed, so the defendants did not have the opportunity to file oppositions to the government's stay motions in this Court.

COVID-19-related complications slowed the defendants' transportation to this District. *See* Status Report ¶ 11, ECF No. 17. Eisenhart moved to rescind the stay or to conduct an immediate review of her detention. Munchel moved to join that motion.

Finally, on February 17, the Court arraigned the defendants on the indictment, and the government made a new oral motion for pre-trial detention.

## II.   LEGAL STANDARD

The government may seek pretrial detention in one of two scenarios. First, the government may seek pretrial detention if the case involves any of an enumerated set of offenses, including a crime of violence or a felony that involves use of a dangerous weapon.[1] 18 U.S.C. § 3142(f)(1). Second, the government may seek pretrial detention if the case involves serious risk of flight, obstruction of justice, or witness intimidation. 18 U.S.C. § 3142(f)(2).

If pretrial detention is available, the judicial officer shall, upon a motion of the government, hold a hearing to determine whether there are any conditions or combinations of conditions that will reasonably assure the appearance of the defendant as required and the safety of any person in the community. *Id.* at § 3142(f)(1). After the hearing, a "judicial officer shall order the pretrial release of the [defendant] . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the [defendant] as required or will endanger the safety of any other person in the community." 18 U.S.C. § 3142(b); *see id.* at § 3142(e)(1).

---

[1] In determining whether an offense is a crime of violence, courts look to the elements of the offense, not the real-world conduct. *United States v. Singleton*, 182 F.3d 7, 11 (D.C. Cir. 1999).

To determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the judicial officer shall consider four factors: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).  A finding that a defendant poses a risk of flight must be supported by a preponderance of the evidence.  *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).  And a finding that a defendant poses a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(e) (flush language).

If a defendant is ordered released, the government may file a motion for revocation of the order with the court having original jurisdiction over the offense. 18 U.S.C. § 3145(a).  The court having original jurisdiction over the offense shall promptly decide the motion.  *Id.*  Its review of the magistrate judge's order of release is de novo.  *United States v. Little*, 235 F. Supp. 3d 272, 277 (D.D.C. 2017).  Furthermore, the reviewing court has discretion to call witnesses, review transcripts, or proceed by proffer.  *Id.*

## III.    DISCUSSION AND FINDINGS

### A. Detention of Eric Gavelek Munchel

#### 1.  Subject to Detention

Because the indictment alleges that Munchel carried a dangerous weapon while committing the alleged offenses, each of the counts charged is a felony.  *See* 18 U.S.C. §§ 1512(c), 1752(a)–

(b); 40 U.S.C. §§ 5104(e)(1), (2); *see also* 40 U.S.C. § 5109(a).  Therefore, the government may seek Munchel's pretrial detention.[2]  *See* 18 U.S.C. § 3142(f)(1).

## 2.  Risk of Flight

Munchel's risk of flight is minimal.  He does not have a passport or the financial means to flee the country.  Munchel Tr. 148:21–24.  And he voluntarily surrendered to the FBI in Nashville.  *Id.* at 70:20–22.  While Munchel faces a potentially lengthy sentence—under both statutory maxima and the sentencing guidelines—if convicted, that fact alone does not render him a flight risk.  *See United States v. Hanson*, 613 F. Supp. 2d 85, 90–91 (D.D.C. 2009) (releasing defendant despite twenty-year maximum sentence).

The government argues that Munchel briefly took actions consistent with attempted flight or obstruction when he left his home to stay with friends and turned his cell phone over to a friend.  But Munchel has offered plausible explanations for those actions.  *See* Munchel Tr. 104:3–17 (describing unwanted media attention and doxing); Munchel Ex. 4.  And his voluntary surrender after these events is telling.

Accordingly, the government has not established that Munchel is a flight risk.

## 3.  Safety of Others and the Community

In determining the risk a defendant poses to others and the community, the Court must consider four factors.

### *(i)  Nature and Circumstances of the Charged Offense*

The grand jury charged Munchel with grave offenses.  In charging Munchel with "forcibly enter[ing] and remain[ing] in the Capitol to stop, delay, and hinder Congress's certification of the

---

[2] None of the offenses is a crime of violence because none of the offenses requires as an element physical force.  *See* 18 U.S.C. § 16.

Electoral College vote," Indictment 1, ECF No. 21, the grand jury alleged that Munchel used force to subvert a democratic election and arrest the peaceful transfer of power.  Such conduct threatens the republic itself.  *See* George Washington, Farewell Address (Sept. 19, 1796) ("The very idea of the power and the right of the people to establish government presupposes the duty of every individual to obey the established government.  All obstructions to the execution of the laws, all combinations and associations, under whatever plausible character, with the real design to direct, control, counteract, or awe the regular deliberation and action of the constituted authorities, are destructive of this fundamental principle, and of fatal tendency.").  Indeed, few offenses are more threatening to our way of life.

Munchel's alleged conduct demonstrates a flagrant disregard for the rule of law.  Munchel is alleged to have taken part in a mob, which displaced the elected legislature in an effort to subvert our constitutional government and the will of more than 81 million voters.  Munchel's alleged conduct indicates that he is willing to use force to promote his political ends.  Such conduct poses a clear risk to the community.

Defense counsel's portrayal of the alleged offenses as mere trespassing or civil disobedience is both unpersuasive and detached from reality.  First, Munchel's alleged conduct carried great potential for violence.  Munchel went into the Capitol armed with a taser.  He carried plastic handcuffs.  He threatened to "break" anyone who vandalized the Capitol.[3]  These were not peaceful acts.  Second, Munchel's alleged conduct occurred while Congress was finalizing the results of a Presidential election.   Storming the Capitol to disrupt the counting of electoral votes is not the akin to a peaceful sit-in.

---

[3] While Munchel's desire to prevent vandalism may be beneficial, his willingness to threaten violence evinces violent behavior.

For those reasons, the nature and circumstances of the charged offenses strongly support a finding that no conditions of release would protect the community.

### (ii) Weight of the Evidence

Substantial evidence supports the government's arguments that Munchel poses a threat to the community.  Munchel's words and actions both inside and outside the Capitol were captured on film by Munchel himself.   *See* Munchel iPhone Video.  That video captured, in real time, Munchel's aggressive language while approaching the Capitol and once inside, as well as his unrepentant statements once he left. *See* Pullman, *supra*.  While the government and Munchel may quibble about how to interpret the evidence, Munchel cannot dispute that these events indeed occurred.

The weight of the evidence thus strongly supports a finding that no conditions of release would protect the community.

### (iii) History and Characteristics

Munchel has a limited criminal history—two minor drug convictions—and no history of violence.  There is also no evidence that Munchel is a member of any violent groups, thought the government has presented evidence that Munchel was in contact with a member of the Proud Boys after January 6 and was interested in joining the group.  *See* Signal Chat Tr. (Jan. 9–10, 2021).

Munchel's history and characteristics slightly weigh against a finding that no conditions of release would protect the community.

### (iv) Danger to the Community

Munchel's words and actions evince a serious threat to the community.

Munchel gleefully entered the Capitol in the midst of a riot.  He did so, the grand jury alleges, to stop or delay the peaceful transfer of power.  And he did so carrying a dangerous

weapon.  Munchel took these actions in front of hundreds of police officers, indicating that he cannot be deterred easily.

Moreover, after the riots, Munchel indicated that he was willing to undertake such actions again.  He compared himself—and the other insurrectionists—to the revolutionaries of 1776, indicating that he believes that violent revolt is appropriate.  *See* Pullman, *supra*.  And he said "[t]he point of getting inside the building is to show them that we can, and we will."  *Id.*  That statement, particularly its final clause, connotes a willingness to engage in such behavior again.

By word and deed, Munchel has supported the violent overthrow of the United States government.  He poses a clear danger to our republic.

The potential danger Munchel poses to the community strongly supports a finding that no conditions of release would protect the community.

### 4.  Potential Release Conditions

All of the release conditions available to the Court depend—at least in part—on voluntary compliance.  A determined defendant can cut off an ankle monitor, ignore travel restrictions, elude a third-party custodian, unlawfully rearm, and endanger his community.

Given Munchel's brazen actions in front of hundreds of law enforcement officers and manifest disrespect for the rule of law, the Court is not satisfied that Munchel would comply with any release conditions.  Munchel has indicated that he would be willing to act against Congress again, and nothing short of pretrial detention can prevent him from doing so.

* * *

The Court finds that the nature and character of the charged offenses, the weight of the evidence, and the danger Munchel poses to the community weigh strongly in favor of pretrial detention. The Court further finds that Munchel's history and characteristics slightly weigh against

pretrial detention.  On balance, the Court concludes that no release conditions it could set would reasonably assure the safety of the community if it were to release Munchel.  Therefore, the Court must order Munchel's detention pending trial.

### B.  Detention of Lisa Marie Eisenhart

#### 1.  Subject to Detention

The indictment alleges that Munchel carried a dangerous weapon while committing the alleged felonies.  *See* 18 U.S.C. §§ 1512(c), 1752(a)–(b); 40 U.S.C. §§ 5104(e)(1), (2); *see also* 40 U.S.C. § 5109(a).  The indictment also alleges that Eisenhart aided and abetted Munchel in unlawfully entering and violently entering the Capitol while carrying a dangerous weapon. Indictment 2.  Because a person who aids or abets an offense is liable as if she were a principal, *see* 18 U.S.C. § 2, Eisenhart's case includes felonies involving the use of dangerous weapons, *cf. United States v. Lee*, 206 F. Supp. 3d 103, 111 (D.D.C. 2016).  Therefore, the government may seek Eisenhart's pretrial detention.  *See* 18 U.S.C. § 3142(f)(1).

#### 2.  Risk of Flight

Eisenhart's risk of flight is minimal.  She does not have a passport or the financial means to flee the country.  *See* Eisenhart Tr. 75:3.  Once she was aware that she was a suspect, she contacted the FBI every day to determine whether she should self-surrender.  *Id.* at 75:12–24.  And once the Court issued a warrant, she surrendered immediately.  *Id.*

While Eisenhart faces a potentially lengthy sentence—under both statutory maxima and the sentencing guidelines—if convicted, that fact alone does not render her a flight risk.  *See Hanson*, 613 F. Supp. 2d at 90–91.  And the government offers no other colorable reason to believe Eisenhart will flee.

Accordingly, the government has not established that Eisenhart is a flight risk.

### 3.  Safety of Others and the Community

In determining the risk a defendant poses to others and the community, the Court weighs four factors.

#### (i)  Nature and Circumstances of the Charged Offense

Eisenhart is charged with the same conduct as Munchel or with aiding and abetting that conduct, subjecting her to the same liability. *See* 18 U.S.C. § 2. Her charged offenses are therefore just as grave. Thus, for the same reasons as explained with respect to Munchel, the nature and circumstances of the charged offenses strongly support a finding that no conditions of release would protect the community.

#### (ii)  Weight of the Evidence

Just as with Munchel, substantial evidence supports the government's argument's about Eisenhart's conduct and of the threat she poses to the community. The best evidence of her conduct is Munchel's video. *See* Munchel iPhone Video. The best evidence of the threat she poses to the community are the unrepentant statements she gave following the assault on the Capitol. *See* Pullman, *supra.* While the government and Eisenhart may quibble about how to interpret the evidence, just as with Munchel, the evidence itself is largely uncontested.

The weight of the evidence strongly supports a finding that no conditions of release would protect the community.

#### (iii)History and Characteristics

Eisenhart has no limited criminal history and no history of violence. There is also no evidence that Eisenhart is a member of any violent groups.

Eisenhart's history and characteristics weigh against a finding that no conditions of release would protect the community.

*(iv) Danger to the Community*

Eisenhart's words and actions evince a serious threat to the community.

Eisenhart gleefully entered the Capitol in the midst of a riot.  She did so, the grand jury alleges, to stop or delay the peaceful transfer of power.  And she did so accompanying her son, who was carrying a dangerous weapon.  Eisenhart took these actions in front of hundreds of police officers, indicating that he cannot be deterred easily.

Moreover, after the riots, Eisenhart indicated that she was willing to undertake such actions again.  Her words were chilling:

> This country was founded on revolution.  If they're going to take every legitimate means from us, and we can't even express ourselves on the internet, we won't even be able to speak freely, what is America for?  I'd rather die as a 57-year-old woman than live under oppression.  I'd rather die and would rather fight.

Pullman, *supra*.  The Court takes Eisenhart at her word.  She, like her son, invoked the American Revolution, indicating support for violent revolt.  In fact, she even indicated that she was willing to give her life in support of her cause.  Thus, Eisenhart too has indicated that she is willing to repeat her behavior.

By word and deed, Eisenhart has supported the violent overthrow of the United States government.  As a self-avowed, would-be martyr, she poses a clear danger to our republic.

The potential danger Eisenhart poses to the community strongly supports a finding that no conditions of release would protect the community.

### 4.  Potential Release Conditions

For the same reasons as with her son, no release conditions can ensure that Eisenhart would not pose a danger to the community.  Indeed, Eisenhart's willingness to die for her cause indicates that release conditions may be even less effective for her.  If Eisenhart does not fear the ultimate consequence, the consequences for disobeying release conditions are unlikely to deter her.

16

* * *

The Court finds that the nature and character of the charged offenses, the weight of the evidence, and the danger Eisenhart poses to the community weigh strongly in favor of pretrial detention. The Court further finds that Eisenhart's history and characteristics weigh against pretrial detention. Having considered the relevant factors, the Court concludes that no release conditions it could set would reasonably assure the safety of the community if it were to release Eisenhart. Therefore, the Court concludes that it must detain Eisenhart pending trial.

## IV.   CONCLUSION

Based on the foregoing, by separate order the Court will **GRANT** the government's detention motion and **ORDER** the defendants detained pending trial.

Date:   2/17/21

Royce C. Lamberth
United States District Judge