1

1          UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF TENNESSEE
2                NASHVILLE DIVISION

3

4    UNITED STATES OF AMERICA      )
                                   )
5    VS                            )   No. 3:21-mj-2679
                                   )
6    LISA EISENHART                )
     _____

7

8        BEFORE THE HONORABLE JEFFERY S. FRENSLEY,

9                  MAGISTRATE JUDGE

10       **TRANSCRIPT OF ELECTRONIC RECORDING**

11               (via video conference)

12               January 25, 2021

13   _____

14   APPEARANCES:

15   For the Government:      JOSEPH KURTZMAN
                              U.S. Attorney's Office
16                            110 Ninth Ave S., Suite A961
                              Nashville, TN 37203
17

18   For the Defendant:      JONATHAN FARMER
                              Bone, McAllester & Norton
19                            511 Union Street, Ste 1000
                              Nashville, TN 37219
20

21   _____

22   PREPARED FROM **ELECTRONIC RECORDING** BY:

23   **Roxann Harkins, RPR, CRR**
     Official Court Reporter
24   801 Broadway, Suite A837
     Nashville, TN 37203
25   615.403.8314.
     roxann_harkins@tnmd.uscourts.gov

2

**I N D E X**

Government witness

**ANGELO DEFEO**

Direct Examination By Mr. Kurtzman ..................6
Cross-Examination By Mr. Farmer .....................28
Redirect Examination By Mr. Kurtzman ...............57

Defense witness

**DEFENSE WITNESS NO. 1**

Direct Examination By Mr. Farmer ...................72
Cross-Examination By Mr. Kurtzman ..................77


**E X H I B I T S**

Government No. 1....Joint complaint ...............10
Government No. 2....Article from The ..............14
        Tennessean
Government No. 3....(SEALED) .....................16
        50-minute video


Defense No. 1....(SEALED)Third party ..............70
        custodian affidavit
Defense No. 2....Twitter feed ....................70

3

1

2          The above-styled cause came to be heard

3   on January 25, 2021, before the Hon. Jeffery S.

4   Frensley, Magistrate Judge, when the following

5   proceedings were had to-wit:

6          **TRANSCRIPT OF ELECTRONIC RECORDING**

7                        **\*\*\***

8

9          THE COURT:  Good afternoon.  Welcome,

10  everyone.  Good afternoon.  We're here this afternoon

11  in the matter of the *United States of America versus*

12  *Lisa Eisenhart*.  It's Case No. 3:21-mj-2679.

13  Ms. Eisenhart's appearing this afternoon for a

14  preliminary hearing and detention hearing on this

15  out-of-district criminal complaint from the District

16  of Columbia.  The number in the District of Columbia

17  is 1:21-mj-71.

18          We have on the line by video conference

19  Ms. Eisenhart participating by video, along with her

20  attorney, Mr. Jonathan Farmer.  Mr. Kurtzman's here

21  for the United States.  Mr. Kurtzman, do you have any

22  other folks with you today on behalf of the

23  government?

24          MR. KURTZMAN:  Your Honor, FBI Special

25  Agent Angelo Defeo, as well as (indiscernible) from my

4

1    office.

2              THE COURT:  All right, very good.  Thank

3    you.  I believe we also have Mr. Murphy on from the

4    pretrial services office as well.

5              Before we go any further, as I mentioned,

6    we're conducting this proceeding today by video

7    conference.  I'd like to ask Mr. Farmer, did you have

8    a chance to speak with your client in advance of this

9    proceeding, specifically did you-all discuss

10   proceeding by video conference and does she consent to

11   do so today?

12             MR. FARMER:  We did -- we did discuss

13   that, Your Honor, and she does so consent.

14             THE COURT:  All right, very good.  Thank

15   you, Mr. Farmer.  Mr. Farmer, are you prepared to go

16   forward at this time?

17             MR. FARMER:  I am, Your Honor.

18             THE COURT:  And Mr. Farmer, just so the

19   record's clear, tell me what we're going forward on

20   today.

21             MR. FARMER:  So we are -- and I

22   referenced this in my pleading that I filed this

23   morning.  We are waiving the issue as to identity,

24   going forward on the issue of preliminary hearing and

25   detention.

5

1            THE COURT:  All right, very good.  Thank

2   you.  Is the government prepared to go forward,

3   Mr. Kurtzman?

4            MR. KURTZMAN:  Yes, Your Honor.  If it

5   pleases the Court, we'll present evidence related to

6   both the preliminary hearing and the detention hearing

7   simultaneously as to expedite the process.

8            THE COURT:  All right, very good.  So

9   we'll go forward on the preliminary hearing and

10   detention hearing today in this matter.  And the

11   parties are present and ready to go forward.

12            Before we begin, the Court's in receipt

13   of the Pretrial Services Report, which I have

14   reviewed.  I assume you each have received a copy of

15   the report and you'll be able to keep your report

16   after the completion of these proceedings.

17            Mr. Kurtzman, would you like to call your

18   first witness, please.

19            MR. KURTZMAN:  Yes, Your Honor.  Before I

20   do so, did the Court receive the government's three

21   exhibits previously submitted by email and delivery?

22            THE COURT:  Yes, thank you very much, we

23   did.  Mr. Farmer, you received a copy of those as

24   well?

25            MR. FARMER:  I did, Your Honor, yes.

6

1          THE COURT:  All right, very good.  Thank

2   you very much.

3          MR. KURTZMAN:  Your Honor, I'm going to

4   move off screen and call FBI Special Agent Angelo

5   Defeo as my first witness.

6          THE COURT:  Thank you, Mr. Kurtzman.

7          Good afternoon, Special Agent.

8                    **ANGELO DEFEO**

9   called as a witness, after having been first duly

10  sworn, testified as follows:

11         THE COURT:  Very good.  If you'd please

12  state your name and spell it for the record, please.

13         THE WITNESS:  Angelo Defeo.  A-n-g-e-l-o,

14  D-e-f-e-o.

15         THE COURT:  All right, very good.

16  Mr. Kurtzman, you can begin.

17         MR. KURTZMAN:  Thank you, Your Honor.

18                 **DIRECT EXAMINATION**

19  BY MR. KURTZMAN:

20      Q.    Agent Defeo, how are you currently

21  employed?

22      A.    Federal Bureau of Investigation,

23  Nashville resident agency.

24      Q.    (indiscernible) with the FBI?

25      A.    We investigate primarily domestic

7

1    terrorism and acts of violence.

2         Q.    How long have you been with the Nashville

3    office?

4         A.    May of 2020.

5         Q.    Is this your first assignment for the

6    FBI?

7         A.    No.

8         Q.    Where have you previously been assigned?

9         A.    I was previously assigned to the Chicago

10   field office.

11        Q.    And were you investigating the same sorts

12   of crimes there?

13        A.    Yes.

14        Q.    How long (indiscernible)?

15        A.    Four years.

16        Q.    Do you have any law enforcement

17   experience prior to your years in Chicago?

18        A.    Yes, I was a --

19             MR. FARMER:  Your Honor, I don't mean to

20   jump in.  It looks like Ms. Eisenhart is saying she's

21   having trouble hearing.  It's a little choppy for me

22   as well.  I can't make it out.

23             THE DEFENDANT:  It's far away and really

24   quiet and choppy.

25             THE COURT:  Yeah, I'm having the same

8

1    issue with that, Mr. Kurtzman.  If you-all could try

2    to maybe get a little closer to the -- to the

3    microphone, please.

4              MR. KURTZMAN:  Your Honor, is this

5    better?

6              THE COURT:  Yeah, I think so.  That

7    sounds better for me at this point, at least.

8              MR. KURTZMAN:  Thank you, Your Honor.

9    BY MR. KURTZMAN:

10         Q.    The last question I asked Agent Defeo was

11   if he had any law enforcement experience prior to his

12   four years in Chicago.  So, Agent Defeo, could you

13   respond to that question?

14         A.    Yes, I was a United States probation

15   officer for the Southern District of Iowa for

16   approximately four years prior to the FBI.

17         Q.    You said your focus both in Chicago and

18   here is investigating domestic terrorism.  Can you

19   define for the Court, based on your experience, what

20   domestic terrorism is?

21         A.    Actually committing any type of violent

22   act or obstruction in furtherance of a personal

23   ideology.

24         Q.    And in your experience, how do

25   individuals become involved in domestic terror?

9

1          A.     Some type of radicalization process where

2     the individual starts to, either through the Internet

3     or other individuals, researching the information and

4     then it becomes more and more of a self-consuming

5     attitude, feeling, and then it just kind of drives

6     them to what we consider to be are a radicalized

7     behavior.

8          Q.     In your role as an FBI special agent,

9     were you involved in the investigation of the invasion

10    of the United States Capitol that occurred on

11    January 6 of this year?

12         A.     Yes.

13         Q.     All right.  And in your role in that

14    investigation, did you become aware of the defendant

15    in this case?

16         A.     Yes, I did.

17         Q.     How did that occur?

18         A.     Through the investigation we identified

19    Eric Munchel as one of the individuals who was seen

20    inside the Capitol, along with his mother, Lisa

21    Eisenhart, as being one of the other individuals

22    identified inside the Capitol building.

23         Q.     And in the course of the investigation,

24    did you -- were you able to determine when the

25    defendant traveled to Washington?

10

1          A.     Yeah.

2          Q.     When did that occur?

3          A.     January -- I believe it was January 4.

4          Q.     Do you recall when -- did the

5     investigation reveal when she left the Capitol?

6          A.     Yes, our investigation revealed that she

7     returned January 7.

8          Q.     In your role of working on this case,

9     have you reviewed the joint complaint that was filed

10    against the defendant herself?

11         A.     Yes.

12         Q.     And based on your working knowledge of

13    the investigation, can you adopt the factual

14    assertions that are contained in that joint complaint?

15         A.     Yes.

16                MR. KURTZMAN:  Your Honor, that joint

17    complaint was provided to -- to the Court and defense

18    counsel and also marked as Exhibit A.  The government

19    would at this point move to admit that exhibit.

20                THE COURT:  All right.  It will be

21    admitted as Exhibit 1.

22                (Government Exhibit No. 1 was admitted.)

23                MR. KURTZMAN:  Thank you, Your Honor.

24    BY MR. KURTZMAN:

25         Q.     Agent Defeo, you said you were able to

11

1    identify and confirm the identity of the defendant
2    through the use of pictures.  Do you see in the video
3    hearing the defendant, Ms. Eisenhart, here today?
4          A.    Yes, I do.
5          Q.    Can you identify her for the Court?
6          A.    Yes, she's wearing glasses on the screen
7    in the top right corner of my screen (indiscernible)
8    blue shirt.
9          Q.    Is that the same individual that you
10   observed in the photos from the Capitol?
11         A.    Yes.
12         Q.    And is that the same individual you
13   observed in the video marked as Government's
14   Exhibit C?
15         A.    Yes.
16         Q.    During the course of your investigation
17   after you realized that the defendant had returned to
18   Nashville, did you interview other witnesses who had
19   not accompanied her to the Capitol?
20         A.    Yes, I did.
21         Q.    And did any of those witnesses make
22   statements about her whereabouts?
23         A.    They indicated that Ms. Eisenhart had
24   left Nashville and returned to -- what wound up being
25   Georgia the day after January 7.  So I guess

12

1   January 8.

2   Q.   And did any of these witnesses make any

3   statements regarding the defendant's feelings about

4   the outcome of the 2020 presidential election?

5   A.   Yes.  Witness 1 indicated that she was

6   very -- Ms. Eisenhart was very upset with the outcome

7   of the 2020 election.

8   Q.   Was it both in this witness's opinion or

9   in your -- in what you learned during the

10  investigation, was that what motivated the defendant

11  to travel to Washington, DC?

12  A.   Yes.

13  Q.   Agent Defeo, in advance of this hearing,

14  the government filed a detention -- or, excuse me, a

15  motion for detention, as well as a memorandum in

16  support.  Have you reviewed the contents of the

17  memorandum in support of the detention motion?

18  A.   Yes, I have.

19  Q.   And you've also reviewed the video taken

20  by defendant Eric Munchel from his cell phone; is that

21  correct?

22  A.   That's correct.

23  Q.   Did the government's memorandum in

24  support of its detention motion accurately describe

25  the events depicted in that video?

1          A.     Yes.

2          Q.     And you and I have spoken -- have you

3     reviewed the factual assertions in that memo on

4     page 17 through 20?

5          A.     Yes, I have.

6          Q.     And within those pages, are there

7     photographs of the defendant here today, as well as

8     her son?

9          A.     Yes.

10         Q.     And within those pages that I just

11    mentioned, 17 through 20, there are quotations made by

12    either defendant Munchel or Ms. Eisenhart; is that

13    correct?

14         A.     That is correct.

15         Q.     Does that memorandum fairly and

16    accurately summarize the statements they gave on that

17    video?

18         A.     Yes, it does.

19              MR. KURTZMAN:  Your Honor, I just would

20    note for the record that Agent Defeo has adopted the

21    factual assertions contained in the government's

22    memorandum in support of its detention motion made on

23    pages 17 through 20.

24              THE COURT:  All right, thank you.  It

25    will be noted.

14

BY MR. KURTZMAN:

    Q.    Agent Defeo, I'm passing you an article from *The Tennessean* which has been provided to the Court and defense counsel as Government's Exhibit 2. Are you familiar with that article?

    A.    Yes, I am.

    Q.    How are you familiar?

    A.    (indiscernible).

    Q.    Are you familiar with the statements made, allegedly made by the defendant in that article?

    A.    Yes.

    Q.    At any point has anyone discounted or refuted that the defendant was, in fact, interviewed as indicated in that article?

    A.    Not to my knowledge.

    MR. KURTZMAN:  Your Honor, at this time the government would move to -- would move to admit Exhibit 2 into evidence.

    THE COURT:  All right.  It will be admitted.

    (Government Exhibit No. 2 was admitted.)

BY MR. KURTZMAN:

    Q.    Agent Defeo, moments ago we were discussing the government's memorandum in support and that it summarized the contents of about a 50-minute

1   video taken by defendant Munchel.  You've reviewed

2   that video?

3           A.    Yes, I have.

4           Q.    And that video was obtained from

5   Mr. Munchel's phone?

6           A.    Yes, it was.

7           Q.    And is it fair to say that that video

8   depicts the defendant Ms. Eisenhart and her son, both

9   in the events leading up to and including her entrance

10  into the Capitol?

11          A.    Yes, it does.

12          MR. KURTZMAN:  Your Honor, the government

13  would move what's previously been provided to the

14  Court and defense counsel, the video exhibit, as

15  Exhibit 3.

16          THE COURT:  Bear with me just a second.

17  Okay.  It will be admitted.  Mr. Kurtzman, let me ask,

18  does this video -- I apologize, I may have just missed

19  the testimony.  Is this video the entirety of the

20  video or is it portions of the video?

21          MR. KURTZMAN:  Your Honor, it is at least

22  what the government understands is the entirety of a

23  50-minute video.

24          THE COURT:  Okay.

25          MR. KURTZMAN:  It is not -- it is not

16

1    clipped in any way by the government.

2             THE COURT:  Okay, thank you.  It will be

3    admitted.

4             (Government Exhibit No. 3 was admitted

5    under seal.)

6    BY MR. KURTZMAN:

7         Q.    Agent Defeo, in your review of the video

8    admitted as Exhibit 3, do you hear the phrase "the

9    line is broken" at a certain point?

10        A.    Yes.

11        Q.    And what did you understand that to mean

12   when the defendant and her son uses "the line is

13   broken?"

14        A.    It indicated to me that either law

15   enforcement or physical barriers had been breached and

16   individuals were now able to get into the Capitol

17   building.

18        Q.    And what did the defendant and her son do

19   once hearing that the line was broken?

20        A.    They moved forward quickly trying to get

21   up the stairs, what appeared to be move towards gain

22   entrance of the Capitol building.

23        Q.    Okay.  And as they're doing that, does

24   the defendant and her son discuss -- do they discuss

25   weapons at any point?

17

1          A.    Yes.

2          Q.    And what's the substance of that

3    discussion?

4          A.    In the video they discuss the fact that

5    they have weapons on them and that they should not

6    enter the US Capitol with weapons.  So they make an

7    effort to return, put them back in the bag or bags,

8    and they go back and return whatever weapons they are

9    indicating back to a bag of some sort.

10         You cannot tell distinctly from the

11   video, but they do retreat for a moment or two to put

12   things, what they consider to be weapons, back in a

13   bag.

14         Q.    All right.  Mr. Munchel maintained his

15   Taser on him; correct?

16         A.    Correct.

17         Q.    So whatever weapons they were putting

18   back were something greater than a Taser?

19         A.    (indiscernible).

20         Q.    And had --

21         MR. FARMER:  Your Honor, I'll object to

22   that.  That lacks foundation.

23         THE COURT:  Yeah, there's no foundation,

24   Mr. Kurtzman.  If you want to ask some more about

25   that, you can, but he can't testify to what that

18

1    meant.

2                    MR. KURTZMAN:  That's fine, Your Honor.

3    I think we can come at it a different way.

4                    THE COURT:  Sure.  Thank you.

5    BY MR. KURTZMAN:

6        Q.    Agent Defeo, as the defendant and

7    Mr. Munchel go to put their weapons away before they

8    go to the Capitol, do you see anything on screen as

9    they're doing that?

10       A.    I believe you're able to see a fanny pack

11   be unclipped by Mr. Munchel.

12       Q.    And what does Mr. Munchel do with the

13   fanny pack?

14       A.    He puts it in the bag.

15       Q.    Now, you -- the fanny pack is not

16   transparent.  You can't see inside; is that fair?

17       A.    (indiscernible).

18       Q.    But at any point, other than calling it

19   weapons and depositing the fanny pack in a larger

20   backpack, did the defendant or her son identify what

21   types of weapons they were putting away?

22       A.    No.

23       Q.    Now, sort of transitioning away from the

24   events at the Capitol to your involvement in the

25   search warrant at Mr. Munchel's house, were you

19

1    involved in the search of Mr. Munchel's apartment?

2        A.    Yes, I was.

3        Q.    And in that were you present or involved

4    with the identification and cataloging of the firearms

5    recovered?

6        A.    Yes.

7        Q.    Now, were any of the firearms recovered

8    from Mr. Munchel's house (indiscernible) fit inside

9    the fanny pack that you see on the video?

10       A.    (indiscernible).

11       Q.    In your experience is a fanny pack used

12   as a way to conceal, carry a weapon?

13       A.    It can be, yes.

14       Q.    Why is that?

15       A.    Because it's close to the hip area and

16   easily accessible.

17       Q.    Now, back to the events depicted on the

18   video.  At a certain point, do you see the defendant

19   come into contact with individuals identified as

20   members of Oathkeepers?

21       A.    Yes.

22       Q.    And what's the contents of the

23   conversation?

24       A.    Positive interaction.  The Oathkeeper,

25   the individual identified as an Oathkeeper by

1    Mr. Munchel, states that there's 65 more of them

2    coming, there's a positive -- like, identification of

3    them as being Oathkeepers.  And Mr. Munchel, I

4    believe, fist bumps one of the individuals who's

5    dressed in tactical gear.

6         Q.   And in that video, do you see the

7    defendant and her son navigating through scaffolding?

8         A.   Yes.

9         Q.   Describe to the Court sort of their route

10   into the Capitol itself.

11        A.   It appears that they move up the stairs

12   and there's -- you can tell some individuals are

13   wanting to breach or go inside the Capitol, others are

14   not.  So they're trying to, what it appears to be,

15   navigate themselves around some scaffolding to get to

16   the entrance of the Capitol or a entrance of the

17   Capitol.

18        Q.   As they're approaching the Capitol, did

19   the defendant here interact with anyone who claimed to

20   have attacked law enforcement?

21        A.   I don't recall (indiscernible).

22             THE COURT:  I'm sorry, I missed that.

23             THE WITNESS:  I said I do not recall

24   specifically.

25

21

1   BY MR. KURTZMAN:

2        Q.    Do you recall on the video the defendant

3   speaking to someone who is off camera who described

4   being maced and having punched two of them in the

5   face?

6        A.    Yes, I do.

7        Q.    What was the contents of that

8   conversation, to your recollection?

9        A.    My recollection of it seemed like the

10  individual had attempted to -- the individual not on

11  the screen or on the camera attempted to --

12            MR. FARMER:  Your Honor, again, I'm going

13  to object to this.  His interpretation of what's

14  happening off camera based on, you know, intones and

15  implication is not appropriate for this Court.  He can

16  testify as to what he saw on the video, but I think

17  his interpretation as to what all that means, the way

18  it applies, is not appropriate for this hearing.

19            THE COURT:  Sustained.

20  BY MR. KURTZMAN:

21        Q.    Agent Defeo, the individual that the

22  defendant is speaking to on the video, you did just

23  say moments ago that that individual stated to the

24  defendant that he had just punched two of them in the

25  face?

22

1      A.      Correct.

2      Q.      Was that individual referring to other

3  members of the protest?

4              THE COURT:  Hang on.

5              MR. FARMER:  Again, same objection,

6  Your Honor.  He doesn't -- same objection.

7              THE COURT:  Sustained.

8  BY MR. KURTZMAN:

9      Q.      Agent Defeo, I'll move on to the

10  defendant's response.  Do you recall the defendant in

11  the video that's labeled Exhibit 3 replying to this

12  individual, good, while everyone else is on their

13  couch, you guys are training and getting ready for it?

14      A.      Yes.

15      Q.      After this interaction, what happens next

16  in the video?

17      A.      (indiscernible) and Mr. Munchel are able

18  to navigate themselves into the US Capitol building at

19  that time.

20      Q.      At another point in the video, the

21  defendant and her son become aware that their actions

22  and the actions of other individuals in -- in or

23  around the Capitol are on the news; is that right?

24      A.      Yes.

25      Q.      And (indiscernible) was we ain't playing

23

1    no Fing nice no goddamn more; is that right?

2         A.    Yes.

3         Q.    And does the defendant respond to him in

4    any way or agree with his -- with his statement?

5         A.    The defendant agreed.

6         Q.    Now, as the -- as the video proceeds and

7    the defendant moves toward the Capitol with her son,

8    do you recall the portion of the video where an

9    individual off screen yells Congress has shut down

10   (indiscernible) Congress, and did the defendant

11   respond by saying they got tear gassed, motherf'ers,

12   oh, my God, that is -- an unintelligible word -- my

13   best day to know that they got tear gassed?

14        A.    Yes.

15        Q.    And this was before she enters into the

16   Capitol building itself; is that right?

17        A.    That's right.

18        Q.    What happens once they're up near the

19   Capitol entrance?

20        A.    Mr. Munchel states that this is probably

21   the last time he'll be able to have a kit and weapons

22   on him in the US Capitol.

23        Q.    And then what happened -- do the

24   defendant and her son eventually enter into the

25   US Capitol?

24

1     A.     Yes.

2     Q.     And what do they do once inside?

3     A.     They walk up some stairs together and

4   begin to walk around the building.

5     Q.     And did the defendant stay in one area or

6   was she moving into multiple hallways throughout?

7     A.     Moving into multiple hallways throughout.

8     Q.     And did the defendant, at a certain

9   point, obtain zip ties?

10    A.     Yes.

11    Q.     Can you describe how that happened in the

12  video?

13    A.     From what you can see in the video, it

14  appears that there's a cabinet in one of the hallways

15  with a significant number of zip ties.  Mr. Munchel

16  grabs a handful of zip ties and the defendant also

17  picks up a zip tie.

18    Q.     When -- once they -- do they take all of

19  the zip ties from that cabinet?

20    A.     I do not believe so.

21    Q.     And once they -- once they obtained the

22  zip ties, what did they do next?

23    A.     They continued to walk through the

24  hallways, including onto the upper area of -- appears

25  to be the Senate floor.

1      Q.    And do you recall the defendant making

2  any statements or chanting or yelling out while inside

3  the Capitol?

4      A.    Yes.

5      Q.    Is it -- is it -- in your recollection,

6  did she at a certain point yell "traitors" and/or

7  "treason?"

8      A.    Yes.

9      Q.    And did that occur once or multiple

10 times?

11     A.    Multiple.

12     Q.    In the video, did you ever hear others

13 nearby the defendant yelling, "anybody home?"

14     A.    Yes.

15     Q.    Do you hear in the video people yelling

16 "where did you go" and "they're cowards?"

17     A.    Yes.

18     Q.    And this occurred when they are in the

19 upper level of the Senate chamber looking down at the

20 empty Senate?

21     A.    Correct.

22     Q.    And that was minutes after the

23 vice-president and the Senate had just been there?

24     A.    Correct.

25     Q.    You also hear an individual who's close

1    to Ms. Eisenhart as she's roaming through the Capitol

2    yelling "they're cowards" and "are you afraid?"

3           A.    Yes.

4           Q.    Following -- I guess eventually

5    Ms. Eisenhart left the Capitol building; is that fair?

6           A.    Yes.

7           Q.    Do you recall learning of events that

8    occurred at her hotel later that night?

9           A.    Yes.

10          Q.    And that was made by an individual named

11   William Turton?

12          A.    Is that fair.

13          Q.    And before reviewing what Mr. Turton said

14   regarding the defendant, were you aware of his

15   presence in and around the insurrectionists at the

16   Capitol?

17          A.    No.

18          Q.    Did Mr. Turton report on other people who

19   were also present at the Capitol?

20          A.    Yes.

21          Q.    Is it fair to say that he was there as a

22   reporter, not as a participant?

23          A.    Based on the (indiscernible), that's what

24   appears to be happening.

25          Q.    Okay.  Are some of his social media

1   postings identifying individuals who had invaded the

2   Capitol?

3          A.    Yes.

4          Q.    And did Mr. Turton indicate that he had

5   come into contact with the defendant and her son the

6   evening of January 6?

7          A.    Yes.

8          Q.    And what were the circumstances of their

9   interaction?

10          A.    Another individual appears to have been

11   interviewing the defendant and Mr. Munchel unrelated,

12   in which Mr. Turton sees the video and reports on

13   social media that these two individuals previously had

14   been harassing him and actually pointed a Taser at him

15   earlier on in the day.

16          Q.    And did Mr. Turton also allege that the

17   individuals had attempted to follow him to his hotel

18   room, refer to him -- well, we'll leave -- did

19   Mr. Turton at least allege that the defendant and her

20   son had tried to follow him to his hotel room?

21          A.    Yes.

22          Q.    And did Mr. Turton also allege that the

23   hotel staff had to move his room for his safety?

24          A.    Yes.

25          Q.    In the -- in the video that -- where

28

1    Mr. Turton identifies the defendant and her son as the

2    ones who had harassed him, did Mr. Munchel make any

3    statements that corroborated Mr. Turton's account?

4            A.    (indiscernible).

5            Q.    And what was that?

6            A.    That it was Antifa, he identified the

7    individual as being Antifa and that they were

8    harassing Antifa individuals.

9            MR. KURTZMAN:  Your Honor, those are all

10   the questions I have.

11           THE COURT:  Okay.  Hang on just a minute,

12   Mr. Farmer.

13           (Pause in proceedings.)

14           THE COURT:  All right.  Mr. Farmer, do

15   you have any cross-examination?

16           MR. FARMER:  Yes, Your Honor.

17                     **CROSS-EXAMINATION**

18   BY MR. FARMER:

19           Q.    Agent Defeo, I'm Jonathan Farmer.  I

20   represent Ms. Eisenhart in this matter.  I've got some

21   questions for you.  Let me know if you have trouble

22   hearing or understanding me.

23           A.    Do the same, please.

24           Q.    I wanted to talk about the time period

25   before Ms. Eisenhart and her son went to the Capitol.

29

1    Okay?  Now, you testified in the preliminary hearing
2    regarding her son, Eric Munchel; is that correct?
3         A.    Yes, I did.
4         Q.    And the video that was introduced is the
5    same video that was introduced in that preliminary
6    hearing; is that correct?
7         A.    Are you referring to the 50-minute video?
8         Q.    I am.  The video that was introduced as
9    evidence today?
10        A.    Yes, sir.
11        Q.    So there's no new video that you
12   introduced today that wasn't introduced in
13   Mr. Munchel's hearing; is that correct?
14             MR. KURTZMAN:  Just for clarity sake, I
15   think it was actually defense counsel that introduced
16   that video as evidence.
17             THE COURT:  Yeah, I think
18   Mr. Munchel's -- or, I'm sorry, I think Mr. Kurtzman's
19   correct, Mr. Farmer.  In the Munchel hearing the
20   defendant introduced video, and there was -- there
21   were three videos introduced is my recollection, one
22   was -- or four, actually.
23             I think there were portions of a video
24   from the night of January the 5th related to an
25   interaction between Mr. Munchel and some law

30

1    enforcement officers in Washington, DC.  There was a

2    portion of the video, which I want to say was

3    somewhere in the neighborhood of about 12 minutes or

4    so maybe, that was the camera footage from Mr. Munchel

5    on the day of January the 6th.

6                    And then there were two videos of -- of

7    surveillance footage from the Capitol that were

8    introduced that were relatively short.  And all were

9    introduced by Mr. Munchel.  The video today,

10   Mr. Kurtzman has represented, is the full, entire

11   video of the events on January the 6th recovered from

12   Mr. Munchel.  So there's some overlap with that, but

13   this video appears to be more than that.

14                    Does that sound pretty accurate,

15   Mr. Kurtzman?

16                    MR. KURTZMAN:  I would agree with that

17   characterization, Your Honor.

18                    THE COURT:  All right.  Thank you,

19   Mr. Kurtzman.

20                    Mr. Farmer, I hope that clarifies for

21   you.

22                    MR. FARMER:  It does.  Thank you,

23   Your Honor.

24   BY MR. FARMER:

25         Q.    So prior to Ms. Eisenhart going to

31

1   Washington, DC on the 6th, you don't have any evidence

2   that she made any plans to meet anybody to go up

3   there, other than her son; is that correct?

4          A.    That's correct.

5          Q.    You don't have any evidence that she

6   planned to coordinate movements with anyone other than

7   her son in Washington; is that correct?

8          A.    Correct.

9          Q.    Okay.  There's been a lot of talk about

10  radicalization and militias and the like.  You don't

11  have any evidence that Ms. Eisenhart is involved in

12  any militias prior to going to Washington, DC; is that

13  correct?

14         A.    Not at this time.

15         Q.    Okay.  Is it your understanding that she

16  left her home in Georgia and came to Nashville and

17  picked up her son on the way to Washington, DC?

18         A.    I do not know definitively where she had

19  come (indiscernible) prior to coming to Nashville to

20  meet her son.

21         Q.    Is it your understanding that she rented

22  a hotel on the way -- on the drive up to

23  Washington, DC?

24         A.    Yes.

25         Q.    Does that indicate to you a more

32

1    spontaneous plan?

2         A.    I can't say one way or the other when she

3    planned to go and when a hotel room was booked.

4         Q.    Did she try to book the hotel under a

5    fictitious name?

6         A.    Not that I'm aware of.

7         Q.    What name did she book the hotel under?

8         A.    I believe it was under Lisa Eisenhart.

9         Q.    Okay.  Did she take any steps to -- to

10   hide her presence in Washington that you know of?

11        A.    No, not that I know of.

12        Q.    Okay.  Let's talk about once they got to

13   Washington, DC but before January -- or before the --

14   the entry into the Capitol.  Okay?

15             So I understand from your testimony that

16   they arrived -- they were in Washington, DC on

17   January 5; is that correct?

18        A.    Yes.

19        Q.    Okay.  You've shown the Court and you

20   reviewed a lot of photographs, social media and

21   otherwise, showing Ms. Eisenhart; is that correct?

22        A.    Yes.

23        Q.    In any of those photographs do you see

24   her with a firearm, physical (indiscernible)?

25        A.    No.

33

1          Q.    The interactions that Mr. Munchel had
2     with law enforcement on January 5, do you know what
3     I'm referring to?
4          A.    Yes, sir.
5          Q.    Mr. Munchel was not arrested in that
6     interaction; is that correct?
7          A.    That is correct.
8          Q.    Have you reviewed the reports for those
9     arrests -- or not arrests, for those interactions?
10          A.    The actual police report, no, I have not.
11          Q.    Do you have any reason to believe that
12     the Washington, DC police found a firearm on
13     Mr. Munchel or Ms. Eisenhart at that time?
14          A.    No, I believe it was just the Taser.
15          Q.    Okay.  And that was found on Mr. Munchel,
16     not on Ms. Eisenhart; is that correct?
17          A.    Correct.
18          Q.    Okay.  Moving on to January 6 prior to
19     entry into the Capitol, again, lots of Facebook
20     photos, lots of surveillance photos from the hotels;
21     correct?  You've reviewed all those things?
22          A.    Yes, sir.
23          Q.    Okay.  Kind of same line of questions.
24     Any firearms present visible on Ms. Eisenhart at that
25     time?

34

1          A.     Not in any evidence we have so far.

2          Q.     Any weapons visible on Ms. Eisenhart at

3    any time?

4          A.     No.

5          Q.     Okay.  Let's talk about the time period

6    when they are out of the hotel, but they are --

7    outside the Capitol, I'll describe it, on January 6

8    before allegedly entering.  Do you understand the

9    timeframe I'm referring to?

10         A.     Yes.

11         Q.     Okay.  And the video evidence that you

12   reviewed, the 50-minute video, about 38 or 39 minutes

13   of it is before entry; is that correct?

14         A.     Yes, right around there, yes.

15         Q.     Okay.  You don't see Mr. Munchel or

16   Ms. Eisenhart break down any barriers, do you?

17         A.     No.

18         Q.     You don't -- and I'm sure you've seen

19   media coverage where people -- where protesters were

20   out there playing tug of war with the police regarding

21   the barriers.  Do you know what I'm referring to?

22         A.     Yes, sir.

23         Q.     You don't see Ms. Eisenhart involved --

24   or participating in that conduct, do you?

25         A.     Not on the video.

35

1          Q.     Okay.  You're aware that some individuals

2    committed acts of vandalism outside the Capitol; is

3    that correct?

4          A.     I'm sorry, sir.  You broke up

5    momentarily.  Just one more time.

6          Q.     You're aware that some individuals

7    committed act of -- acts of vandalism outside the

8    Capitol; is that correct?

9          A.     Yes, sir.

10         Q.     You don't have any evidence that

11   Ms. Eisenhart participated in anything like that, do

12   you?

13         A.     Not at this time.

14         Q.     Or her son, Mr. Munchel?

15         A.     Again, not at this time.

16         Q.     Okay.  Windows were broken outside of the

17   Capitol; is that correct?

18         A.     I believe so.

19         Q.     You don't have any reason to believe that

20   Ms. Eisenhart or Mr. Munchel was involved in any of

21   that, do you?

22         A.     Not at this time.

23         Q.     The door was breached to get in the

24   Capitol.  We've seen on the national media people

25   knocking the door in.  You don't have any reason to

36

1   believe that Ms. Eisenhart or Mr. Munchel was involved

2   in that, do you?

3           A.    Not at this time.

4           Q.    How many police officers were assaulted?

5   Do you have any idea?

6           A.    I do not know the actual number.

7           Q.    You haven't seen any media reports about

8   that?

9           A.    I may have.  I just could not recall an

10  exact number.

11          Q.    Okay.  But in any event you don't have

12  any evidence that Ms. Eisenhart or her son,

13  Mr. Munchel, were involved in assaulting police

14  officers outside the Capitol, do you?

15          A.    No.

16          Q.    Okay.  You say you can -- you can review

17  the cameras and the video that Mr. Munchel provided

18  before going to the Capitol.  And I believe you

19  testified you can see a Taser on Mr. Munchel; is that

20  correct?

21          A.    Not on the video provided, but there's

22  pictures of Mr. Munchel inside the Capitol in which

23  you can see the Taser on his hip.

24          Q.    Okay.  You can't see that on the videos?

25          A.    No, because the video is being shot from

37

1    Mr. Munchel's chest.  You wouldn't be able to see

2    what's on his body.

3         Q.    Okay.  That makes sense.  But in any

4    event, you don't see any Taser, weapon, anything

5    whatsoever on Ms. Eisenhart, do you?

6         A.    No, not on the video.

7         Q.    Okay.  And so let's talk a little bit

8    about this -- this stashing of weapons as it was

9    phrased.  And I want to be clear.  And I think this is

10   a point where precision makes a difference, okay.  To

11   be clear, Ms. Eisenhart never said "I have weapons;"

12   is that correct?

13        A.    That exact statement was not made by

14   Ms. Eisenhart, that I recall.

15        Q.    What she said is:  If you go into the

16   Capitol with weapons, you go to federal prison;

17   correct?

18        A.    That's correct.

19        Q.    She did not say she had weapons; is that

20   correct?

21        A.    Correct.

22        Q.    And so when they -- and so at that point

23   Ms. Eisenhart and her son, Mr. Munchel, decide to turn

24   around, what I would kind of describe as fighting

25   upstream to retreat from the Capitol; is that a fair

38

1    characterization?

2            A.    Yes, it is.

3            Q.    And what I mean by that, and tell me if

4    you view the videos the same way I do, there are a lot

5    of people out there; is that correct?

6            A.    Yes.

7            Q.    How many people would you estimate are

8    outside the Capitol at this time?

9            A.    I couldn't even venture a guess.  At

10   least thousands.

11           Q.    At least thousands.  And the people are

12   shoulder to shoulder; is that correct?

13           A.    Yes.  There was no social distancing

14   going on.

15           Q.    No social distancing at all.  And so

16   Mr. Munchel and Ms. Eisenhart kind of go against the

17   grain of -- against the grain of the crowd and they

18   move back to where this backpack is; is that correct?

19           A.    Yes.

20           Q.    And now you -- you testified on your

21   direct that they both stashed things in the backpack.

22   Do you recall that testimony?

23           A.    Yes, sir.

24           Q.    But to be fair, you can't see

25   Ms. Eisenhart put anything in the backpack, can you?

39

1          A.     No, you cannot.

2          Q.     You can only see Mr. Munchel put things

3     in the backpack; is that correct?

4          A.     Correct.

5          Q.     And you -- in fact, you can't even see

6     what he put in that backpack, can you?

7          A.     No, you cannot.

8          Q.     It's just simply a -- a fanny pack; is

9     that correct?

10         A.     Yes, it appears to be a fanny pack, but

11    you can't see the contents.

12         Q.     In any event, you, as we sit here today,

13    you don't have any actual or direct knowledge as to

14    what was in that fanny pack or the backpack at all; is

15    that correct?

16         A.     That's correct.

17         Q.     So let's jump to when the -- when

18    Ms. Eisenhart and Mr. Munchel are entering.  Are you

19    familiar with that part of the video?

20         A.     Yes, sir.

21         Q.     And it's about -- about minute 38 or so;

22    does that sound about right?

23         A.     Are you referring to just the time when

24    they walk in and up the stairs?

25         Q.     When they walk through the door.

1       A.    I don't know the exact time.  But if

2    that's what you say, that sounds about right.

3       Q.    All right.  Do you see police officers

4    lined up on the wall as they walk in?

5       A.    Yes.  It appears to be police officers.

6       Q.    Are they Capitol police officers, as near

7    as you can tell?

8       A.    I cannot tell.

9       Q.    But nevertheless, uniformed police

10   officers?

11      A.    Yes.

12      Q.    Okay.  They're not -- they don't say

13   anything to Ms. Eisenhart, do they?

14      A.    No.

15      Q.    They're not trying to block entry or

16   barricade entry or issue warnings.  They're just

17   simply standing there; is that correct?

18      A.    Yes.

19      Q.    Okay.  And at the same time all kinds of

20   people are going into the Capitol along side

21   Mr. Munchel and Ms. Eisenhart; is that right?

22      A.    Yes, there was multiple people going up

23   the -- into the entrance and up the stairs with them,

24   yes.

25      Q.    As you put it, no social distancing --

1      A.    Correct.

2      Q.    -- is that right?

3      A.    Correct.

4      Q.    And a big crowd kind of lined in and went

5  through and the police officers didn't -- the police

6  officers at the door, anyway, didn't say anything at

7  all about that; is that fair?

8      A.    Yes, on the video that is fair.

9      Q.    Are you aware that Ms. Munchel has told

10  the media and I believe FBI agents as well -- not

11  Ms. Munchel.  Ms. Eisenhart has told the media and I

12  believe FBI that she was there as an observer?

13      A.    I do not recall.  She did not say that to

14  me, if that happened.

15      Q.    Okay.  You've never heard that before?

16      A.    No.

17      Q.    Are you aware that Eric Munchel told his

18  mother, Ms. Eisenhart, don't touch anything, inside

19  the Capitol?

20      A.    Yes, I do recall.

21      Q.    Okay.  And she complied with that; is

22  that correct?

23      A.    She touched a zip tie.

24      Q.    Other than the zip tie, she didn't

25  vandalize or hurt anything?

42

1     A.     Not that we can see on the video.

2     Q.     Okay.  So let's talk about the vandalism

3 a little bit.  There's a lot of vandalism inside the

4 Capitol as well; is that right?

5     A.     Yes.

6     Q.     No evidence that Ms. Eisenhart had any

7 role in any of that; correct?

8     A.     No, not at this time.

9     Q.     There were assaults that took place

10 inside the Capitol; is that right?

11     A.     Yes.

12     Q.     No evidence that Ms. Eisenhart had any

13 role in any of that; correct?

14     A.     Yeah, not at this time.

15     Q.     Okay.  Did people have firearms inside

16 the Capitol?

17     A.     I do not know.

18     Q.     (indiscernible) firearms?

19     A.     I'm not aware -- I'm unaware if they had,

20 I'm not sure.

21     Q.     Certainly Ms. Eisenhart didn't have any

22 firearms inside the Capitol?

23     A.     Not that we can see from a video.

24     Q.     Okay.  And then from the video you also

25 can't see any weapons either on Ms. Eisenhart; is that

1    correct?

2          A.    Correct.

3          Q.    And you say it's not that you can see

4    from the video.  That's true, but you also don't have

5    any other evidence of that either; correct?

6          A.    Yes, not at this time.

7          Q.    Okay.  You did tell me earlier that you

8    saw that Mr. Munchel had a Taser in his -- in his side

9    waist; is that right?

10         A.    Yes, it appears in a -- in a holster on

11   his right hip.

12         Q.    Did he ever take that out?

13         A.    Not on the video that we can tell.

14         Q.    Did he ever show it to anybody?

15         A.    Again, not on the video that we can see.

16         Q.    He didn't fire it at anybody, to be sure?

17         A.    Not on the video.

18         Q.    Okay.  And, again, you say not on the

19   video.  You don't have any evidence, video or

20   otherwise, that he did any of those things; is that

21   correct?

22         A.    As of right now, we do not know whether

23   he fired it or displayed it at any other the time.

24         Q.    And all I'm asking is what you know right

25   now, right.

44

1            Do you have any evidence that

2    Ms. Eisenhart photographed any sensitive documents?

3            A.    No, not at this time.

4            Q.    Do you have any evidence that she entered

5    any legislative offices?

6            A.    No, not at this time.

7            Q.    Let's talk a little bit about the zip

8    ties.  Do you remember testifying about the zip ties?

9            A.    Yes, sir.

10            Q.    Okay.  And that's clearly visible on the

11    video; is that correct?  Ms. Eisenhart and her son

12    taking zip ties?

13            A.    Yes.

14            Q.    Okay.  You don't have any evidence that

15    they did anything with those zip ties, do you?

16            A.    No, not at this time.

17            Q.    Okay.  Do you recall Ms. Eisenhart in the

18    video talking to another person inside the Capitol

19    about -- about why she had the zip ties?

20            A.    I do not recall that.

21            Q.    Okay.  So if I told you there was a

22    section around minute 48 when someone asked her about

23    the zip ties and she discusses that, you don't have

24    any knowledge of that whatsoever?

25            A.    I just cannot recall at this time.  You

1   can remind me.

2          Q.    Okay.  Well, if she says -- someone asked

3   her, hey, what about the zip ties, she says some

4   version of, I just got these to keep them out of bad

5   peoples' hands, those types of things, does that ring

6   a bell to you?

7          A.    No, sir, it doesn't.  I apologize.

8          Q.    Okay.  But if it's on the video, I mean,

9   you certainly wouldn't dispute that; is that correct?

10          A.    I'm not disputing that.

11          Q.    Okay.  And then the government introduced

12   a *Tennessean* article, I believe it was Exhibit 2.  Are

13   you familiar with that *Tennessean* article?

14          A.    Yes, sir, I have it in front of me.

15          Q.    Okay.  And let's talk a little bit about

16   that, first about the zip ties.  Do you see where

17   Ms. Eisenhart discusses the zip ties in the article?

18          A.    Could you point me just to the -- make it

19   faster?

20          Q.    It's on page 2.

21          A.    It's under where it says why is he called

22   Zip Tie Guy, is that what you're referring to?

23          Q.    Yeah, it is.  And it is the fifth

24   paragraph down.  It starts with we saw the zip ties.

25          A.    Yes, sir, I'm reading it now.

46

1      Q.    Read that out loud, if you don't mind.

2      A.    We saw the zip cuffs on top of an already

3   open cabinet in the hallway inside the Capitol

4   building.  We do not know how the cuffs came to be

5   there.  We picked them up to prevent them from falling

6   into the hands of bad actors, she said in Tuesday's

7   statement.

8      Q.    Okay.  And so if I told you that's

9   consistent with what she said on-site, you wouldn't

10   have any basis, I guess right now, to agree or

11   disagree with that, would you?

12      A.    Correct.

13      Q.    Okay.  While we're on this article, let's

14   look at the very first paragraph.  Do you see that?

15      A.    Yes, sir.

16      Q.    Zip Tie Guy did not go to the US Capitol

17   with nefarious intent, his mother said; is that right?

18      A.    Yes, sir.

19      Q.    And she said that freely and voluntarily

20   before she was under arrest or before there was a

21   warrant issued against her; is that right?

22      A.    According to the date, I can -- I can

23   confirm that there was not an arrest warrant for her

24   at the time of this article being published.

25      Q.    Okay.  And then jumping back to -- to the

47

1   video inside the Capitol, does the video show

2   Mr. Munchel and Ms. Eisenhart, does it show them

3   leaving voluntarily?

4        A.   Yes.  I believe the video cuts out before

5   they actually exit the building fully, but they are

6   looking for the exit at that time.

7        Q.   And I think you testified in

8   Mr. Munchel's hearing that he and his mother appeared

9   to be together in the Capitol.  They appeared to be

10   kind of walking through the Capitol together.  Do you

11   remember that?

12        A.   Yes, sir.

13        Q.   There wasn't any conflict between them;

14   is that right?

15        A.   No.  It appeared Mr. Munchel was trying

16   to follow Ms. Eisenhart around inside the Capitol to

17   keep them close.

18        Q.   He had his arm on her the whole time; is

19   that crite -- right?  On the (indiscernible) you can

20   see a tether; is that right?

21        A.   Yeah, it appears he's holding a handle on

22   the back of her bulletproof vest for the majority of

23   the time, not the entire time, but especially outside

24   as well.

25        Q.   And while they're in the Capitol, they

1    are repeatedly admonishing other people inside the

2    Capitol not to break anything; is that right?

3         A.    I believe Mr. Munchel makes statements

4    with regards to not breaking things and they are not

5    Antifa I believe is some version of what he said.

6         Q.    Is it fair to say that what he's saying

7    is I don't -- we don't need to be breaking anything,

8    we don't need to be vandalizing, we don't need to be

9    doing anything like that here.  Is that a fair

10   characterization?

11        A.    That's what Mr. Munchel states.

12        Q.    I understand, I understand.  He sees

13   police officers in the Capitol as well?

14        A.    Yes, sir.

15        Q.    Okay.  And he says words of support for

16   the police; is that fair?

17        A.    Yes, sir.  I believe he apologizes as

18   well.

19        Q.    Okay.  And says we still love ya, we

20   still support ya, words to that effect?

21        A.    Yes, to that effect.

22        Q.    Okay.  All right, all right.  Let's talk,

23   then, about the hotel lobby incident that you

24   described.  Now, you didn't testify about that with

25   Mr. -- during Mr. Munchel's hearing; is that right?

49

1          A.     That's correct.

2          Q.     Have you interviewed William Turton?

3          A.     No, sir.

4          Q.     So is the sum basis of your knowledge

5     what he says in his Twitter feed?

6          A.     Yes, sir.

7          Q.     Okay.  Do you have that Twitter feed in

8     front of you?

9          A.     I do not believe I do.  Stand by, I'll

10    see if I can.

11         Q.     Okay.

12                MR. KURTZMAN:  Just one minute,

13    Your Honor.  I'm pulling it up.

14                THE COURT:  Okay, thank you.

15                THE WITNESS:  As long as you can still

16    see me, I do have the Twitter feed pulled up.

17    BY MR. FARMER:

18         Q.     Okay.  I want to go through it with you

19    and I want to be sure we're looking at the same thing.

20    So I'm looking at William Turton's Twitter thread.  Is

21    that right?  Is that what you have?

22         A.     Yes, sir.

23         Q.     Okay.  And at the very first, at the very

24    top there's a video and above it -- it's dated

25    January 6, and above it it says, pretty chill vibe

1    here in this hotel lobby as Trump supporters

2    decompress from today's events.  All are violating

3    local mask rules despite multiple massive signs about

4    the mask rules.  Do you see that?

5           A.    Yes, sir.

6           Q.    Okay.  So we're reading from the same

7    sheet, it looks like; is that correct?

8           A.    Yes, sir.

9           Q.    Okay.  And then he goes on and next

10   tweeted, after I took this video, it says several

11   Trump supporters harassed me and tried to follow me to

12   my room.  Do you see that?

13          A.    Yes, sir.

14          Q.    One accused me of being Antifa.  Hotel

15   security intervened and moved me to a new room.  What

16   a weird day.  Is that right?

17          A.    Yes, sir.

18          Q.    Okay.  And then it says -- the next one

19   is, the Trump supporters demanded that I delete the

20   video.  One woman flashed her Taser at me and

21   threatened to mace me.  I should also say for the

22   record, the hotel staff and security were extremely

23   professional, polite and got me out of a bad

24   situation.  Is that fair?

25          A.    Yes, sir.

1      Q.    And then -- and then there's a video of

2  what appears to be Mr. Munchel in the Senate

3  chamber -- or a photograph, and he says I can now say

4  that one of the people in the hotel lobby who demanded

5  I delete the video put his hands on me and screamed at

6  me is this guy.  He appears in the first frame of the

7  video above.  Right?

8      A.    Yes, sir.

9      Q.    So he's saying Mr. Munchel put his hands

10  on him and yelled at him?

11      A.    Yes, that's what he's accusing.

12      Q.    Okay.  And then at the end there's a

13  video of Mr. Munchel, and you can see Ms. Eisenhart

14  kind of in the back where he's talking about people

15  trying to film him earlier; is that right?

16      A.    Yes, sir.

17      Q.    So where in this Twitter feed does it say

18  Ms. Eisenhart did anything to this guy?

19      A.    I believe the only reference to her is

20  that he states that a female is the one that pointed a

21  Taser at him.  One woman flashed her Taser at me and

22  threatened to mace me.

23      Q.    Okay.  So when you -- so when you told

24  the Judge that Ms. Eisenhart threatened to tase and

25  mace this guy, you're referring to a statement saying,

52

1    after I took this video, several Trump supporters

2    harassed me, and one woman flashed her Taser at me and

3    threatened to mace me; is that right?

4         A.    Then if you go down to the actual video

5    where they're both discussing -- basically I infer

6    that they were together when this was occurring.

7         Q.    Okay.  But to be clear, Mr. Turton, he

8    identifies Mr. Munchel in the video as the guy who

9    laid hands on him; right?

10        A.    Correct.

11        Q.    And he -- and you see Ms. Eisenhart in

12   the same video, don't you?

13        A.    Yes.

14        Q.    And he doesn't say a word about

15   Ms. Eisenhart being the person that maced or

16   threatened him?

17        A.    No, the only reference is when he says

18   one woman flashed her Taser at me and threatened to

19   mace me.  I should also say for the record, this is

20   the tweet that you'd already stated before.

21        Q.    Okay.  But that's not the question I

22   asked you.  The question I asked you is that when

23   Mr. Turton is linking to the video and saying,

24   Mr. Munchel is the guy that put hands on him, you can

25   see Ms. Eisenhart in that video, can't you?

53

1          A.     Yes, sir.

2          Q.     And he doesn't -- Mr. Turton doesn't say

3    a word about Ms. Eisenhart having any involvement

4    whatsoever, much less tasing or macing; is that

5    correct?

6          A.     Not in that tweet, correct.

7          Q.     Not in that tweet.  You haven't talked to

8    him, have you?

9          A.     Excuse me?

10         Q.     You haven't talked to him, have you?

11         A.     No, sir.

12         Q.     All right.  Were you involved in the

13   search warrant of this case, of Mr. Munchel's house?

14         A.     (indiscernible) involved in the search

15   warrant of Mr. Munchel's apartment, yes, sir.

16         Q.     All right.  His apartment, okay.  It is

17   your understanding, correct me if I'm wrong, that

18   every single gun in that -- that was recovered and has

19   been referenced and admitted into evidence by the

20   government, that belongs to Mr. Munchel; is that

21   correct?

22         A.     Yes.  According to the witness in the

23   home, yes.

24         Q.     Okay.  Not to Ms. Eisenhart; is that

25   correct?

54

1          A.     Correct.

2          Q.     Okay.  There's -- and to be clear,

3     there's no evidence that you have that any of those

4     weapons went to Washington, DC; correct?

5          A.     Not at this time, that's correct.

6          Q.     Okay.  The tactical vests that were

7     recovered, is it your understanding that both of those

8     also belonged to Mr. Munchel?

9          A.     According to the witness interviewed,

10    they belonged to Mr. Munchel, but the -- the witness

11    stated they were purchased for family is how he stated

12    it.

13         Q.     Purchased for family?

14         A.     Yeah, something to that effect.  He

15    doesn't say they're both Eric's or whatever.  It's

16    more so, Eric -- Mr. Munchel has his own and then he

17    purchased an extra one for a family member.

18         Q.     So Eric bought another one just in case

19    someone in the family might need one; is that a fair

20    summary?

21         A.     That's basically how the witness stated

22    it, yeah.

23         Q.     Okay.  All right, all right.  And you

24    don't have any reason to believe that's not true, is

25    it?

1        A.    No, sir.

2        Q.    Okay.  So let's talk a little bit about

3  what the witness says.  He said that when Mr. Munchel

4  and Ms. Eisenhart went to the rally in Washington,

5  they didn't have any plan to cause trouble; is that

6  right?

7        A.    Correct.

8        Q.    No plan to do anything illegal --

9        A.    That's correct.

10       Q.    -- correct?  That Ms. Eisenhart went to

11  voice her opinion; is that correct?

12       A.    Yes, sir.

13       Q.    There was no plan to take hostages or

14  cause violence?

15       A.    Correct.

16       Q.    That they were nonviolent people?

17       A.    Correct.

18       Q.    And that they don't hold any

19  antigovernment ideologies?

20       A.    That's correct.

21       Q.    Did you -- are you aware of the

22  communications between Ms. Eisenhart and the FBI after

23  she returned from Washington?

24       A.    Just on the periphery.  I did not have

25  any direct contact with Ms. Eisenhart after she

56

1    returned from Washington.

2         Q.    Are you aware of any evidence of

3    Ms. Eisenhart committing any acts of obstruction since

4    she got back?

5         A.    No, sir.

6         Q.    Any acts of concealment (inaudible) or

7    any evidence since she got back?

8         A.    No, sir.

9         Q.    Engage in any flight since she got back?

10        A.    Not that I'm aware of.

11        Q.    Are you aware that she stayed in daily --

12   almost daily contact with the local FBI agent, Agent

13   Potts?

14        A.    Yes, sir.

15        Q.    And then she contacts him regularly to

16   see if there was a warrant, and if so, she was going

17   to surrender herself, is that -- are you aware of

18   that?

19        A.    Yes, sir.

20        Q.    And, in fact, she did that, didn't she?

21   When the warrant was issued, she came down the next

22   day and surrendered herself; is that right?

23        A.    That's right.

24        Q.    Without incident?

25        A.    Correct.

57

1          Q.     Okay.

2                 MR. FARMER:  Those are my questions,

3     Your Honor.

4                 THE COURT:  Redirect, Mr. Kurtzman?

5                 MR. KURTZMAN:  Thank you, Your Honor.

6                      **REDIRECT EXAMINATION**

7     BY MR. KURTZMAN:

8          Q.     Agent Defeo, moments ago the defense

9     lawyer was asking you if you saw the defendant here

10    participating in any violence in that video.  I want

11    to come at it a little differently.  In that video,

12    did you view -- did you see the defendant do things

13    that endorsed violence?

14         A.     What do you mean by endorsed?

15         Q.     Did the defendant encourage others who

16    had previously engaged in violence?

17         A.     Discussed, conversations at least with

18    other individuals who stated that they were punching

19    the police, I believe.

20         Q.     And did she seem to encourage this person

21    not to assault police or encourage the conduct that

22    they had claimed to have participated in?

23         A.     (indiscernible).

24         Q.     And at a certain point, you mentioned

25    when you were testifying earlier, that you do recall

58

1    the defendant's son discussing that the line has

2    broken; correct?

3         A.    Yes.

4         Q.    And you inferred that the line was the

5    line of police protecting the elected representatives

6    of our country; correct?

7         A.    Yes, physical barriers as well

8    (indiscernible).

9         Q.    Someone had engaged in some acts to get

10   into the Capitol where they were prohibited from

11   being; correct?

12        A.    (indiscernible).

13        Q.    And we discussed the sort of obstacle

14   course of scaffolding and things that the defendant

15   moved through in Exhibit 3 to get inside the Capitol.

16   Were the defendant and her son moving with the flow of

17   the crowd or were they intent on getting into the

18   Capitol?

19        A.    (indiscernible) because statements were

20   made by the defendant about, if you're just standing

21   around, move out of the way, things of that sort.  I

22   would say they were intent on going inside.

23        Q.    On multiple occasions in the video, both

24   the defendant and her son tell people who are merely

25   exercising their First Amendment rights to get out of

1   the way?

2          A.    Yes.

3          Q.    And she wanted them out of the way so she

4   could access the Capitol?

5          A.    Correct.

6          Q.    And Mr. Farmer also asked you questions

7   about whether -- whether the defendant herself had

8   weapons on her while -- while the video is running and

9   they're outside and then inside the Capitol.  And you

10  respond to that you did not see a weapon on her body;

11  is that fair?

12         A.    Yes.

13         Q.    Now, throughout the course of the video,

14  how close is her son to her?

15         A.    The majority of the video they're very

16  close because his video -- is being shot from his vest

17  and he's holding onto her vest.  So they're very close

18  proximity.

19         Q.    He's essentially touching her almost the

20  entire time they're on video together?

21         A.    Yes.

22         Q.    And throughout the entirety

23  (indiscernible) Mr. Munchel possessed the Taser when

24  they entered the Capitol; correct?

25         A.    Yes.

1      Q.    And he possessed some other weapons

2  beyond that Taser before he entered the Capitol?

3           MR. FARMER:  Objection, Your Honor.  That

4  lacks foundation.

5           THE COURT:  Sustained.  If you want to go

6  at it another way, Mr. Kurtzman, you can.

7  BY MR. KURTZMAN:

8      Q.    Agent Defeo, did Mr. Munchel claim to

9  have other weapons on his person besides the Taser in

10 the video?

11     A.    Yes --

12          THE COURT:  Hang on.

13          MR. FARMER:  I'll object again,

14 Your Honor -- I'm sorry.

15          THE COURT:  That's okay.  Go ahead.  I

16 was telling the witness to wait.  You go ahead,

17 Mr. Farmer, I'll hear you.

18          MR. FARMER:  I'll object again.  I think

19 he can say what -- what Mr. Munchel said on the video,

20 and certainly counsel can argue how he interprets

21 that.  But to ask the witness to give his own

22 interpretation as a fact witness I think is

23 inappropriate and shouldn't be allowed.

24          THE COURT:  What do you say,

25 Mr. Kurtzman?

1          MR. KURTZMAN:  Your Honor, if I asked it

2     that way, that was not my intention.  The witness has

3     previously testified that the defendant made comments

4     about weapons.  I'm merely asking if Mr. Munchel in

5     the video claims to have weapons other than the Taser.

6          THE COURT:  You can --

7          MR. FARMER:  I think the answer to that

8     question has been established.  The answer to that

9     question is no.  He wants him to take statements he

10    made and then create an assumption or presumption or

11    an inference.

12         THE COURT:  Yeah, you can --

13         MR. FARMER:  (indiscernible).

14         THE COURT:  You can ask that question,

15    Mr. Kurtzman.  I'll let the witness answer that

16    question.  But in terms of what the witness understood

17    that to mean or believed that to mean or thought that

18    meant or thought that Mr. Munchel was talking about,

19    we're not going there.

20         MR. KURTZMAN:  Okay, Your Honor.

21    Understood.  And I'll just move on.

22         THE COURT:  Okay.

23         MR. KURTZMAN:  Because I think -- I think

24    the previous sort of evidence regarding that is

25    established --

1          THE COURT:  Okay.

2          MR. KURTZMAN:  -- in Agent Defeo's

3   initial testimony.

4   BY MR. KURTZMAN:

5          Q.    Agent Defeo, Mr. Farmer also asked you

6   questions about whether -- whether Ms. Eisenhart was

7   an observer.  Do you recall that line of questioning?

8          A.    Yes, sir.

9          Q.    And he said that at certain points in the

10  video you hear perhaps her son saying don't touch

11  anything.  But she did, in fact, touch things inside

12  the Capitol building; is that fair?

13         A.    Yes.

14         Q.    She is seen on video carrying a zip tie;

15  is that correct?

16         A.    Yes.

17         Q.    And she is inside the Senate chamber with

18  her son?

19         A.    Yes.

20         Q.    And you mentioned in your earlier

21  testimony that she and her son are moving through

22  multiple hallways; is that correct?

23         A.    Correct.

24         Q.    And did they touch any of the doors as

25  they were moving through the hallway?

1    A.    Yes.  As opposed to touching anything, I

2    need to clarify that handrails were touched, doors

3    were touched, things of that sort were -- I mean, it's

4    not that nothing was touched on the video.  It's more

5    so that, yes, things were touched as they moved about

6    inside the Capitol.

7        Q.    And as they're walking the hallways with

8    doorways on either side, are they trying any of the

9    door handles?

10    A.    Yes.

11    Q.    And those doors were locked?

12    A.    (indiscernible).

13    Q.    But they're trying to open those doors,

14    the defendant is trying to open those doors as she

15    moves through the hallway on the video?

16    A.    Yes.

17    Q.    You talked about some of the quotes that

18    Ms. Eisenhart made in *The Tennessean* article that's

19    been entered as Exhibit 2.  Are you familiar with any

20    other interviews that the defendant and her son gave

21    to other media outlets?

22    A.    (indiscernible).

23    Q.    And do you recall Ms. Eisenhart saying

24    after the invasion of the Capitol, the following day,

25    that she would rather die than live under, I'm

64

1    paraphrasing, the current state of affairs?

2         A.    Yes.

3         Q.    And her son is also quoted as saying that

4    the purpose in going to Washington was to show that

5    we're willing to rise up, band together and fight, if

6    necessary; same as our forefathers who established

7    this country in 1776?

8         A.    Yes.

9         Q.    So you recall that quote being attributed

10   to her son after the invasion of the Capitol?

11        A.    Yes.

12        Q.    And in any of the interviews you've seen

13   of the defendant available in media, have you seen any

14   remorse expressed for her actions?

15        A.    No.

16        Q.    Mr. Farmer asked you questions about the

17   plan.  Remind us again, when did Ms. Eisenhart and her

18   son depart for Washington, DC?

19        A.    I believe it was January 4.

20        Q.    And when was the planned rally?

21        A.    (indiscernible).

22        Q.    Do you have any information that

23   Mr. Munchel and his mother purchased their tactical

24   vests or any other -- or Taser or anything else in

25   Washington, DC?

65

1        A.    No.

2        Q.    All of that was purchased before they

3   went to Washington, DC?

4        A.    (indiscernible).

5        Q.    The individual you've described I think

6   as Witness 1 told you that the tactical vests were

7   purchased by Mr. Munchel before they went to

8   Washington, DC?

9        A.    (indiscernible).

10            MR. KURTZMAN:  Your Honor, those are all

11   the questions I have.

12            THE COURT:  Thank you, Mr. Kurtzman.

13   Special Agent Defeo, thank you for your testimony.

14   You can stand down at this time.

15                *****WITNESS EXCUSED*****

16            THE COURT:  Mr. Kurtzman, does the

17   government have any other proof you want to put on at

18   this time?

19            MR. KURTZMAN:  No, Your Honor.

20            THE COURT:  All right, very good.  Thank

21   you.

22            Mr. Farmer, do you have any proof you'd

23   like to put on?

24            MR. FARMER:  Yeah, I would like to -- and

25   I haven't sent this to the Court yet because, frankly,

1   I was surprised by the testimony about it.  But I'd

2   like to send the Twitter thread that I went through

3   with the agent about the hotel lobby after the fact.

4   Mr. Kurtzman provided it to me this morning and said

5   he was going to ask the agent some questions about it.

6   This is about the alleged mace and tasing.  I'd like

7   to submit that as an exhibit to his testimony.

8                THE COURT:  Mr. Kurtzman --

9                MR. FARMER:  And I can email it --

10               THE COURT:  Hang on, Mr. Farmer.

11   Mr. Kurtzman, that was not an exhibit that you sent

12   me, was it?  I don't remember seeing that.

13               MR. KURTZMAN:  It is not, Your Honor.  I

14   supplied it to defense counsel this morning.  I hadn't

15   actually had a chance to discuss it with Agent Defeo

16   until shortly before I sent it to defense counsel.

17               THE COURT:  Okay.

18               MR. KURTZMAN:  I did not (indiscernible)

19   or intend to introduce it as an exhibit.

20               THE COURT:  Okay.  But whatever

21   Mr. Farmer has, he got it from you, and so you're

22   aware of what it is.

23               MR. KURTZMAN:  It's the same link, that's

24   correct, Your Honor.

25               THE COURT:  All right.  Okay.  I'll admit

1    that, Mr. Farmer.  If you want to send that to me,

2    I'll take a look at it when we take a break after the

3    proof comes in.

4              MR. FARMER:  Okay, very well.

5              Okay, Your Honor.  I don't have any

6    witnesses as to probable cause.  I do as to detention.

7    I think procedurally -- proceduralwise, though, I

8    think it would make sense to have argument as to

9    probable cause.

10             I do have an argument related to probable

11   cause that affects detention.  I outlined this in my

12   pleadings.  Essentially the defense's position at this

13   point is there isn't probable cause that 1752(a)(1),

14   (2) or (3) has been established with the (b)(1)

15   enhancement.  So I'll translate that into English a

16   little bit.

17             In order for the -- in order for 1752,

18   which is unlawful entry, to become a felony, there has

19   to be a dangerous weapon, right.  And so I have an

20   argument that -- that that hasn't been established to

21   a probable cause standard, at least as it pertains to

22   Ms. Eisenhart.  And that if that is true, then there's

23   no statutory basis to even go through 3142(g),

24   detention analysis.

25             The government outlines in their motion I

1   think three basis to have this analysis.  Two of them

2   I think are just facially wrong.  The third one is the

3   one regarding the probable cause issue.  So I'm happy

4   to argue that, or if you want to jump into the

5   detention testimony and have the argument all at the

6   end, I'm happy to do that too.  I just don't want to

7   waive that.

8              THE COURT:  Yeah, I understand.  So let

9   me say -- let me say this.  This is what I'd like to

10  do.  I want to go ahead and take all the proof.

11  Mr. Farmer, I checked this morning, and I did not see

12  your response to the government's detention

13  memorandum.  And, in fact, I was -- I've been busy

14  with other matters in court this morning and hadn't

15  had a chance to check the docket again, so I didn't

16  actually realize you'd filed something until you

17  mentioned it as we began these proceedings.

18             I think it would be appropriate and fair

19  for me to review your pleadings before I hear from

20  you-all on this.  So what I think I want to do is just

21  go ahead and take the proof.  Then I'll take a recess

22  and review -- I think I'm going to need to review the

23  videotape since Mr. Kurtzman has entered that into

24  evidence.  And I also want to take a look at your

25  response.  So I think from an efficiency standpoint,

1    it makes sense for me to have done all that before I

2    hear argument.

3              So I'm not going to -- by going forward

4    on the detention issue, you're not waiving anything.

5    I'll take you-all up at the end on that.  I appreciate

6    you raising it, but I think -- I think that's the best

7    way for us to go at this, so.

8              MR. FARMER:  Okay.  Very good.  Then as

9    to detention, first I have the exhibit that I sent to

10   chambers and to Mr. Kurtzman, the proffered statement

11   of a witness.  I'm going to ask that that be placed

12   under seal.  She's concerned about the media scrutiny

13   of this case proceeding and her name and identity and

14   address and phone number and the like being out in the

15   public.

16             THE COURT:  Okay.  What's the

17   government's position on that?

18             MR. KURTZMAN:  Your Honor, I concur with

19   Mr. Farmer that placing it under seal is appropriate

20   here.

21             THE COURT:  All right.

22             MR. KURTZMAN:  And I do have a copy.

23             THE COURT:  Very good.  That will be

24   admitted as Defendant's Exhibit No. 1.  I'll place

25   that under seal.

70

1              (Defense Exhibit No. 1 was admitted under

2       seal.)

3              THE COURT:  Mr. Farmer, I'm going to

4       admit the Twitter feed that you're going to send as

5       No. 2.  That way we'll sort of keep everything in

6       order that way, since we've premarked your -- we've

7       premarked your proffered statement.  Thank you.

8              (Defense Exhibit No. 2 was admitted.)

9              MR. FARMER:  Okay.  And then lastly for

10      detention, Your Honor, I have a witness who I hope is

11      on the line.

12             THE COURT:  Okay.

13             MR. FARMER:  I have given her -- do you

14      have someone on the line?

15             THE WITNESS:  Yes.

16             THE COURT:  Very good.

17             MR. FARMER:  Very good.

18             THE COURT:  All right.  Tell me how you

19      want to proceed with this witness, Mr. Farmer.

20             MR. FARMER:  Well, so I would like to

21      establish her identity through the sealed document and

22      then you can swear her at that point and then I'll

23      just go through some quick questions with her.

24             THE COURT:  All right.  That's very good.

25      Thank you, go ahead.

71

1          MR. FARMER:  All right.  Ma'am, can you

2     hear me?

3          THE WITNESS:  Yes, I can.

4          MR. FARMER:  This is Jonathan Farmer,

5     Ms. Eisenhart's attorney.  You and I have spoken

6     several times over the past few days; is that correct?

7          THE WITNESS:  Yes.

8          MR. FARMER:  And I sent you a document

9     that you reviewed earlier today, in fact.  Are you

10    familiar with what I'm referring to?

11         THE WITNESS:  Yes.

12         MR. FARMER:  And are you the person in

13    that document?

14         THE WITNESS:  Yes, I am.

15         MR. FARMER:  Okay.  And the person who

16    purports to be a third-party custodian if that is

17    required.  Is that you?

18         THE WITNESS:  Yes.

19         MR. FARMER:  Okay.  All right.  I'm going

20    to ask that the Judge swear you in now.

21         THE WITNESS:  Okay.

22         THE COURT:  Very good.

23              **DEFENSE WITNESS NO. 1**

24    called as a witness, after having been first duly

25    sworn, testified as follows:

72

1          THE COURT:  Very good, thank you.

2   Mr. Farmer, you can continue.

3                **DIRECT EXAMINATION**

4   BY MR. FARMER:

5          Q.    Okay.  Ma'am, I'm going to be careful not

6   to use your name.  And so there might be a little bit

7   of an awkwardness about that, but we're going to do

8   our best.

9                So you have known Lisa Eisenhart her

10  entire life; is that correct?

11         A.    Yes, yes.

12         Q.    She has resided with you in your home for

13  the past nine years; is that correct?

14         A.    Yes.

15         Q.    And now, to be fair, that is her primary

16  residence with you.  She's also doing her work as a

17  traveling nurse.  So she's not at the home every day

18  and every night; is that -- is that correct?

19         A.    That's correct.

20         Q.    Okay.  In all the time that you've known

21  Ms. Eisenhart, have you known her to have a criminal

22  history?

23         A.    No.

24         Q.    Ever known her to have any violent

25  tendencies?

1       A.      No.

2       Q.      Would you describe her as a person who

3  follows rules?

4       A.      Yes, I would.

5       Q.      Has respect for authority?

6       A.      Yes.

7       Q.      Okay.  You may be aware kind of an

8  undercurrent of these proceedings is talked about

9  militias and insurrectionists and the like.  Is

10  Ms. Eisenhart in any way affiliated with any militia

11  group at all, to your knowledge?

12       A.      No, she is not.

13       Q.      Any insurrectionist group, revolutionary

14  group?

15       A.      No, she is not.

16       Q.      To your knowledge, does she even know

17  anybody involved in those groups?

18       A.      Not that I'm aware of.  I really don't

19  think so.

20       Q.      Okay.  She's got a college degree; is

21  that right?

22       A.      Yes, she does.

23       Q.      And what is that degree in?

24       A.      She's a registered nurse.  She's an RN.

25       Q.      Okay.  And how long has she been a

74

1  registered nurse?

2      A.    About 30 years.

3      Q.    Okay.  And what -- most recently how was

4  she employed?

5      A.    Through a traveling agency.

6      Q.    Okay.  All right.  Would you say that she

7  often develops close relationships with the patients?

8      A.    Yes, she does.

9      Q.    And that she's a caring individual that's

10 reflected in her work; is that fair?

11     A.    Extremely caring.

12     Q.    Okay.  All right.  What about her family?

13 Is she close to her sons?

14     A.    She's very close with the boys, yes, she

15 is.

16     Q.    Okay.  All right.  And in and around the

17 community where you live, does she have close friends?

18     A.    Yes, she does.

19     Q.    Okay.  Does she interact with them

20 regularly and daily?

21     A.    Yes.  Yes, she does.

22     Q.    Okay.  All right.  If the Judge orders

23 her to be released, do you think she will try to hide

24 or not come to court?

25     A.    No, she would never do that.

75

1          Q.    Okay.  Has she ever left the
2    United States?
3          A.    No, she doesn't even own a passport.
4          Q.    Okay.  You became aware after January 6
5    that your daughter's -- your daughter -- that
6    Ms. Eisenhart and Mr. Munchel were -- their pictures
7    were in the media; is that fair to say?
8          A.    Yes.
9          Q.    Okay.  Did she -- did Ms. Eisenhart ever
10   ask you to help her hide or destroy anything at all?
11         A.    No, she did not.
12         Q.    Okay.  Do you have any knowledge about
13   her interaction with the local FBI agent during this
14   time?
15         A.    Yes.  Yes, I do.
16         Q.    Okay.  Tell me about that.
17         A.    I talked to Lisa every day, and every day
18   she said she called the office to see whether there
19   was a warrant out for her arrest because she wanted to
20   turn herself in and get this over with.  So every day
21   she would call and every day they'd say there was no
22   warrant yet.  And when she did call and they said
23   there was a warrant, she said that she was going that
24   day to turn herself in.
25         Q.    Okay.  You had talked to me about the

76

1    concept of a third-party custodian; is that right?

2         A.    Yes, I have.

3         Q.    Have you talked to the pretrial services

4    office about that as well?

5         A.    Yes, I have.

6         Q.    And has it been explained to you what

7    that role would be?

8         A.    Yes.

9         Q.    Okay.  Explain it to the Judge in your

10   own words what a third-party custodian is.

11        A.    I would be responsible to monitor her

12   comings and goings or whatever rules the Court has set

13   forth for her.  And if she disobeys any of them, it

14   would be up to me to call and report her, which I

15   would do.

16        Q.    Okay.  You're willing to do that?

17        A.    Yes, I am.

18        Q.    Do you think she would disobey any of the

19   rules?

20        A.    No, because she wouldn't want to

21   jeopardize my safety or me getting involved in

22   anything.

23        Q.    But even if she did disobey the rules,

24   you'd be willing to -- to --

25        A.    Report her.

77

1      Q.    -- tell the appropriate authorities?

2      A.    Yes, I would.

3      Q.    Last bit of housekeeping, I'd ask you if

4  you've read this.  And I said at the beginning that

5  you don't have an email address.  You, in fact, do

6  have one; is that correct?

7      A.    Yes, I do.

8      Q.    Yeah, don't tell us, but at least

9  (indiscernible).  But you'd be willing to share that

10 with the authorities or whoever else needed it; is

11 that right?

12     A.    I would.

13     Q.    Okay.  All right.  Those are my

14 questions.  I think the prosecutor may have some

15 questions for you.

16           How old are you, ma'am?

17     A.    73.

18           MR. FARMER:  Okay.  I think the

19 prosecutor may have some questions for you.

20           THE COURT:  Mr. Kurtzman?

21           MR. KURTZMAN:  Yes, Your Honor.

22                    **CROSS-EXAMINATION**

23 BY MR. KURTZMAN:

24     Q.    Ma'am, can you hear me?

25     A.    Yes, I can.

78

1      Q.    Ma'am, I understand that your daughter's

2  primary residence has been with you, but she's worked

3  as a traveling nurse.  Within the past year, how long

4  would you say she's stayed at your residence with you?

5      A.    Last year she was here eight months.

6      Q.    Okay.  And so was she working locally

7  where you are or was there just no traveling nurse

8  work at that time?

9      A.    No, she was working for (indiscernible)

10  Hospital, Downtown Atlanta.

11      Q.    Okay.

12           MR. KURTZMAN:  Thank you, Your Honor.

13  Those are -- those are all my questions.

14           THE COURT:  Okay.  Mr. Farmer, any

15  redirect?

16           MR. FARMER:  No, Your Honor.

17           THE COURT:  All right.  Thank you, ma'am.

18  I appreciate your testimony.  This is the Judge.  You

19  are welcome to stay on the line if you'd like to, but

20  you don't have to.  I appreciate your testimony.

21  Thank you for being here today.  If you do stay on the

22  line, I'd just ask that you mute your telephone so

23  that we don't get any potential feedback from that.

24  Thank you.

25           THE WITNESS:  Okay, thank you.

1                 *****WITNESS EXCUSED*****

2                 THE COURT:  Mr. Farmer, do you have any

3     other proof you want to put on?

4                 MR. FARMER:  No, Your Honor, just

5     argument.

6                 THE COURT:  All right, very good.

7                 Mr. Kurtzman, does the government have

8     any rebuttal proof or proof on detention?

9                 MR. KURTZMAN:  No, Your Honor.

10                THE COURT:  All right.

11                MR. KURTZMAN:  Nothing other than what

12    we've already presented.

13                THE COURT:  Sure, I understand.  Thank

14    you.

15                Okay.  I tell you what we're going to do

16    right now is I'm going to take a recess.  I need to

17    look at the exhibits that have been introduced.

18    Mr. Kurtzman, you filed this videotape, which has been

19    described as being roughly 50 minutes, so I'll be

20    looking at that.  And then I'm going to look at the

21    pleadings as well, as I referenced, Mr. Farmer's

22    motion on detention -- or opposition to the

23    government's motion for detention.

24                So I'm guessing we can probably expect

25    this recess to last about an hour, just based on the

80

1   time it will take to get through the video recording.

2                What we'll do is come back on at that

3   point in time, and I'll hear argument from you then

4   and we'll go forward.  During the recess if you-all

5   need to discuss anything, you're welcome to do that.

6   I would suggest -- we don't have a separate room to

7   put you into, but if you-all want to talk on the

8   telephone or need to discuss any matters amongst

9   yourselves, you can do that.  When we come back, I'll

10   ask for any announcements, and then we'll move on to

11   argument at that point.

12                I'm going to leave the screen up and just

13   come back on when I'm ready.  So I would just suggest

14   you-all leave your screen available as well.  And, you

15   know, you can certainly move about, do whatever you

16   need to do.  Like I said, it's going to be a little

17   bit, but when we come back, I'll let you know and

18   we'll wait for everybody to get on at that point.

19                Anything further before we take a recess,

20   Mr. Kurtzman?

21                MR. KURTZMAN:  Your Honor, if it's okay

22   with the Court, I'll excuse Agent Defeo because

23   (indiscernible).

24                THE COURT:  Yeah, thank you,

25   Mr. Kurtzman.  I apologize if I didn't mention that.

81

1    I meant to excuse Mr. Defeo -- Agent Defeo if he

2    needed to leave.  I appreciate you bringing that to my

3    attention.  And certainly he's free to go at this

4    point in time.

5                    Mr. Farmer, any else from you before we

6    take recess?

7                    MR. FARMER:  No, Your Honor.

8                    THE COURT:  All right, very good.  Thank

9    you all.  We'll be in recess.

10                   (Whereupon, a break was taken.)

11                   THE COURT:  All right.  We're back on the

12   record after a recess.  During the recess I was able

13   to review the exhibits in this case and also take a

14   look at the defendant's pleadings in response to the

15   government's motion for detention and memorandum.

16                   Are there any announcements before we

17   begin?

18                   MR. FARMER:  Not from the defense.

19                   MR. KURTZMAN:  Not from the government,

20   Your Honor.

21                   THE COURT:  Very good, thank you.  Okay.

22   So all right.  As I mentioned at the outset, this

23   matter is set today for a preliminary hearing and

24   detention hearing.  Mr. Farmer, I know you have an

25   issue to raise.  Tell me what you would propose in

1   terms of procedurally how we go at this.

2            Do you want to take -- does anybody want

3   to be heard on the -- on the probable cause issue?  I

4   know there is some interplay between the two, but tell

5   me what you'd propose, Mr. Farmer, and I'll hear from

6   you, Mr. Kurtzman.

7            MR. FARMER:  I'm happy to just argue all

8   of it, Your Honor, as opposed to breaking it up.

9            THE COURT:  Okay.

10            MR. FARMER:  (indiscernible).

11            THE COURT:  Hang on, Mr. Farmer.  We're

12   having a little trouble hearing you.  Your volume

13   seems to be a little bit low.  Maybe if you could

14   speak up some for us.

15            MR. FARMER:  (indiscernible).

16            THE COURT:  You're still not that loud.

17   You're pretty clear, but you're just not very loud.

18            MR. FARMER:  How about now?

19            THE COURT:  That's better for me.

20   Ms. Eisenhart, can you hear him okay?  Mr. Kurtzman,

21   how about for you?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Mr. Kurtzman, could you hear

24   Mr. Farmer okay?

25            MR. KURTZMAN:  It was a little better,

1    Your Honor.

2              THE COURT:  All right.  Go ahead,

3    Mr. Farmer.  Sorry --

4              MR. FARMER:  What I was saying is I can

5    proceed either way.  I think given a preference, it

6    probably makes sense just to argue once, but there is,

7    I think in Your Honor's noting, a kind of threshold

8    point we've got to cross before we get into the

9    3142(g) factors.  So just as long as we kind of keep

10   that threshold in mind, I'm happy to argue about all

11   of it.

12             THE COURT:  All right, that's fine.

13   Let's go ahead with the government first.

14   Mr. Kurtzman, if you want to go ahead and argue.  And

15   then we'll -- we'll see what Mr. Farmer has to say and

16   we'll sort of go at it that way.

17             MR. KURTZMAN:  Your Honor, in dealing

18   with alternative (indiscernible) to the probable cause

19   issues, as we laid out -- the government laid out the

20   elements of each of the offenses in its -- in its

21   detention motion.  As the Court's well aware at this

22   early stage, the probable cause threshold is very low.

23             And the government, through the testimony

24   of the FBI special agent presented today, his adoption

25   of the affidavit within the criminal complaint and the

84

1    (indiscernible) statements made, allegedly made by

2    Ms. Eisenhart in the video of her and her son's

3    actions on January 6, the government has established

4    well beyond the probable cause standard -- or well

5    beyond a basis necessary for the Court to find

6    probable cause as to each of the four charged offenses

7    did occur.

8         I'm happy if Mr. Farmer challenges a

9    particular element of a particular charge, I can

10   address that in a rebuttal, but I would just leave

11   it -- leave the preliminary hearing and probable cause

12   finding with what I've just outlined.

13        With respect to the threshold issue of

14   whether detention is appropriate under 3142, I think

15   if the Court looks at the *Casper* case which discusses

16   one of these offenses and lays out -- as cited in the

17   government's motion for detention, lays out that one

18   of these (indiscernible) is an element of the offense;

19   albeit, it does not say that in the law itself.

20        But under 3141(f)(1)(E), I think we also

21   have established that -- or 3141(f)(1)(E) establishes

22   that any felony done with a dangerous weapon is an

23   offense that an individual could be detained pending

24   trial.  Here we have a defendant charged with

25   conspiracy.  We have her co-conspirator ultimately

1    carrying a Taser.  That possession of that Taser can

2    be attributed both to the fact that she is charged as

3    a co-conspirator within the proximity throughout the

4    events of January 6.

5              And it is also, as the government

6    established in its proof, the defendant and her

7    co-conspirator discussed the possession of other

8    weapons on that day as well, which they viewed as

9    being more dangerous than the Taser in potentially

10   leading to federal prison to them.

11             Your Honor, for those reasons, I believe

12   the government -- oh, and one more, under the civil

13   disorder charge, 18 United States Code Section 231, I

14   think it is worth the Court noting that

15   18 United States Code 232 (indiscernible) defines

16   civil disorder as any public disturbance involving

17   acts of violence by assemblages of three or more

18   persons which poses an immediate danger or results in

19   damage or injury to the property or person of any

20   other individual.

21             For those reasons, Your Honor, I believe

22   the government has established that Ms. Eisenhart is,

23   at the very least, eligible for detention.  And for

24   the reasons the government is about to outline should

25   be detained pending trial.

1          THE COURT:  Let me interrupt you right

2    there, Mr. Kurtzman.  Let me hear from Mr. Farmer on

3    those issues at this point because I think that goes

4    to the threshold issue that he's describing for the

5    Court.

6          MR. FARMER:  Thank you, Your Honor.

7          As Your Honor is aware, in this case the

8    government, at least in their pleadings, have

9    addressed three separate threshold basis that they

10   feel they can -- they can have a detention hearing.

11   Specifically in their pleadings, they tie two of the

12   three to 18 USC 1752.  And those three I guess

13   (indiscernible), first is the statutory elements of

14   the crime indicate that it is a crime of violence.

15   The second (indiscernible) that's not true, any felony

16   that involves a dangerous weapon can get them there.

17   And then the third is a substantial risk of flight.

18          So it's very important, I think, to note

19   that I guess despite the government attorney's

20   argument just now, in their pleadings and in their

21   motions, the government's traveling under 1752.  So

22   the first rung, the elements establish a crime of

23   violence, I think that's just a matter of Your Honor

24   looking at the elements of the statute and seeing that

25   they -- that it simply does not.

1          Notably, the government has confined its

2    charging documents to 1752(a)(1) through (3).  This is

3    in the motion and memo.  (a)(4) references physical

4    violence, to be sure.  And I think if the government

5    in their memo said she's also guilty of (a)(4), then

6    their argument would be stronger, but that's not what

7    it says.

8          And then trying to dovetail the (b)(1)

9    enhancement of 1752, the firearm enhancement -- or,

10   excuse me, the dangerous weapon enhancement, that in

11   and of itself certainly doesn't give rise to an

12   elemental crime of violence.  So that way is gone.

13         Then I'm going to jump to the third

14   piece, the substantial risk of flight.  I just don't

15   think there's any evidence whatsoever about risk of

16   flight at all, much less substantial risk of flight.

17   And the government has to do more than just utter the

18   words "substantial risk of flight" and saying she's

19   facing a big sentence and have the Court undergo this

20   analysis.

21         I think -- I understand if you take all

22   the crimes alleged and add up the statutory maximum,

23   you get theoretically to 20 years, but I think the

24   government knows and I know, I think the Court know.

25   There's not really any remote way these charges end up

1   with such significant penalty.  The grouping, the

2   guideline range, my rough estimate, it's about a

3   offense level of a 10 to 12.

4            So I don't think this is one of the cases

5   where it's so serious that we've got to keep

6   Ms. Eisenhart in custody so she won't flee.

7            And that leads to the last one.  This is

8   the theory that if the -- if 1752 is not a crime of

9   violence, we can still proceed if it is a felony and

10  involves a dangerous weapon.  And that's where the

11  probable cause determination comes in.

12           So to proceed -- it's important to note,

13  if there's no dangerous weapon, it's not a felony.

14  1752 is a misdemeanor unless there's a dangerous

15  weapon.

16           So what is the proof that Ms. Eisenhart

17  possessed a dangerous weapon?  None.  There was a lot

18  of attempt to try to kind of tie her to dangerous

19  weapons, there was a lot of attempts to, well -- I

20  heard the agent saying, you know, well, they went and

21  stashed weapons.  You know, but when we bore down on

22  that, he said, well, really (indiscernible) Eisenhart

23  did.  He said Ms. Eisenhart admitted to carrying

24  weapons and we bore down on that -- and I think

25  Your Honor listened to the video.  She says no such

89

1    thing.  She said she can't go in there with weapons.

2    That's not the same thing as saying "I have weapons."

3    There's no -- there's just simply no proof whatsoever

4    that she possessed a weapon.

5              So I guess the other way they get there

6    is through this conspiracy with Mr. Munchel and that

7    she is, you know, on the hook for his conduct.  I

8    understand that's the rule.  And I understand that

9    probable cause is a low standard.  It is a standard

10   nonetheless.  And the evidence before the Court is is

11   that they didn't take any guns that were found up to

12   Washington, DC.  And notably and significantly as they

13   made their way towards the Capitol, they got to the

14   threshold -- that word again, threshold -- of the

15   Capitol and decided, in fact, we don't want to take

16   any weapons in here.  That's what Ms. Eisenhart said.

17   No weapons are going in here.  That's a line we're not

18   going to cross.

19              So she turned around, went back, fought

20   upstream, went all the way back and something, the

21   agent's not able to testify what, the video doesn't

22   reveal what, but placed something into the -- into the

23   duffle bag.

24              I would submit the evidence preponderates

25   that there was no conspiracy to carry a weapon in the

90

1   Capitol.  And if Your Honor so finds, then there's no

2   detention hearing.  Ms. Eisenhart's simply released on

3   her own recognizance.

4                THE COURT:  So, Mr. Kurtzman, I'm looking

5   at the government's pleading in support of its motion

6   for detention.  What do you say about Mr. Farmer's

7   argument that 1752(a) by itself doesn't form a basis

8   for detention?  I mean, do you -- do you acknowledge

9   that to form a basis as a crime of violence would

10  require Ms. Eisenhart to possess a dangerous weapon?

11               MR. KURTZMAN:  Your Honor, if you could

12  say that again.

13               THE COURT:  Yeah.  So as I see it, we're

14  looking at really sort of two issues here.  One is --

15  is the one you've just advanced with regard to the

16  conspiracy and that, as set forth in your memorandum

17  at page 5, where it discusses that this involved a

18  conspiracy to possess a dangerous -- or use a

19  dangerous weapon, namely a Taser.

20               My question is:  If you set aside the

21  conspiracy for a minute, what do you say about

22  Mr. Farmer's argument that there's been no proof that

23  Ms. Eisenhart possessed any sort of a dangerous weapon

24  such as 1752 by itself, without the conspiracy

25  element, doesn't form a basis for detention as to her.

1    Do you agree with that?

2              MR. KURTZMAN:  Your Honor, I would -- I

3    would disagree with that, Your Honor.  I would argue

4    that this is like a case that where we're more

5    familiarly in front of you with, where even throughout

6    the conspiracy charge, the government would be able to

7    proceed under constructive possession of a dangerous

8    weapon, in that, as the Court knows, as it sees in the

9    video, Ms. Eisenhart and her son are attached,

10   literally, attached for the majority, the majority of

11   their time both approaching and inside the Capitol.

12   And I would disagree with the characterization that

13   she said that it was Ms. Eisenhart who did not want to

14   take weapons in there.

15             That is not what the evidence shows.  The

16   evidence shows that her son said he wasn't going in

17   there because he had weapons.  And she said, you know,

18   we're going to go dump them back in the bag and then

19   we're going.

20             She was fully aware that he possessed the

21   Taser.  As defense counsel elicited, Mr. Munchel's

22   interaction with law enforcement the day preceding the

23   storming of the Capitol, he was asked about his Taser.

24   The evidence shows that Ms. Eisenhart was with him

25   when he was asked.  And I believe the Taser was in the

1    same location, i.e. on his hip, as she stormed the

2    Capitol, which is the same place that the Taser was

3    when he and Ms. Eisenhart were stopped by the police

4    asking what that was that he was carrying.

5              THE COURT:  Does the government take the

6    position that Ms. Eisenhart conspired with anyone

7    other than Mr. Munchel?

8              MR. KURTZMAN:  Your Honor, I -- at this

9    point with search warrants not returned on their

10   phones, I'm not -- I'm willing to say that at this

11   point we don't know of any other interaction between

12   her and -- we don't know of any other agreements to

13   further criminal conduct, other than between she and

14   her son.  But as the Court knows, the investigation is

15   in a relatively (indiscernible) stage.

16             THE COURT:  But you're not suggesting

17   that she's subject to detention because some random

18   person who was a part of that group had a dangerous

19   weapon on them.  You're focusing exclusively on

20   Mr. Munchel for your argument of constructive

21   possession.

22             MR. KURTZMAN:  With respect to this

23   threshold issue, yes, Your Honor.

24             THE COURT:  Okay.  And so you -- the

25   government's position is that if one person who's a

1    part of the alleged conspiracy possesses a firearm,

2    then the other person possesses the firearm as well.

3              MR. KURTZMAN:  Well, in this conspiracy

4    they are --

5              THE COURT:  Or, I'm sorry, the dangerous

6    weapon, I'm sorry.  I think it's established there's

7    no firearm taken into the Capitol.

8              MR. KURTZMAN:  There's no evidence that

9    there was a firearm, Your Honor, in the Capitol.

10             THE COURT:  Right, but that's your --

11   that's the government's basis for these charges is

12   that Mr. Munchel's possession is attributable to her.

13             MR. KURTZMAN:  Correct, Your Honor, both

14   through their conspiracy and through constructive

15   possession as they moved sort arm in arm or connected

16   through the Capitol.

17             THE COURT:  Okay.  Mr. Farmer, anything

18   else you want to say about that?

19             MR. FARMER:  Yes, Your Honor.  Just

20   simply that that's not the law on conspiracy or

21   possession as it applies (indiscernible).  And I'll

22   rest on my statements I've already made in the

23   pleadings I filed.

24             THE COURT:  Well, I didn't notice, maybe

25   you can direct me to it.  I didn't see that either

94

1   side provided me any law on that issue.  I gather,

2   Mr. Farmer, you sort of say that you didn't

3   necessarily think that was the argument the government

4   was going to make, but -- but are you aware of any law

5   on that issue?  You say that's not the law.

6           MR. FARMER:  The law -- the law as to

7   conspiracy to take a weapon or a dangerous weapon into

8   the Capitol, I don't cite that, but I think that was

9   required (indiscernible).

10           THE COURT:  So it's --

11           MR. FARMER:  I do cite in my motion a --

12   some law about -- and I guess that's about elements,

13   about the elements about this issue.

14           THE COURT:  Okay.  So you argue that in

15   order for her to be guilty of -- or to meet the

16   standard for conspiracy to possess the dangerous

17   firearm, there has to be some agreement between her

18   and Mr. Munchel to take that Taser in.  It's not

19   enough that he had it on his person.  There has to be

20   some evidence of an agreement that he was going to go

21   in, that she was a part of that.

22           MR. FARMER:  I think that's exactly

23   right.

24           THE COURT:  Okay.  What about you,

25   Mr. Kurtzman?  Are you aware of any case law on that

1   issue that you can speak to?

2              MR. KURTZMAN:  Your Honor, case law on

3   that issue, no, not -- not sort of at the -- at the

4   ready.  But she's -- Ms. Eisenhart isn't charged with

5   conspiracy to possess that Taser.  She's charged with

6   conspiracy to violate the other charges in her

7   charging document.  She knows and knew at the time

8   that Mr. Munchel had that Taser on his hip.  She knew

9   he had packed it, knew he had it with him the night

10  before, she knew he had it that day.  And they went

11  into the Capitol with it.  And that's sufficient to

12  form the basis to have a detention hearing.

13             THE COURT:  Well, the -- the possession

14  of that firearm is not a necessary element of any of

15  the crimes with which she's charged, is it?  I mean,

16  isn't that the argument that you make on probable

17  cause, that all I have to do is find probable cause as

18  to any of the elements under the offense.  And I could

19  find that without the dangerous weapon being present,

20  couldn't I?

21             MR. KURTZMAN:  As you look at 1752,

22  Your Honor, at this point you're not looking to apply

23  the (b)(1)(A) enhancement.

24             THE COURT:  Right.  I'm just looking for

25  probable cause on 7152(a) (sic); right?

1              MR. KURTZMAN:  Yes, Your Honor.

2              THE COURT:  And I could -- I could find

3     that without possession of a dangerous weapon,

4     couldn't I?

5              MR. KURTZMAN:  You could, Your Honor.

6              THE COURT:  Okay.  And the same is true

7     for the other offenses with which she's charged;

8     right?

9              MR. KURTZMAN:  Well, Your Honor, I'd

10    contend that 231 defines itself as a felony undertaken

11    in a violent fashion.  So I think if we look -- if

12    we're going to rely on the letter, as I described

13    before, I believe it's -- Title 18 United States Code

14    Section 232(1) defines what civil disorder is, which

15    is something that Ms. Eisenhart is charged with.  And

16    the language of that law defines it as a violent

17    offense or an offense undertaken in a violent matter.

18             THE COURT:  Right.  But the elements of

19    231, if you look at 231(a)(1) through (3), again like

20    1752(a), I could find probable cause on that without

21    there being an act of violence or possession of a

22    firearm or use of a dangerous device or possession of

23    a dangerous device, can't I?  I mean, aren't we in the

24    same boat with 231 that we are with 1752(a)?

25             MR. KURTZMAN:  Yes, Your Honor.  I

1    guess -- yes, Your Honor.  I would agree, but I think

2    ignoring the fact that that dangerous weapon is there

3    is frankly not appropriate when we are only looking at

4    it from the perspective of detention and whether we

5    can have a detention hearing.

6              So we're sort of saying, imagine that

7    Taser's not there to see if we can meet the threshold,

8    but that's not -- we're sort of ignoring the Taser's

9    there and then saying you can't make the threshold

10   when we all have seen (indiscernible).

11             THE COURT:  Right.  But we certainly know

12   that she didn't possess the Taser.  So, therefore, the

13   only theory for her to be accountable for the Taser is

14   the conspiracy.  So we're right back to where we

15   started, aren't we?

16             MR. KURTZMAN:  Your Honor, eventually,

17   but I think it ignores the fact that that conspiracy

18   resulted in Ms. Eisenhart with her co-conspirator, who

19   has the dangerous weapon on his hip, roaming through

20   the Capitol with zip ties trying doorways to enter as

21   other individuals are ultimately wondering where the

22   lawmakers are and where they went.

23             And so when we look at that, those facts

24   in the context of charges, I think that conspiracy

25   takes on a more significant -- rises to a more

1    significant level and it's appropriate to look at the

2    circumstances underlying the charges, even though the

3    Court is correct, you can find probable cause without

4    getting to the dangerous weapon.

5                    THE COURT:  And the government's position

6    is that Ms. -- because you allege that there's this

7    conspiracy between Mr. Munchel and Ms. Eisenhart, that

8    then she is responsible and accountable for anything

9    that he does or possesses; right?

10                   MR. KURTZMAN:  Yes, Your Honor.

11                   THE COURT:  Okay.  All right.  I'm going

12   to reserve ruling on that.  What I want to do is hear

13   from you on -- well, first let me -- Mr. Farmer,

14   anything else you want to argue on probable cause at

15   this point?

16                   MR. FARMER:  No, Your Honor.

17                   THE COURT:  All right, thank you.

18                   I'm going to reserve ruling on the

19   statutory basis -- on the basis for detention.  I want

20   to hear argument on detention, assuming that we get

21   past that threshold.  And, again, Mr. Farmer, your --

22   your argument is still preserved on that.  I just

23   think it's more efficient to go through the argument

24   and see where we are and I'll make my ruling on that

25   point.

1          Mr. Kurtzman, do you want to be heard on

2     the detention issue?

3          MR. KURTZMAN:  Yes, Your Honor.

4          I'm getting a little feedback.

5          THE COURT:  Okay, I'm sorry.

6          MR. KURTZMAN:  That seems to be better.

7     Nope.

8          THE COURT:  All right.  I refreshed my

9     screen.  I don't know if that's any better for you.

10    I'm hearing you okay.

11         MR. KURTZMAN:  I can -- it sounds better

12    for me as well.  Thank you.

13         THE COURT:  Sure.  Sorry about that,

14    Mr. Kurtzman.  Go ahead.

15         MR. KURTZMAN:  Your Honor, as you look at

16    the nature and circumstances of the offense here, it's

17    sometime on January 4 this year the defendant and her

18    son left Nashville prepared for battle.  They packed

19    tactical vests, stun gun, knives and likely other

20    weapons that they mentioned in the video they recorded

21    of themselves in preparation for the events of

22    January 6 which culminated in the storming of the

23    Capitol and the evacuation of lawmakers.

24         So any assertion the defendant did not

25    play in that engaging in the conduct that we saw on

1   January 6 is simply inaccurate.  She packed in

2   Nashville on January 4 ready for violence and ready

3   for whatever may come.

4              As we turn to the events of January 6,

5   the best evidence is Exhibit 3, the 50-minute video

6   depicting her actions.  When moving into the Capitol,

7   she was preceded by violent, fellow insurrectionists

8   who cleared a path.  In fact, members of the militia

9   known as Oathkeepers were encountered as she moved

10  towards (indiscernible).  As the video makes clear,

11  she was not moving with the crowd.  In fact, she was

12  asking people to get out of the way so she could get

13  up to the front, which is what she eventually did.

14  And the video also (indiscernible) were pleased that

15  members of this group, the Oathkeepers, were advancing

16  in front of them as they approached the Capitol.

17             Prior to entering the Capitol, the

18  defendant directs her son to stash their weapons

19  before they (indiscernible).  At this point her son

20  stated that he was not going to go inside the Capitol.

21  The defendant insisted that we drop something off and

22  then advance towards the Capitol.  And she's

23  encouraging other protesters to do the same as they go

24  forward and remark that the tear gas pointed against

25  her would not be sufficient to stop her.

1              She approaches -- as she again approaches
2    the Capitol, she accuses representatives of treason.
3    And then runs into somebody who says he just punched
4    two in the face, presumably referring to law
5    enforcement.  Ms. Eisenhart, advancing towards the
6    Capitol, said good, and continued to encourage this
7    person by saying while everyone else is on their
8    couch, you guys are training and getting ready for it.
9    And "it" is the insurrection that she herself wanted
10   to participate in that day.
11              After learning that the events of the
12   Capitol were on the news, Ms. Eisenhart
13   (indiscernible) and her son stated, we ain't playing
14   Fing nice no Goddamn more, to which she replied,
15   that's right.  Moments later another person in the
16   crowd sees them advancing towards the Capitol.  The
17   (indiscernible) look like y'all are ready to go, and
18   her son, advancing with her, says "Fing ready to F
19   shit up."
20              Your Honor, the next -- there's just
21   footage on the video (indiscernible).  You know, I
22   think that one of the most concerning parts is what
23   they do once they get inside the Capitol.  As the
24   Court is well aware, there were a lot of people who
25   walked into the Capitol, albeit breaking the law and

1   were charged with misdemeanors.

2              In this case, Ms. Eisenhart and her son

3   walked in (indiscernible), and then obtained zip ties

4   and began roaming the hallways checking for unlocked

5   doors.  Now, there's plenty of (indiscernible)

6   statements now that they wanted to keep those zip ties

7   away from others.  They walked by plenty of police

8   officers and didn't give them to them.  And they

9   didn't take all of them.  Her son took approximately

10  four and she had one.  So the idea that they were

11  somehow acting benevolently is not supported by their

12  actions.

13             At one point the defendant can be seen

14  (indiscernible) police officers who had just

15  (indiscernible) and she yells from the banister,

16  "Freedom," "Traitors."  "We want a fair election" and

17  "We want rule of law."

18             The defendant then proceeded inside the

19  Senate gallery armed with a stun gun, she walking with

20  the zip ties as other individuals that they are

21  commiserating with moving through the Capitol saying

22  "anybody home, where'd you go," "they're cowards,"

23  yelling "treason."

24             So the idea that those zip ties were not

25  taken -- or were taken in a benevolent move by the

1   defendants is just not supported -- not supported by

2   the evidence.

3          As we look at the evidence of

4   dangerousness, after storming the Capitol, the

5   defendant reveled in what she had done rather than

6   (indiscernible).  In interviews the following day, she

7   explained to a reporter that she was prepared to fight

8   and ultimately die for the cause.  She said it would

9   be (indiscernible) to live under an oppressive

10  government and would rather fight and rather die.

11         Her son also participated in the

12  interview, said that their collective purpose in

13  coming to Washington was to show that we're willing to

14  rise up, band together to fight, if necessary, same as

15  our forefathers who established this country in 1776.

16         That's why the defendant packed a tac

17  vest.  That's why they packed the stun gun.  That's

18  why they packed other weapons, because they knew they

19  were going to get into something.  They know exactly

20  what?  No.  They were willing participants

21  (indiscernible).

22         Your Honor, Ms. Eisenhart's conduct and

23  statements here are dangerous and clearly those of an

24  insurrectionist who tried to derail the United States

25  government, and in this case through violence.

1        If you divorce her statements from her
2    actions, you can say, well, that's just somebody
3    saying something.  But she's saying she wants to fight
4    and is willing to die for her cause, which is
5    overthrowing the election and installing
6    (indiscernible).  She said she's willing to die for
7    that.
8        And on January 6 she stormed the Capitol
9    in furtherance of her agenda.  And I don't think we
10   can divorce her statements and actions when we look at
11   both the nature and circumstances of the offense and
12   the weight of evidence as to dangerousness if
13   released.
14       Based on these statements and her
15   actions, I don't think there's any way the Court can
16   set conditions of release that would alleviate the
17   danger the defendant poses to the community.  She was
18   willing to break the law and then openly state that
19   she was willing to die on behalf of her cause.  I
20   think we need to believe her.  And accordingly, the
21   United States would ask the Court to detain
22   Ms. Eisenhart pending trial.
23       THE COURT:  Mr. Kurtzman, what is the
24   danger that the government believes Ms. Eisenhart
25   poses between now and the time she stands for the

1    offenses with which she's charged?  What do you think

2    she's going to do, in other words, between now and

3    then?

4              MR. KURTZMAN:  Your Honor, it appears,

5    based on her own public statements, that the

6    lawlessness that she engaged in on January 6

7    emboldened her and encouraged her in what she has

8    defined as her cause.  So the government would rely

9    upon the danger that she has told you she wants to

10   fight and die to overthrow the government.  We're just

11   asking you to believe what she has said.

12             THE COURT:  So you think she's -- you

13   think if I let her out she's going to overthrow the

14   government?

15             MR. KURTZMAN:  Your Honor, I think she is

16   going to be involved in more insurrectionist

17   behavior --

18             THE COURT:  Such as?

19             MR. KURTZMAN:  -- absolutely.

20   Your Honor, she's shown that she will -- she will jump

21   in at any opportunity.  There's a lot of people, as

22   the Court knows, in that video not advancing towards

23   the Capitol, not cheering the assault of law

24   enforcement, not accompanied by someone with a stun

25   gun.

1      There's a lot of people inside the

2  Capitol who didn't go into the Senate gallery with zip

3  ties, as others around them are openly looking for

4  lawmakers.  I don't think any set of conditions could

5  prevent her from engaging in the same sort of conduct

6  if given the opportunity.

7      THE COURT:  Well, that's an important

8  point, if given the opportunity, right?  Can't I

9  deprive her of the opportunity through conditions?  I

10  mean, if I tell her she can't go to Washington, DC and

11  can't be in the Capitol, haven't I deprived her of the

12  ability to do what you're saying you think she's going

13  to do?

14      MR. KURTZMAN:  Your Honor, as the Court

15  is likely aware and as a matter of public record,

16  there were plans, albeit -- I'm not sure the level to

17  which they came to fruition, there were plans to have

18  armed -- armed protests at every state Capitol shortly

19  after the inauguration.

20      I don't think the Court can set

21  conditions that would prevent Ms. Eisenhart from

22  engaging in local activities that would also be viewed

23  as insurrectionist, antilaw enforcement.

24      THE COURT:  What if I ordered home

25  detention?  Wouldn't that keep her from going to those

1    events?  Couldn't I order that she not go or

2    participate in any of these events?  Why would that

3    not prevent that from happening?

4              MR. KURTZMAN:  Your Honor, nothing --

5    Ms. Eisenhart stormed the Capitol of the

6    United States.  That's something that is relatively

7    unimaginable.  And the fact that she knew federal

8    prison was a likely result of that -- she says that on

9    the video -- that did not dissuade her, and I don't

10   think -- I don't think you setting a condition that

11   she remains at home would alleviate that danger.

12             THE COURT:  Why is that?  What evidence

13   do you have that she wouldn't comply with any

14   condition that I imposed?

15             MR. KURTZMAN:  Your Honor, she has -- she

16   has told the public that she is willing to fight and

17   die for her cause and that she would prefer that over

18   living under the current system.  I'm just asking --

19   I'm just asking the Court to believe her.  That --

20   that is not just rhetoric when it's coupled with her

21   actions here.

22             THE COURT:  You would agree with me that

23   the term fight has multiple connotations, doesn't it?

24             MR. KURTZMAN:  Not -- not when you're

25   saying you're willing to fight and die,

1   no, Your Honor.  When you say you're willing to fight

2   and die, that is -- I don't -- I don't agree that

3   there's a different connotation that doesn't involve

4   violence.

5           THE COURT:  So it's your belief and the

6   government's arguing that Ms. Eisenhart's statement

7   that, as set forth on page 10 of your memorandum, "I'd

8   rather die and would rather fight" is a literal

9   statement.

10          MR. KURTZMAN:  Yes, Your Honor.

11          THE COURT:  Okay.  Based on what?  Who

12  did she fight on January the 6th?

13          MR. KURTZMAN:  She was actively looking

14  for people, Your Honor.

15          THE COURT:  Right.  Who did she fight on

16  January the 6th, Mr. Kurtzman?

17          MR. KURTZMAN:  Your Honor, she and her

18  son and other individuals were actively seeking

19  lawmakers with -- her son having a stun gun and both

20  of them possessing zip ties.

21          THE COURT:  Did she fight any lawmakers?

22          MR. KURTZMAN:  Fortunately she did not

23  encounter any, Your Honor.

24          THE COURT:  She encountered law

25  enforcement that day; right?  Walked by them in the

109

1    video.  That's seen in the video; right?

2                    MR. KURTZMAN:  It is, Your Honor.

3                    THE COURT:  Did she fight any of them?

4                    MR. KURTZMAN:  She did follow them and

5    yell that they had committed treason and somehow

6    stolen the election, Your Honor.

7                    THE COURT:  Let's talk about that.  She

8    followed them, you say.  Is there a difference between

9    following somebody and chasing someone?

10                   MR. KURTZMAN:  I would agree, I would

11   agree that there's a distinction there.

12                   THE COURT:  And in this video, did

13   Ms. Eisenhart or Mr. Munchel ever say anything to the

14   effect -- with this particular instance that you're

15   talking about, where she allegedly followed these

16   officers, did they ever say anything about, there's

17   some officers, let's go get them, let's chase them,

18   let's follow them?

19                   MR. KURTZMAN:  No, Your Honor.

20                   THE COURT:  You've seen the surveillance

21   video of that situation, haven't you?

22                   MR. KURTZMAN:  Yes, Your Honor.

23                   THE COURT:  And the surveillance video

24   shows an altercation between a number of individuals

25   who had entered the Capitol and it looked like maybe a

1    couple of what appeared to be like plainclothes

2    officers.  Is that -- that's the incident that you're

3    referring to, isn't it?

4              MR. KURTZMAN:  I believe so, yes,

5    Your Honor.

6              THE COURT:  And those two plainclothes

7    officers, those heros are standing at the door of the

8    Senate chambers; right?

9              MR. KURTZMAN:  Yes, Your Honor.

10              THE COURT:  At the lower level; correct?

11              MR. KURTZMAN:  I believe that's correct,

12    Your Honor.

13              THE COURT:  And a group of folks that

14    have entered the building come up to them and then

15    they move away from the doors down a hallway, right?

16    And you would -- it's fair to say, don't you think,

17    that those -- those protesters, those rioters, they

18    forced those -- those officers away from the Senate

19    chamber doors; right?

20              MR. KURTZMAN:  I think that's what the

21    video depicts, yes, Your Honor.

22              THE COURT:  Right.  And at the time

23    that's occurring, based on the video from Mr. Munchel,

24    Ms. Eisenhart and Mr. Munchel are nowhere even near

25    that, are they?

1        MR. KURTZMAN:  I don't think so,

2    Your Honor.

3        THE COURT:  And then in the video from

4    the surveillance cameras, the police officers, at

5    least one of them, appears to take some sort of a

6    boxing-type pose where he looks like he's going to box

7    or defend himself and some of the protesters or

8    rioters take a similar pose; isn't that right?

9        MR. KURTZMAN:  I think so, Your Honor.

10       THE COURT:  And at that time, again,

11   Ms. Eisenhart and Mr. Munchel are nowhere near that;

12   right?

13       MR. KURTZMAN:  I don't -- it's certainly

14   not -- that I ever recall it's not on the video that

15   Mr. Munchel recorded.

16       THE COURT:  Right.  And there's no

17   evidence to believe that Ms. Eisenhart or Mr. Munchel

18   had any knowledge that that was even happening at that

19   time, is there?

20       MR. KURTZMAN:  Your Honor, they were --

21   they were both well-informed that there was violence

22   being inflicted upon the law enforcement that was

23   trying to protect the Capitol.

24       THE COURT:  Right.

25       MR. KURTZMAN:  (indiscernible).

1          THE COURT:  Yes, sir.  We're talking

2     about this incident that you've referred to of them

3     following these officers.  No evidence that they knew

4     that that was going on, is there?

5          MR. KURTZMAN:  Not that I know of,

6     Your Honor.

7          THE COURT:  All right.  And then some

8     other rioters step in between and the officers proceed

9     down a hallway; correct?

10          MR. KURTZMAN:  Yes, Your Honor.

11          THE COURT:  And the officers have been

12     gone for several seconds, 15, 20 -- I don't know what

13     it is, but several seconds before Ms. Eisenhart and

14     Mr. Munchel even come into the scene, into the picture

15     of the surveillance camera; isn't that right?

16          MR. KURTZMAN:  I believe so, Your Honor.

17     If you look at Mr. Munchel's video, I think the

18     officers are already off screen when you see the

19     defendant move towards them --

20          THE COURT:  Right.

21          MR. KURTZMAN:  -- down the stairs.

22          THE COURT:  Right.  So in reality, they

23     happened to go into the same direction that those

24     officers went.  There's no evidence that they were

25     following, pursuing, chasing or going after them in

1   any way, was there?

2           MR. KURTZMAN:  Your Honor, it appeared on

3   the video that she is yelling directly (indiscernible)

4   sort of down that stairwell.

5           THE COURT:  Okay.

6           MR. KURTZMAN:  She didn't proceed down

7   the stairwells, certainly.  But -- but I think

8   everything else you've said is accurate.

9           THE COURT:  Yeah.  So the point that

10  she's yelling that you're talking about, again, the

11  officers aren't in the frame -- we couldn't even see

12  them, can we?

13          MR. KURTZMAN:  No, because Mr. Munchel's

14  behind her, that's right, Your Honor.

15          THE COURT:  Right.  And she's yelling

16  over a balcony as is someone else; right?

17          MR. KURTZMAN:  That's correct,

18  Your Honor.

19          THE COURT:  And the government doesn't

20  have any evidence at all about who's under that

21  balcony or below that balcony that she might be

22  yelling at; right?

23          MR. KURTZMAN:  Other than what we've

24  discussed, Your Honor.

25          THE COURT:  Right.  But you don't know

1    that those officers are even there.  There's no

2    evidence to suggest one way or the other, is there?

3                  MR. KURTZMAN:  I mean, I think they

4    departed that area shortly before they get there.

5                  THE COURT:  Right.  But you don't know

6    where they went, do you?

7                  MR. KURTZMAN:  I'm presuming they were

8    going down the stairs.

9                  THE COURT:  Right, you're presuming.  You

10   don't have any evidence; right?

11                  MR. KURTZMAN:  I cannot -- I do not have

12   any footage of her -- over her shoulder with the

13   officers in sight, that's correct, Your Honor.

14                  THE COURT:  Okay.  So what we know from

15   that is that we know that these officers went in a

16   direction, and Ms. Eisenhart also went in the same

17   direction and that she yelled some things; right?

18   That's really what that boils down to, isn't it?

19                  MR. KURTZMAN:  That instance?

20                  THE COURT:  Yes.

21                  MR. KURTZMAN:  Yes, Your Honor.

22                  THE COURT:  And there's no other instance

23   that you're aware of of Ms. Eisenhart or Mr. Munchel

24   threatening or following any officers, is there?

25                  MR. KURTZMAN:  Threatening or following

115

1    officers, no, Your Honor.  She certainly, at least in

2    the government's -- or the government's position, was

3    endorsing that conduct.

4                    THE COURT:  Okay.

5                    MR. KURTZMAN:  (indiscernible) to the

6    Capitol.

7                    THE COURT:  Okay.

8                    MR. KURTZMAN:  She was incredibly pleased

9    that she had learned that the House or Senate chamber

10   had been tear gassed.  I believe she said one of the

11   best days of her life --

12                   THE COURT:  Okay.

13                   MR. KURTZMAN:  -- hearing that.

14                   THE COURT:  Okay.

15                   MR. KURTZMAN:  And she also talked to an

16   individual who was going away from the Capitol after

17   encountering Capitol police and fighting them.

18                   THE COURT:  Okay.

19                   MR. KURTZMAN:  And she was also

20   encouraging of that conduct.  So she knew -- as she

21   was moving up there, she knew what she was moving

22   towards, and that was violence.

23                   THE COURT:  Okay.  Well, there's --

24   there's a difference between encouraging and

25   supporting, isn't there?

1           MR. KURTZMAN:  Certainly, Your Honor.

2           THE COURT:  Yeah.  And yet another one

3    between actually doing it; right?

4           MR. KURTZMAN:  I would -- your Honor, I

5    think I might have conceded too quickly.

6           THE COURT:  Okay.

7           MR. KURTZMAN:  Encouraging and

8    supporting, I think -- I think both these are here.

9           THE COURT:  Okay.

10          MR. KURTZMAN:  Ms. Eisenhart --

11          THE COURT:  I'm just thinking of -- I'm

12   just thinking of the -- the example you used of the

13   individual who said he punched two in the face.  She

14   didn't say go back and punch some more; she said words

15   to the effect that she supported what he did.  Right?

16          MR. KURTZMAN:  She said it was great --

17          THE COURT:  Right.

18          MR. KURTZMAN:  -- and praised him for

19   actively training the militia to engage in the sort of

20   conduct that she was a part of.

21          THE COURT:  Right.  And that's different

22   than saying "go fight those people," isn't it?

23          MR. KURTZMAN:  Your Honor, it was -- it

24   was reminiscent of thanking a returning Service member

25   for their service.

1          THE COURT:  Okay.

2          MR. KURTZMAN:  Except she's giving that

3    praise to a violent insurrectionist who's going to

4    take a break after assaulting Capitol police officers.

5          THE COURT:  Okay.  All right.  So back to

6    the statements at page 10 about I'd rather die and I

7    would rather fight.  What day was Ms. Eisenhart

8    arrested?

9          MR. KURTZMAN:  I want to say it was the

10   17th, Your Honor.

11         THE COURT:  Okay.  So it was 11 -- 11

12   days after the riot; right?

13         MR. KURTZMAN:  I believe that's correct,

14   Your Honor.

15         THE COURT:  Okay.  And is there any

16   evidence that the government has that in those 11 days

17   Ms. Eisenhart engaged in any fighting activity?

18         MR. KURTZMAN:  Not that I'm aware of,

19   Your Honor.

20         THE COURT:  You heard that Mr. Farmer

21   questioned the FBI agent about Ms. Eisenhart

22   contacting the FBI on a daily basis.  Do you have any

23   reason to dispute that?

24         MR. KURTZMAN:  I don't, Your Honor.

25         THE COURT:  And when she -- she

1   surrendered to the FBI; right?  They didn't have to go

2   arrest her, did they?

3              MR. KURTZMAN:  That's correct,

4   Your Honor.

5              THE COURT:  The FBI can -- can arrest

6   people subject -- under the law, when they believe

7   they're dangerous; right?  And they're charged with an

8   offense; right?

9              MR. KURTZMAN:  Right.  And, Your Honor,

10  here she had not been charged yet.

11             THE COURT:  Okay.  She -- when she found

12  out she'd been charged, the FBI didn't go out to

13  arrest her; right?

14             MR. KURTZMAN:  That's correct,

15  Your Honor.

16             THE COURT:  They told her she'd been

17  charged; right?

18             MR. KURTZMAN:  Yes.

19             THE COURT:  And the consequences of that

20  was literally taking her freedom; right?  She was

21  going to go into custody; right?

22             MR. KURTZMAN:  She was, yes, Your Honor.

23             THE COURT:  She didn't fight anybody

24  then, did she?

25             MR. KURTZMAN:  Not that I'm aware of,

119

1    Your Honor.  No.  And I would be aware if she did.

2                THE COURT:  Right.  Okay.  In fact, what

3    she was expressing concern about, in part, was that

4    she didn't feel like she had the ability to express

5    herself on the Internet.  Do you think she was going

6    to fight over the Internet but yet when her liberty

7    was taken away from her she didn't fight?  Isn't that

8    somewhat inconsistent and doesn't that suggest that

9    maybe that fighting and dying is more hyperbole than

10   it is, as you say, take her at her word?

11               MR. KURTZMAN:  No, Your Honor.  Based on

12   her conduct and the conduct of her co-conspirator,

13   it's not just rhetoric.

14               THE COURT:  When somebody -- when

15   somebody's ready to fight and die, don't you think

16   when they find out that they're going to be arrested,

17   they might fight?

18               MR. KURTZMAN:  Potentially, Your Honor.

19               THE COURT:  Wouldn't you expect that if

20   she's willing to fight and die, that she really

21   wouldn't want to turn herself in and go into custody?

22               MR. KURTZMAN:  Your Honor, I think her

23   decision could have been informed by the fact that her

24   son was already in custody and all the weapons had

25   been seized from his house.  So I think -- I think --

120

you know, I think if -- if Ms. Eisenhart's cause are
different here, I think her rhetoric would be -- would
be taken a little more seriously.  And I just ask that
we take it seriously because of the conduct she's
charged with.

And the seriousness of what's in that
video, which is her and her son -- Mr. Farmer will
dispute, but it's she and her son illegally roaming
the halls of the Capitol with a stun gun and zip ties
as people are looking for lawmakers.  Now -- so I just
ask that we take her at her word that this is a cause
that she very much believes in and that she is willing
to undertake criminal conduct to further her cause.

THE COURT:  You talked about the advance
planning about, you know, making a decision to go to
Washington, DC, taking the tactical jacket,
Mr. Munchel take the stun gun and perhaps taking other
weapons as well.  Is there any evidence that the
government can point to that at the time those plans
were made that there was actually a plan by
Ms. Eisenhart and/or Mr. Munchel to go into the
Capitol and commit the crimes with which she's
charged?

MR. KURTZMAN:  I don't know if they had
planned to go in the Capitol, Your Honor.  I have not

1    seen any advance planning on their part of entering

2    the Capitol.

3            THE COURT:  Right.

4            MR. KURTZMAN:  I would submit there are

5    others around the country being charged with that

6    advance planning.  Mr. Munchel and Ms. Eisenhart are

7    not amongst that group.  But Your Honor witnessed the

8    FBI agent testified today, and he is in a suit.  He

9    did not bring his tactical vest.  He did not have

10   weapons.

11           The advance planning is that they knew

12   they were going to more than likely engage in violent

13   conduct in support of the cause.  You don't -- one

14   does not bring a tactical vest and multiple weapons to

15   a free speech rally if one does not also anticipate

16   participating in other unlawful or violent activity.

17           THE COURT:  If your FBI agent thought he

18   was going to be attacked by somebody, wouldn't that be

19   a reasonable reason to wear some sort of protective

20   gear?

21           MR. KURTZMAN:  Your Honor, if he were

22   making an arrest, I would more than likely expect him

23   to be in it.

24           THE COURT:  Because he would expect at

25   least there was a possibility that he might be

1   attacked; right?

2            MR. KURTZMAN:  I would imagine that's a

3   policy thing as well, Your Honor.  I'm not --

4            THE COURT:  Okay.

5            MR. KURTZMAN:  (indiscernible).

6            THE COURT:  I've seen media reports that

7   the government has authorized members of Congress to

8   purchase bulletproof vests.  Are you aware of that

9   reporting?

10           MR. KURTZMAN:  I was not, Your Honor.

11           THE COURT:  Okay.  Isn't it possible,

12   though, that someone would wear a bulletproof vest for

13   their protection rather than to offensively engage in

14   conduct?

15           MR. KURTZMAN:  Perhaps, Your Honor, but

16   that divorces us from the fact that they brought

17   weapons with them.  So -- and one would also not -- I

18   thought my screen broke up.

19           One would also not expect that a free

20   speech rally would be something necessary -- would be

21   necessary to wear a tactical vest, carry multiple

22   weapons and do those sorts of things.  So I think the

23   government's inference, at least, is that all that

24   stuff was packed for both offensive and defensive

25   purposes.

1          THE COURT:  But you concede that

2    offensive purposes would not be the only reason that

3    someone would have that kind of gear; right?

4          MR. KURTZMAN:  Fair, Your Honor.  It

5    would be -- it would be reasonable that someone arming

6    themselves with a weapon would wear that to protect

7    themselves from others armed with weapons.  In this

8    case those individuals were the -- unfortunately on

9    January 6 were the Capitol police officers.

10          THE COURT:  You read Mr. Farmer's

11    position paper here today?

12          MR. KURTZMAN:  I have, Your Honor.

13          THE COURT:  He makes an estoppel

14    argument.  What do you think about that argument?

15          MR. KURTZMAN:  I think that's probably

16    not for us, Your Honor.  And I've seen the argument,

17    but I think at this preliminary/detention hearing it

18    is probably unnecessary for us to dive into that.

19          THE COURT:  Well, okay.

20          MR. KURTZMAN:  (indiscernible).

21          THE COURT:  Okay.  Well, let me ask this:

22    You certainly don't think that I should detain

23    Ms. Eisenhart as punishment for engaging in the crimes

24    she's alleged to have committed on January the 6th, do

25    you?  That's not the government's position, is it?

1          MR. KURTZMAN:  No.  Our position is that

2     she's a danger to the community based on her words and

3     her actions.

4          THE COURT:  And it would be unlawful and

5     unconstitutional and against the body of the law for

6     me to engage her -- to detain her just because I

7     believe she's guilty of what she's alleged to have

8     done on January 6; right?

9          MR. KURTZMAN:  Absolutely, Your Honor.

10    As the Court knows, I'm in front of -- in front of you

11    very often and often don't seek detention for

12    individuals; sometimes do.  It's a case-by-case

13    determination, which is what the government did here.

14         THE COURT:  Right.  That's what happened

15    in this case as well.  In fact, there have been two

16    individuals that have been brought before me where the

17    government did not seek detention; right?

18         MR. KURTZMAN:  They were only charged

19    with misdemeanors, Your Honor.  That's the

20    distinction.  I don't think I had a statutory basis

21    there --

22         THE COURT:  Yeah, okay.

23         MR. KURTZMAN:  -- to seek detention.

24         THE COURT:  Give me just a minute.  That

25    might be all I need to ask.

1          Oh, I wanted to ask you about one issue.

2  And in your memorandum, Mr. Kurtzman, you refer to a

3  charge that Ms. Eisenhart had for driving -- I think

4  it was driving on a suspended license from 1990 in

5  Georgia.  The bond report doesn't have any information

6  about any charges.  Do you know anything about that

7  discrepancy?

8          MR. KURTZMAN:  I do not.  I don't know

9  about the discrepancy there.  Potentially -- it's

10  obviously very old, so it's potentially -- potentially

11  it was purged from the system.  As Your Honor knows,

12  charges like that sometimes improperly appear.  Or we

13  learn of them on someone's NCIC report or something

14  like that.  So it could have been any number of

15  things.

16          THE COURT:  There's nothing about

17  Ms. Eisenhart's prior criminal history that would

18  suggest that she's a danger to the community; right?

19          MR. KURTZMAN:  Other than the charged

20  offenses, Your Honor?

21          THE COURT:  Yeah, right.  I'm talking

22  about any prior criminal history.

23          MR. KURTZMAN:  Correct, Your Honor.  The

24  government's unaware of any.

25          THE COURT:  And there are no prior

126

1   examples of Ms. Eisenhart that the government's aware

2   of not showing up for court, not making appearances

3   when she's supposed to?

4          MR. KURTZMAN:  Not that I'm aware of,

5   Your Honor.

6          THE COURT:  There's not any examples that

7   the government's aware of of Ms. Eisenhart not

8   complying with conditions that any court might impose

9   on her to -- to engage or not engage in any kind of

10  conduct, is there?

11         MR. KURTZMAN:  Her past interaction while

12  on conditions of supervised release?  I don't think

13  there's ever an instance that she's been under that,

14  Your Honor --

15         THE COURT:  Okay.

16         MR. KURTZMAN:  -- so...

17         THE COURT:  Okay.  Thank you,

18  Mr. Kurtzman.  I appreciate your spirit and answers to

19  my questions.  Thank you.

20         Mr. Farmer, you want to be heard?

21         MR. FARMER:  Yes, Your Honor.  I'll just

22  cover the factors that I -- of course, if Your Honor

23  has any questions, I'm happy to answer them as well.

24  The first factor is the nature and circumstances.  I'm

25  going to break those out because they're not the same

1    thing.  The nature of these charges, (indiscernible)

2    what are they charged with.

3            (indiscernible) is not charged with

4    killing anyone, is not charged with treason, is not

5    charged with sedition.  She's charged with going into

6    the Capitol when she wasn't supposed to, clearly, and

7    the government is doing everything they can to try to

8    make it more serious than what it was.  It was an act

9    of civil disobedience and not these revolutionary

10   insurrection-type charges that they seek detainer on.

11           The circumstances of the offenses, I

12   think we spent a lot of time on the hearing about

13   that, so I'll be brief.  I guess first I'd be remiss

14   if I didn't point out that the government in its

15   argument said there were knives and other items on --

16   with Ms. Eisenhart and Mr. Munchel.

17           First, I've not heard the word knife in

18   this proceeding.  There has been no evidence that I

19   recall one way or another regarding a knife or any

20   weapon whatsoever.  I think the proof that Your Honor

21   heard is we think they might have had weapons, but

22   we're not positive.  I don't think it's really

23   anything (indiscernible).

24           The evidence has been clear and unrefuted

25   that Ms. Eisenhart is not in a militia, an

1   insurrectionist group, a revolutionary group.  The

2   evidence has been clear and unrefuted that she didn't

3   conspire with any of those people.  She didn't plan

4   with any of those people.  She went to Washington, DC.

5   True enough, it appears she took a -- or that her son

6   took a tactical vest.  But that, as Your Honor points

7   out, a tactical vest is not an offensive weapon.  It

8   is a defensive piece of equipment.

9           And I think Your Honor -- I think we

10  would all have to have heads in the sand if we weren't

11  aware that during protests such as these, protesters

12  with the left wing persuasion and protesters from the

13  right wing persuasion clash.  So that every bit of

14  evidence was that that was the purpose of the tactical

15  vest.

16          While -- and I guess I'll say on the way

17  up she didn't make any attempt to hide her identity.

18  She registered under her own name.  She was open and

19  obvious and clear about why she was there.  She came

20  up there because she was to attend a rally, to make

21  her voice heard, to stop an injustice that she

22  perceived and, frankly, millions of people in our

23  country perceive occurred in the presidential election

24  in November.

25          While in DC before going in -- before the

129

1    rally, before going to the Capitol, there's no

2    evidence that she had a weapon, despite the

3    government's (indiscernible).  There just simply

4    isn't.  They have video of her, they have pictures of

5    her.  Never, ever, ever do you see her with a weapon.

6              Mr. Munchel didn't say she had a weapon,

7    the witnesses they interviewed didn't say she had a

8    weapon.  She didn't say she had a weapon.  There's

9    just simply no proof to that.  There's no proof that

10   she acted violently in whatever form that takes.  She

11   didn't vandalize anything.  She didn't break anything.

12   She didn't assault anybody.  She didn't physically

13   encounter anyone in an aggressive way whatsoever.  And

14   I'm talking about the time period going into the

15   Capitol.  The video is clear that on the way to the

16   Capitol they are in a sea of people.

17             The video is clear when they get to the

18   steps, they have a eureka moment where they decide --

19   where the statement is, you'll get in trouble,

20   basically, if you bring some kind of weapons in there.

21   And they go back, and the video shows that Mr. Munchel

22   put weapons up.  The video doesn't show anything else

23   about weapons, vis-à-vis Ms. Eisenhart.

24             They then make their way through the

25   throng back to the Capitol where they enter.  And,

1    again, same stuff.  No violence.  No breaking things,

2    no vandalizing things, no breaking windows, no

3    assaulting police officers.  No assaulting other

4    protesters.  No going into private offices, no

5    stealing sensitive documents.  None of that.

6              Now, what -- I don't think it's, frankly,

7    any secret that what has them so hung up in the eyes

8    of the government are these zip ties.  I would submit

9    but for Mr. Munchel being essentially the poster boy

10   for this act on the 6th that we wouldn't be here.  But

11   that's kind of a fact beyond change, the picture of

12   him with zip ties.  So the national media is running

13   with it, and apparently the government has too.

14             Now, the government introduced as an

15   exhibit Ms. Eisenhart's statement to the newspaper

16   reporter where she says, look, I wasn't -- I didn't

17   have a nefarious intent.  I wasn't going to do

18   anything bad with them.  I was actually trying my best

19   to keep them out of bad people's hands.  And the

20   government is skeptical of that.

21             But what the government hasn't addressed

22   and doesn't address is that on-site in the Capitol

23   Ms. Eisenhart is asked by another person inside the

24   Capitol, hey, what about those zip ties.  And she says

25   (indiscernible) but she says some version of we're not

1   going to do anything with them.  I just wanna -- I

2   just wanna keep them.  I want to keep them out of bad

3   people's hands.

4           That's what she says on-site to another

5   person that the government claims is a treasonous

6   insurrectionist.  So if ever there was a time for her

7   to say, we intend to use these zip ties to find

8   somebody and tie them up and do bad things, that was

9   the time to say it.  So the government wants to take

10  her on the word at one hand but not on the other hand.

11          And frankly, the taking of the zip ties

12  to protect is consistent with the way Ms. Eisenhart

13  and her son behaved in there and that they were

14  concerned about other people breaking things and

15  vandalizing.  They didn't want that to happen.  They

16  were concerned about the police, telling them they

17  supported them and (indiscernible).

18          THE COURT:  Mr. Farmer, before you leave

19  that, I want to ask a question because I'm thinking

20  about it and since it won't interrupt your train of

21  thought.  Isn't there a third alternative to her

22  statements about the zip ties?  Isn't it possible that

23  she took the zip ties in order to prevent law

24  enforcement from using those on the rioters, and maybe

25  the bad people she's talking about, in her mind, were

132

1    law enforcement?

2            MR. FARMER:  I don't think anyone has

3    said anything that makes me say, no, that's absolutely

4    impossible, out of hand.  But I don't think there's

5    any support for that.  I think what we've heard is

6    that she and her son were prolaw enforcement.  She

7    treated the police officers they encountered with

8    respect.  There's not any evidence at all

9    (indiscernible) law enforcement.

10           THE COURT:  Well, the --

11           MR. FARMER:  (indiscernible).

12           THE COURT:  What is your -- what's your

13   response to Mr. Kurtzman's point that if -- if she

14   really was well-intended and really wanted to make

15   sure that those didn't get in the hands of bad actors,

16   all those rows of police officers that we saw her

17   encounter, why didn't she give the zip ties to them if

18   that was really her intent?

19           MR. FARMER:  Well, and so because someone

20   forms an intent to do something, it doesn't mean every

21   act they take is 100 percent aligned with

22   the (indiscernible) in the very best way.  And so

23   certainly it would have been the best practice for her

24   to take those and give them to police officers if that

25   was the intent.  But because she didn't do that

133

1  doesn't therefore mean that she didn't have that

2  intent.

3          THE COURT:  Okay.  Go ahead.  Sorry to

4  interrupt.

5          MR. FARMER:  That's okay, that's okay.

6  Actually, I think I was finished with the

7  circumstances piece of it, except to add that, you

8  know, she left nonviolently, walked out the door

9  without causing any violence at all.

10         The next thing I'd like to address is the

11 weight of the evidence.  And I think Your Honor and I

12 and Mr. Kurtzman have already had kind of a back and

13 forth about the -- where the Taser fits in and what

14 the proof is about the Taser and those sort of things,

15 so I won't rehash that to the Court.

16         I will point out, as Your Honor said, I

17 have raised on some level two affirmative defenses.

18 First is just simply the First Amendment right because

19 at its core what Ms. Eisenhart did is she went into

20 the Capitol and yelled that she felt like the

21 lawmakers were -- were doing terrible things, that

22 they were treasonous and she was against what they

23 were doing and using her voice to make those things

24 heard certainly (indiscernible) the First Amendment.

25         Secondly is the due process argument.

134

1    And, again, I'm not expecting a ruling from Your Honor

2    (indiscernible), but I think we would be remiss to not

3    at least mention it, and the facts are undisputed that

4    she was -- she and millions of others like them were

5    summoned up there to help then-President Donald Trump

6    what he claimed was the biggest injustice in American

7    history.  And the incendiary language that

8    then-President Trump used, if the government applied

9    the same standard they have to him as they applied to

10   Ms. Eisenhart, they would arrest him as well.

11             But that hasn't happened and it was -- at

12   least not to my knowledge.  But the language he used

13   to rile supporters up and convince them that this is

14   good versus evil, right versus wrong and we need to go

15   up there, can't be ignored.  When you combine that

16   with the fact that he is -- was at the time the

17   president of the United States, the commander in

18   chief, and the head of the executive branch of

19   government, one of our three branches of government,

20   that statement has power and it (indiscernible) of

21   legality.

22             And that's what the elements of

23   entrapment by estoppel require, a statement from a

24   government agent (indiscernible) and that's what you

25   do.

1        So they were called to the Capitol.
2   While at the -- on the grounds they were told we're
3   going to go down to Congress and we're going to
4   object, we're going to give strength to our Republican
5   Senators who are objecting and we're all going to go
6   and President Trump -- then-president Trump said he
7   was going to go with them.
8            This belief of legality, frankly, is
9   compounded, at least on some levels by when they had
10  to get into the building.  The door they go to isn't
11  (indiscernible) and there are police officers lined on
12  the wall and aren't objecting or stopping them.
13           So I raise all that to say, there are
14  constitutional concerns with this entire prosecution
15  on more than one level.  This is not a case where
16  somebody got pulled over and has a handgun in the
17  console or whatever.
18             In regards to the gun, the government and
19  I frankly disagree about the strength of the evidence,
20  but there are angles and wrinkles to this case that
21  aren't found in most cases.  And that makes the end
22  result of this case more uncertain, frankly, than
23  those cases.
24           So moving on to Ms. Eisenhart's history
25  and characteristics.  In their pleadings -- and I

1    don't know if the government stands by this still, but

2    in their pleadings they acknowledge the factor

3    regarding history and characteristics weighs in

4    support of release for Ms. Eisenhart.  And we

5    obviously agree.

6           She has a 30-year career as a registered

7    nurse.  She has no criminal record.  You've heard

8    evidence of a stable home and family life.  No ties to

9    violence, no ties to militia.  No cache of weapons.

10   Described, frankly, as a follower of the law, a rule

11   follower.  Out of frankness to Your Honor, in almost

12   any other case, there would be no question that she

13   would be released.

14          And then lastly, the last piece is this

15   concept of dangerousness.  And I think this is where

16   the government hangs its hat.  And its position is

17   frankly, as I understand it, she did something bad and

18   therefore she's dangerous.  So dangerous that we are

19   to ignore her 57-year life of being a law-abiding

20   citizen and finding that she can't mingle with the

21   public, she's so dangerous.

22          And I think if you dig down closely, what

23   they're most upset about, frankly, is the word she

24   uses.  That's what they seem to be relying on,

25   primarily.  And I understand the government's

argument, we've got to combine, we've got to look at

them together.  But it's the words that was -- I'd

rather die.

Well, let me ask this.  What if she wore

a shirt that said "live free or die?"  That's a

popular slogan out there.  What if she had a T-shirt

or a hat that said that?  Would that matter?  What if

she was handing out pamphlets that had Patrick Henry's

statement on it, "Give me liberty or give me death."

Isn't that kind of what she was saying?

This is hyperbole, these are political

statements, and for the government to argue, well, we

should ignore information about the zip ties on the

one hand but believe that she's actually going to

fight to the death against all evidence to the

contrary on the other hand and, therefore, keep her in

jail, it frankly strains credibility.

And I want to touch on a couple of things

as well.  You know, you heard testimony from the FBI

agent about this incident in the hotel with the mace.

I was frankly appalled at that testimony.  And I heard

him to testify that he understood from those tweets

that Ms. Eisenhart herself went in and maced -- or

threatened to mace somebody and followed somebody to

their room.  There's just simply not any support for

138

1    that whatsoever in the record.

2              Your Honor has read the tweets.  I don't

3    know, frankly, if the government stands by that at

4    this point, but it was amazing to me that they would

5    try to spin that tweet in such a way.

6              Similarly, they use the statements,

7    Ms. Eisenhart said we've got to stash our weapons.

8    That's not what Ms. Eisenhart said.  The FBI agent

9    testified to that, but when I drove down on it, he

10   said, well, no, she didn't say it like that.  That's

11   not exactly what she said at all.

12             So I don't -- frankly, it's concerning to

13   me that the government's taking (indiscernible).  And

14   I think, frankly, it's got as much to do with

15   anything, as I said, with the words she says and the

16   phrases she uttered and the fact that she was with,

17   quote/unquote, Zip Tie Guy, the national face of this

18   insurrection.

19             But none of that is for today.  What is

20   for today is what do we do with Ms. Eisenhart.  It

21   looks to me, it seems to me that she went to

22   Washington, DC and engaged in civil disobedience.  And

23   I think -- well, first thing, I think we shouldn't

24   have a detention hearing.  I think that Your Honor

25   should rule that the government hasn't met the

1    threshold to conduct this analysis.

2              In the event that Your Honor disagrees

3    with me, I think minimal conditions are appropriate.

4    I think this concept that we have to keep her locked

5    up because she might go to Washington, DC and attempt

6    to assassinate the president or some nonsense like

7    that is absurd.  And I think conditions could be

8    framed around some remote possibility that that might

9    happen.

10             Same with the (indiscernible).  Frankly,

11   Your Honor, if Your Honor is inclined to impose

12   conditions at all, I think regular reporting to the

13   probation or the pretrial services office would be --

14   would be sufficient but not greater than necessary.

15             All that to say, we've offered up a

16   third-party custodian.  And if Your Honor disagrees

17   with me as to whether that is appropriate,

18   Ms. Eisenhart is willing to abide by whatever

19   restrictions Your Honor -- Your Honor decides to

20   impose, third-party custodian, the same restrictions

21   that Mr. Munchel received, whatever.

22             She obviously has never been in jail

23   before, doesn't want to be back.  So don't hear me

24   saying it's my way or the highway.  But the legal

25   analysis is that the least restrictive conditions

1    necessary is probably just regular reports to pretrial

2    services office.  Thank you.

3                THE COURT:  Hang on just a minute,

4    gentlemen.

5                (Pause in proceedings.)

6                THE COURT:  Okay, thank you.

7    Mr. Kurtzman, I will give you the last word if you

8    want it since it's the government's burden.

9                MR. KURTZMAN:  Thank you, Your Honor.

10   Just a couple points based on Mr. Farmer's argument.

11               THE COURT:  Sure.

12               MR. KURTZMAN:  (indiscernible) as a

13   rationale of supporting police.  And the government's

14   counter to that would be, Your Honor, Ms. Eisenhart

15   was prepared to throw all that away with her -- by her

16   actions that day.  She understood she was breaking the

17   law, and all the things she's done in her life, her

18   stable career, her long career, her family, none of

19   that prevented her from storming the Capitol alongside

20   her fellow insurrectionists.

21               To call the barnstorming of the Capitol

22   of the United States civil disobedience I think

23   stretches both the word civil and disobedience beyond

24   their point.  She was not engaged in civil

25   disobedience.  The video is replete with people who

1  are doing what the president said during his speech,

2  which was to go and protest outside of the Capitol.

3  Ms. Eisenhart and her son were clearly

4  not amongst that (indiscernible) they were there to go

5  into the Capitol and that's exactly what they did.  As

6  the Court can see in the video, which at the

7  conclusion of the hearing the government would ask

8  that that be placed under seal, or filed under seal --

9  THE COURT:  The video?

10  MR. KURTZMAN:  Yes, Your Honor,

11  Exhibit 3.

12  THE COURT:  Okay.

13  MR. KURTZMAN:  The momentum of the crowd

14  is not heading towards the Capitol.  If anything,

15  Ms. Eisenhart and her son are swimming upstream to get

16  in.  And they would not be denied.  They knew there

17  was violence up there against Capitol police officers.

18  They knew that for a fact.  They believed at the time

19  that they were approaching that the lawmakers of this

20  country had been tear gassed in the Senate and House

21  chamber and that was a great development.  That is

22  what she was headed for.

23  Now, fortunately for both Ms. Eisenhart

24  and the lawmakers, she didn't encounter anyone really

25  other than a few police officers and other -- and

1    other rioters.  But to say that somehow just her --

2    that she just walked in there, she and her son are

3    actively going through hallways where there are not

4    many other rioters with a stun gun and zip ties and

5    they're checking nearly every door.

6              And there's only one thing to be looking

7    for back there and those are the lawmakers that they

8    had not found to that point.  That's belied by the

9    fact that everyone around them is also looking for

10   lawmakers and you can hear them saying, "where'd they

11   go, those cowards."

12             I guess sort of all of that leads -- the

13   idea -- I was present at the hearing the other day.

14   The idea that either Mr. Munchel or Ms. Eisenhart are

15   prolaw enforcement is not supported by a single thing,

16   other than their self-serving statements that they

17   are.

18             Your Honor, and I'll just quote -- I

19   close -- I would just ask that Your Honor believe the

20   statements of Ms. Eisenhart, believe how she feels

21   about her cause, believe that she was willing to

22   engage in criminal behavior in advance of that.  And

23   when that is done, I think any other decision other

24   than detention is hard to get to.  Thank you.

25             THE COURT:  I want to ask you a question,

143

1    Mr. Kurtzman, about Ms. Eisenhart's statement to the

2    media about rather die and rather fight.  Does the

3    government believe that that was Ms. Eisenhart's

4    sentiment before she went into the Capitol or that she

5    somehow developed that sentiment after going into the

6    Capitol?

7                 MR. KURTZMAN:  The statement was made

8    after they entered the Capitol.

9                 THE COURT:  Right.

10                MR. KURTZMAN:  Based on -- based on her

11   conduct in advance of getting into the Capitol, she

12   had that same intent.

13                THE COURT:  Okay.  If that was her intent

14   prior to going into the Capitol, why would someone who

15   had that intent not take weapons into the Capitol if

16   they had them available?

17                MR. KURTZMAN:  Your Honor, she was

18   prepared to go in with whatever weapons her son had.

19   It was her son's objection to going inside with them.

20   So any idea that she was against, her son expressed, I

21   don't want to go in there with weapons, albeit still

22   carrying his stun gun.

23                THE COURT:  Right.

24                MR. KURTZMAN:  And she said, well, just

25   go put it in the bag or something to that effect.  So

144

1    the fact that she didn't want to go in there with
2    weapons is not, I think, accurate.
3                THE COURT:  Well, she said go put them in
4    the bag.  She didn't say, I don't care, let's go in
5    with the weapons, did she?
6                MR. KURTZMAN:  Well, her son had said at
7    that point, I'm not going in.  And she -- then to get
8    him to go in with her, at least, you know, an
9    inference I'm making --
10               THE COURT:  Yeah.
11               MR. KURTZMAN:  -- is she said, go put
12   them in the bag.  And whatever it was, one would
13   presume it's more serious than a Taser.
14               THE COURT:  Right.
15               MR. KURTZMAN:  And that he
16   (indiscernible).
17               THE COURT:  Right.
18               MR. KURTZMAN:  And (indiscernible)
19   repercussions from that.  So the idea that the
20   government can't prove it, I'm not going to ever tell
21   you I can prove it --
22               THE COURT:  Yeah.
23               MR. KURTZMAN:  -- but there's a heavy
24   inference on what was in that fanny pack.
25               THE COURT:  Yeah.  But it just seems --

145

1    it just seems inconsistent with what you're telling me

2    to believe about her I'd rather die and rather fight.

3    If that's really how she felt, you wouldn't think that

4    somebody who had those feelings would say, but I'm not

5    going to take a firearm or whatever other weapon into

6    the -- into the chamber.

7              MR. KURTZMAN:  Your Honor, I think that

8    was more her (indiscernible).

9              THE COURT:  Yeah.

10             MR. KURTZMAN:  And he still was armed

11   with the stun gun when they went in there, so it's

12   not -- the idea that they were doing anything other

13   than meeting a condition that he had demanded I think

14   is -- is not correct.

15             THE COURT:  Okay.  All right.  Thank you,

16   Mr. Kurtzman.

17             Okay.  What we're going to do right now

18   is we're going to take another short recess.  This

19   will be significantly shorter than the last.  I don't

20   have any hour-long videotapes to go through.  So,

21   again, you-all can take a little break, but don't go

22   too far.  I'll be back shortly.  Thank you all again.

23   If you could bear with us, thanks.  We'll be in

24   recess.

25             (Whereupon, a break was taken.)

146

1          THE COURT:  All right.  We're back on the

2    record after a short recess.  Thank you all for your

3    patience.  The Court's heard the proof in this matter.

4    As I indicated at the outset, we had this matter set

5    today for detention hearing and preliminary hearing

6    with regard to this out of district-complaint.

7          I want to begin by thanking the lawyers

8    for their hard work and their diligence.  I appreciate

9    your written submissions, as well as your arguments.

10   As always, it's -- it's very fortunate that we have

11   the caliber of lawyers that we do in this district who

12   can advance argument on behalf of their clients that

13   are well thought out and very effective as advocates.

14   So thank you all for that.  I also want to thank the

15   witnesses who participated today and tell you my

16   appreciation for you being here and your willingness

17   to testify in this case.

18          The issue of identity as sort an initial

19   matter, I'll note Mr. Farmer indicated at the

20   beginning of this hearing was going to be waived.  And

21   so that's not an issue.  As I stated, the two matters

22   are preliminary hearing/probable cause, and detention.

23          With respect to the preliminary hearing

24   in this case, again, the Court's heard the proof in

25   this matter.  I've considered the charges in this

1    case, as well as the elements for each of those

2    charges.  As the parties are aware, the burden of

3    proof is on the government and it's a relatively low

4    standard of proof in this particular case.

5            And based upon all the facts and

6    circumstances, as well as arguments of counsel, the

7    Court finds that the government has satisfied its

8    burden of establishing probable cause as to each of

9    the charges brought in this criminal complaint.

10           Now on to the issue of detention.  As a

11    threshold matter, Mr. Farmer has raised the issue of

12    whether or not the charges brought in this criminal

13    complaint are even subject to detention.  The

14    government in its pleadings and arguments have

15    suggested several different bases for which the Court

16    can consider detention in this particular case.

17           While the Court believes that this is a

18    relatively close call, the Court's satisfied with the

19    arguments that the government's advanced with regard

20    to the conspiracy aspects charged in this case and

21    will find that in light of those arguments and in

22    light of those charges, that the Court can consider

23    detention in this particular case; and, therefore,

24    I'll move on to the issue.

25           Mr. Farmer's objections are preserved and

148

1    he can advance those as he sees fit, if necessary, in

2    subsequent proceedings.

3            With respect to the issue of detention,

4    the Court, again, has heard proof in this matter, as

5    well as the arguments of counsel.  To paraphrase

6    Winston Churchhill, the true measure of a civilized

7    society is how it treats those accused of a crime.

8    Unlike autocratic or authoritarian governments, we in

9    the United States provide and protect the rights of

10   the accused.  Those rights are enshrined in the

11   Constitution, primarily in the Fourth, Fifth, Sixth

12   and Eighth Amendments to the constitution.  And chief

13   among those rights is the presumption of innocence,

14   that all persons charged with crimes are presumed

15   innocent, unless and until convicted or found guilty

16   of the charges for which they are facing.

17           We don't punish people in this country

18   based on what they're accused of.  We punish them

19   based upon what they're convicted of.

20           The government has acknowledged that it

21   would not be appropriate or lawful for this Court to

22   detain Ms. Eisenhart in this matter simply because I

23   believe she's guilty of the charges she's facing on

24   January the 6th for her conduct there.

25           The conduct alleged on January the 6th is

149

disputed, but what's not disputed is that
Ms. Eisenhart was a part of this mob that entered into
the Capitol unlawfully.

The issue, however, before the Court
today is not whether Ms. Eisenhart is guilty of the
crimes with which she's charged.  The issue is whether
there are any conditions that will reasonably ensure
the safety of the community and her appearance at
future court proceedings.

The Bail Reform Act ordinarily requires
that a defendant be released pending trial unless
there are no conditions that will reasonably assure
the appearance of the person at future court
proceedings and the safety of the community.

In making this determination, the Court
must consider a number of factors, including the
nature and circumstances of the offense charged, the
weight of the evidence against the defendant, the
history and characteristics of the defendant and the
nature and seriousness of the danger posed by the
defendant's release.  These are often referred to, and
have been in this hearing, as the 3142(g) factors.

With respect to the factor regarding the
weight of the evidence, it's important to note that
this goes to the weight of the evidence of

dangerousness and risk of flight, not the weight of
the evidence of the defendant's charges -- guilt as to
the charges brought against her in this case.

In our society, liberty is the norm and
detention prior to trial or without trial is the
carefully limited exception.  As the Supreme Court has
stated, unless this right to bail before trial is
preserved, the presumption of innocence secured only
after centuries of struggle would lose its meaning.

The traditional right to freedom before
conviction permits a defendant to prepare his defense
and prevents the infliction of punishment prior to
conviction.

The Court is mindful of the tension that
exists between the Bail Reform Act and the presumption
of innocence that applies to Ms. Eisenhart and all
defendants in criminal cases.

Ms. Eisenhart's involvement in this riot
is undisputed.  The Court has to determine, however,
whether there are any conditions or combination of
conditions that will reasonably assure her appearance
at court proceedings and the safety of the community.

I'll begin with the issue of flight.  The
government advances in its sentencing memorandum that
Ms. Eisenhart poses a risk of flight.  Specifically at

151

page 22 of the memorandum, the sum and substance of
the government's argument is:  As noted Eisenhart
faces a significant statutory maximum penalty if she
is convicted of the charges in the complaint.  For
this reason, the Court should find by a preponderance
of the evidence that Eisenhart poses a serious risk of
flight and detain her on that basis.

        As Mr. Farmer notes, virtually every
offense for which someone comes before this Court in
the federal system is a serious charge that often
carries significant statutory maximum penalties.  The
Court is not persuaded by this fact alone that
Ms. Eisenhart would pose a significant flight risk.

        What's equally if not more important with
regard to any risk of flight in this case is that the
Court believes that there are conditions of release
that would reasonably assure her appearance at future
court proceedings.  And the Court has no reason to
call into question whether or not she would comply
with those conditions.

        The evidence that's been presented before
this Court is that Ms. Eisenhart does not have a
significant criminal record.  In any event, she does
not have any history of not appearing for any court
proceedings, of violating any conditions of release

1  that have previously been imposed or violating any

2  conditions of probation that she might have been

3  subject to in the past.

4       And more importantly, the evidence in

5  this case shows, and it was undisputed, that upon

6  learning that she was potentially a subject -- subject

7  to arrest, Ms. Eisenhart made daily contact with the

8  FBI to determine whether she was being sought and

9  whether she should make arrangements to surrender

10  herself, including when she was advised, finally, that

11  there were charges against her, and she thereafter

12  reported and turned herself in, surrendered on those

13  charges.

14       For these reasons the Court does not

15  believe that Ms. Eisenhart poses a significant risk of

16  flight and that there are not conditions that I can

17  impose that would reasonably assure her presence at

18  court proceedings.  So the Court finds that flight

19  does not provide a basis for Ms. Eisenhart's continued

20  detention.

21       Therefore, the remaining issue the Court

22  must determine is whether or not there are conditions

23  of release that will reasonably assure the safety of

24  the community in this particular case.

25       As noted before, the Court's heard the

153

proof in this matter, as well as the arguments of
counsel.  The government's argument of dangerousness
really boils down to, as Mr. Farmer alluded to, three
significant elements.  The first is her conduct on the
day of January 6 and thereabouts, of traveling to
Washington, DC, of taking certain articles of clothing
and equipment with her in advance of that trip, and
storming the Congress with a group of insurgents
dissatisfied with the results of the presidential
election.

No. 2, her obtaining a pair of hand ties
or what have been commonly referred to as zip ties
while she was in the Capitol and her presumed
intentions of holding those zip ties during the time
she was in the Capitol.

And No. 3, statements she has made, in
particular statements she's made to media outlets
following the events on January the 6th.  Those
statements specifically are, as indicated on page 10
of the government's memorandum:  The left has
everything, the media, organizations, the government.
We have to organize if we're going to fight back and
be heard.

Eisenhart further made clear that she was
willing to die for that cause, explaining, this

154

1    country was founded on revolution.  If they're going

2    to take every legitimate means from us and we can't

3    even express ourselves on the Internet, we won't even

4    be able to speak freely.  What is America for.  I'd

5    rather die as a 57-year-old woman than live under

6    oppression.  I'd rather die and would rather fight.

7              It appears that Ms. Eisenhart's

8    possession of the zip ties and her statements are

9    really what the government suggests distinguishes her

10   from the hundreds or thousands of other individuals

11   who entered the Capitol on that day.  They argue that

12   she went into the building, that she dressed for

13   combat, that she picked up the pair of zip ties and

14   she made these statements, reflecting her intention to

15   die and fight, rather than live under oppression.

16             According to the government, she had the

17   motive, opportunity and means to fight on January the

18   6th; however, the evidence in this case suggests that

19   she didn't do that.  She entered the Capitol

20   unlawfully, but she didn't appear to fight her way

21   into the Capitol, other than fighting her way through

22   the crowd.

23             She walked through an unsecured door,

24   past law enforcement, none of whom said to her to stop

25   or turn around or not go in.  She went into the

155

Capitol.  It appears clear from the video evidence
that the Court's reviewed that there was no grand
master plan that she was a part of in advance of that.

The government's admitted they have no
evidence of her making any plans to storm the Capitol
before the circumstances and events on January the
6th.  There is no evidence or record of her having
ever engaged in any prior conduct of a similar nature
to that.

While she was in the Capitol, there's
conversation between her and her son at which point
her son says, what's the plan here, what are you going
to do, words to that effect, which, again, would
suggest that there was a master plan in advance of
that.  If there had been a plan, then certainly there
would be no need to have asked those questions.

The possession of the zip ties seems to
be clearly by chance.  Everyone's acknowledged that
she didn't bring the zip ties into the Capitol
herself.  She found them in the cabinet and took that
from inside the Capitol itself.

Her motives and intent with the zip ties
are far from clear in this case.  The Court's heard
evidence contemporaneous with the events when speaking
with other alleged insurgents that Ms. Eisenhart made

1    the statements that she was just trying to keep them

2    from bad people or words to that effect.

3              She certainly didn't tell those

4    insurgents that she had any intent to use those zip

5    ties to capture or take hostage or take any other

6    action against anybody, quite frankly.  And, again,

7    there's no evidence that in advance of having gone in

8    there that that was her intention to do.

9              And most importantly, I suppose, is the

10   fact that she didn't do that.  She didn't attempt to

11   put zip ties on anybody.  She never said to anybody,

12   I'm going to come put these zip ties on you or

13   anything to that effect.

14             So the Court's not convinced that her

15   picking up the zip ties is anything that's consistent

16   with any sort of grand plan in advance to fight or die

17   in this case.

18             Likewise, there's no evidence that she

19   was engaged in any assaultive behavior while she was

20   in the Capitol.  The government concedes that they

21   have no evidence at this time that she exercised

22   physical violence against anyone, law enforcement,

23   members of Congress, staff of the Congress, other

24   insurgents or anyone for that matter.  Again, none of

25   this suggests her stated intention to die and fight

1    rather than live under her perceived oppressions.

2              Similarly, the government suggested that

3    Ms. Eisenhart and her son had or at least had access

4    to weapons more dangerous than a Taser gun, but,

5    again, rather than take those weapons that one might

6    use to die and fight into the Capitol, Ms. Eisenhart

7    and her son apparently left any weapons that they had,

8    other than the Taser gun, outside the Capitol.  This

9    undercuts the government's suggestion of her stated

10   intent in this regard.

11             There's also the issue that I spent some

12   time with Mr. Kurtzman about, because it -- on its

13   face appears very troubling.  It's the information

14   suggested on page 19 of the government's memorandum at

15   Docket No. 8 in the last paragraph where the

16   government suggests that it appears from Capitol

17   surveillance video that Eisenhart is following after

18   two Capitol police officers who had just encountered a

19   mob outside the entrance to the Senate gallery.

20   Eisenhart shouts from the banister, "Freedom,"

21   "Traitors," "We want a free and fair -- want a fair

22   election.  And "we want rule of law."

23             Again, these allegations on their face

24   seem very serious and very significant.  If

25   Ms. Eisenhart was giving chase to law enforcement

1    officers who were there in the Capitol, that would be

2    indicative of a desire and intent to do violence.

3    However, upon questioning the government conceded that

4    the evidence doesn't suggest or support a theory that

5    Ms. Eisenhart was giving chase to these Capitol police

6    officers.  In fact, it doesn't support the contention

7    that she even had any idea that those officers were

8    there.

9              The idea that she was shouting from the

10   banister at these officers is, likewise, unproven from

11   the evidence that's in this record.  The record does

12   suggest and show that she was shouting something from

13   a banister, but it's not clear at all who she was

14   shouting at or that she was shouting at those

15   officers.

16             The evidence that is on the videotapes

17   about the encounter of the mob and those officers is

18   extremely concerning to the Court, but, again, there's

19   simply no evidence that Ms. Eisenhart was engaged in

20   that kind of conduct or even engaged in the conduct

21   that the government suggests she was engaged in in

22   their memorandum in support of detention in this case.

23             So that factor, likewise, fails to

24   substantiate her alleged stated goal of fighting and

25   dying because of her misplaced beliefs of being

1    oppressed.

2              What is clear and can be taken as

3    judicial notice by the Court is that there were many

4    other individuals in the Capitol who were doing the

5    same thing as Ms. Eisenhart.  Individuals who went

6    into the Capitol, who were themselves not armed, who

7    were making boisterous, loud statements of a similar

8    nature to Ms. Eisenhart, suggesting their belief that

9    the election results were improper, that their rights

10   had been denied in some way, and that they sought to

11   overthrow or at least obstruct the efforts to certify

12   the vote for president in this case of the electoral

13   college.

14             Many of those individuals have been

15   released.  Specifically the Court takes judicial

16   notice of the release of Mr. Brock, an individual who

17   was observed on the floor of the Senate with combat

18   gear on, including a combat helmet, who was holding

19   zip ties and who also made similar statements to those

20   asserted by Ms. Eisenhart.  Mr. Brock was released by

21   a judge in Texas.  And the government, to my

22   knowledge, has not appealed that decision.

23             But in any event, this Court is also

24   aware of two other individuals in this court who have

25   come before the Court who made statements and whose

160

1    presence suggested their intention to participate in

2    these activities who likewise did not, to the Court's

3    knowledge, harm anybody but were released without

4    objection by the government.

5              And those situations and examples go on

6    and on and on.  In other words, this Court is not an

7    outlier in finding that release is appropriate for

8    these individuals.  Certainly there are individuals

9    who engaged in very serious misconduct.  And nothing

10   about my statements is intended to suggest that I

11   don't believe that the conduct of Ms. Eisenhart was

12   serious and dangerous as of itself.  But everything

13   that Ms. Eisenhart did on January the 6th I can

14   address through conditions of release.  And that's

15   what the law requires me to do.

16             The law requires me to impose the least

17   restrictive conditions that I can impose in order to

18   reasonably assure her appearance at court proceedings

19   and the safety of the community.

20             I also want to take a moment to note the

21   allegations that were raised in the testimony with

22   regard to an incident that allegedly occurred after

23   the events on January the 6th at the hotel related to

24   Mr. Turton.  The Court heard that proof.  I've been

25   provided with the Twitter threads.  And the Court

1  gives that evidence very little weight in this

2  circumstance.

3          The Court doesn't dispute Mr. Turton's

4  account of what happened to him on that occasion.  But

5  as it relates to this defendant, the Court believes

6  that the government's inference that Ms. Eisenhart was

7  the person who was engaged in the conduct alleged by

8  Mr. Turton is too much of a stretch without additional

9  proof that the Court doesn't have before it.

10         The Court notes that Mr. Turton was able

11 to identify, apparently, Mr. Munchel, based on video

12 as an individual who allegedly assaulted him, or at

13 least laid hands upon him at the hotel.  The Court

14 notes, as Mr. Farmer pointed out, that Ms. Eisenhart

15 is also visible in that video.  However, Mr. Turton

16 did not, as one would expect, say, that's the woman

17 who pointed the Taser at me.

18         The evidence on this matter is just too

19 thin for the Court to rely on in support of a

20 contention that Ms. Eisenhart poses a danger that

21 cannot be addressed through appropriate conditions.

22         So having considered all of the factors

23 and circumstances that the Court is required to under

24 Section 3142(g), the Court believes that there are

25 conditions of release that would reasonably assure the

162

1    safety of the community with regard to Ms. Eisenhart.

2                    Now, my decision in this matter should

3    not be misunderstood or misconstrued.  I am in no way

4    condoning the behavior and conduct of Ms. Eisenhart or

5    the others on January the 6th of 2021.  The events of

6    that day are shocking and they're disturbing.

7                    We witnessed an attack on the Capitol

8    that many of us could never have imagined.  The sight

9    of confederate flags in the Capitol and antisemetic

10   messaging is unthinkable.  Understandably, people are

11   angry and they're scared by what they saw.  They feel

12   like the rioters attacked our constitution and our

13   democracy, and they rightfully want accountability for

14   that.

15                   However, the time for accountability for

16   that conduct is not what's before this Court.  As I

17   noted at the outset and have continued to note, my

18   decision to detain or not to detain is not to be based

19   upon whether or not I think Ms. Eisenhart is guilty of

20   the crimes for which she is accused.  In fact, if I

21   were to make such a finding, it would be improper and

22   unlawful, and the government concedes as such.

23                   Protecting the rights of the accused is

24   often difficult and unpopular.  But when we disregard

25   those rights based on anger and fear, we damage the

163

1   very constitution and democracy that we seek to

2   protect.

3            As a judge, I take an oath to secure and

4   defend the constitution.  That can't be based on

5   emotion.  It must be based on the law and the evidence

6   that comes before the Court.  Even as I talk about the

7   events on January the 6th and what happened at the

8   Capitol, I feel my own emotion in dealing with this

9   issue.  But that's why it's so important to make

10  decisions based only on the law and the evidence as a

11  judge.  It's what John Adams meant when he said that

12  we are a law -- or a nation of laws and not of men.

13           Based on the laws and the evidence in

14  this case, the Court finds that there are conditions

15  of release that will reasonably assure the defendant's

16  appearance and the safety of the community.

17           And, therefore, it will be the order of

18  the Court that Ms. Eisenhart be released subject to

19  the following conditions:  She must not violate

20  federal, state or local law while on release.  She

21  must advise the Court or pretrial services in writing

22  before making any change of residence or telephone

23  number.  She must appear in court as required and, if

24  convicted, must surrender as directed to serve any

25  sentence that the Court may impose.

164

1              Ms. Eisenhart, I need to make sure that

2    you listen closely to these conditions because when I

3    complete them, I'm going to ask you if you've heard

4    them and understand them.  In addition to those

5    conditions, I'm going to impose some additional

6    conditions.  The defendant will be placed in the

7    custody of the third-party custodian proffered by

8    Mr. Farmer and whom the Court has heard testimony from

9    in these proceedings.

10             That individual agrees to supervise

11   Ms. Eisenhart, to use every effort to assure her

12   appearance at all court proceedings, and to notify the

13   Court immediately if she violates a condition of

14   release or is no longer in the custodian's custody.

15   The Court is satisfied that the custodian understands

16   the responsibilities and obligations and will fulfill

17   those obligations to the best of her ability.

18             The Court will likewise require that

19   Ms. Eisenhart submit to supervision by and report for

20   supervision to the pretrial services office as

21   directed.  She's to continue or actively seek

22   employment.  She is to abide by the following

23   restrictions on personal association, residence or

24   travel.  That will be limited to within the Northern

25   District of Georgia unless preapproved by pretrial

1   services.

2            The defendant must not travel outside the

3   continental United States without Court approval.  The

4   defendant must participate in all future proceedings

5   as directed.  The defendant may not go to

6   Washington, DC unless she is appearing for court,

7   meeting with pretrial services or consulting with her

8   attorney.

9            She is to get medical or psychiatric

10  treatment as determined by pretrial services, if

11  deemed appropriate.  She is not to possess a firearm,

12  destructive device or other dangerous weapon.

13           She's to participate in the following

14  location restriction program and comply with the

15  requirements:  That will be home detention.  You are

16  restricted to your residence at all times except for

17  employment, education, religious services, medical,

18  substance abuse or mental health treatment, attorney

19  visits, court appearances, Court-ordered obligations

20  or other activities approved in advance by the

21  pretrial services office or supervising officer.

22           You are to submit to a location

23  monitoring as directed by the pretrial services office

24  and comply with all the program requirements and

25  instructions provided.  You must pay all or part of

1   the cost of the program based on your ability to pay,

2   as determined by the pretrial services.

3           You're to report as soon as possible,

4   within 48 hours to the pretrial services office every

5   contact with law enforcement personnel, including

6   arrests, questioning or traffic stops.  And you're to

7   permit the pretrial services officer to visit you at

8   home or elsewhere at any time, and allow the officer

9   to confiscate any contraband in plain view.

10          I need to also advise you of the

11  following penalties and sanctions:  Violating any of

12  the foregoing conditions of release may result in the

13  immediate issuance of a warrant for your arrest, a

14  revocation of your release, an order of detention, a

15  forfeiture of any bond, and a prosecution for contempt

16  of court and could result in imprisonment, a fine or

17  both.

18          While on release if you commit a federal

19  felony offense, the punishment's an additional prison

20  term of not more than ten years, and for a federal

21  misdemeanor offense, the punishment's an additional

22  prison term of not more than one year.

23          This sentence will be consecutive,

24  meaning in addition to any other sentence you receive.

25  It's a crime punishable of up to ten years in prison

1  and $250,000 fine or both to obstruct a criminal

2  investigation, to intimidate a -- tamper with a

3  witness, victim or informant, retaliate or attempt to

4  retaliate against a witness, victim or informant or

5  intimidate or attempt to intimidate a witness, victim,

6  juror, informant or officer of the Court.

7          Penalties for tampering, retaliation or

8  intimidation are significantly more serious if they

9  involve a killing or attempted killing.

10          If after release you knowingly fail to

11  appear as the conditions of release require, or to

12  surrender to serve a sentence, you may be prosecuted

13  for failing to appear or surrender and an additional

14  punishment may be imposed.  If you're convicted of an

15  offense punishable by a term of imprisonment of five

16  years or more than but less than 15 years, you will be

17  fined not more than $250,000 or imprisoned for not

18  more than five years or both.

19          For any other felony, you'll be fined not

20  more than $250,000 or imprisoned for not more than two

21  years or both.  For a misdemeanor, you'd be fined not

22  more than $100,000 or imprisoned for not more than one

23  year or both.  A term of imprisonment imposed for

24  failure to appear or surrender will be consecutive to

25  any sentence you receive.

168

1          Now, Ms. Eisenhart, normally this is the
2     point in the proceedings where I would pass this order
3     down for you and Mr. Farmer to review and have you
4     execute it in open court.  But since we're proceeding
5     by video conference, I need to ask you several
6     questions and I need you to respond, please.
7          Do you acknowledge that you're the
8     defendant in this case and that you're aware of the
9     conditions of release previously announced?
10          THE DEFENDANT:  Yes.
11          THE COURT:  Do you promise to obey all
12     the conditions of release, to appear as directed and
13     surrender to serve any sentence imposed?
14          THE DEFENDANT:  Yes.
15          THE COURT:  And that you're aware of the
16     penalties and sanctions set forth in the document
17     above?
18          THE DEFENDANT:  Yes.
19          THE COURT:  All right, very well.  This
20     will be the order of the Court.  Ms. Eisenhart will be
21     released subject to these conditions.
22          MR. KURTZMAN:  Your Honor, the
23     government, as we did in Ms. Eisenhart's codefendant's
24     case, would ask that the order be stayed until
25     Thursday at 1:00 p.m.

169

1           THE COURT:  Okay.  Go ahead,

2   Mr. Kurtzman.

3           MR. KURTZMAN:  I expect the prosecuting

4   attorneys in Washington to file an appeal, as they've

5   done both in Mr. Munchel's case, as well as

6   Mr. Barnett's case out of Arkansas.  The commonalities

7   between these three is that they were all essentially

8   charged with the same offenses, and that in all of

9   them involved (indiscernible).  As the Court's aware

10  the judge in DC ordered at least Mr. Munchel and

11  Mr. Barnett to be transported pending that appeal.

12          THE COURT:  All right.  Thank you,

13  Mr. Kurtzman.

14          Mr. Farmer, do you have any response?

15          MR. FARMER:  A couple of responses,

16  Your Honor.  First just as to whether a stay should be

17  imposed.  I think the primary consideration is there

18  any irreparable harm to the government.  And in light

19  of the conditions that you have outlined, there is

20  virtually no risk that Ms. Eisenhart is going to be

21  anywhere except exactly where we think she's going to

22  be.

23          So if the government wants to kind of

24  have a review of that, I don't think it's appropriate

25  to keep Ms. Eisenhart incarcerated while that happens.

170

1          If Your Honor disagrees or thinks a stay

2    maybe is the best route, Thursday at 1 o'clock is

3    entirely too long.  I think the government has filed a

4    motion like this already for Mr. Munchel.  It's the

5    same complaint, so if Your Honor is inclined to grant

6    the stay, it shouldn't be any longer than tomorrow.

7                  THE COURT:  All right, very good.

8                  Mr. Kurtzman, anything else you want to

9    say about that?

10                 MR. KURTZMAN:  Just in general, I think

11   the primary consideration was the likelihood of

12   success.  I would concede that irreparable harm is a

13   factor, but the likelihood of success is the

14   predominant one.  As the Court notes, the court in DC

15   has, in two extremely similar cases and in the

16   codefendant's case, during that stay has authorized

17   the transport of these individuals pending the appeal

18   of the release order.

19                 THE COURT:  Very good, thank you,

20   Mr. Kurtzman.  Thank you, Mr. Farmer.

21                 The Court was aware of the government's

22   position based upon the information contained in their

23   memorandum.  I've considered this matter.  I believe,

24   particularly taking into account this is an

25   out-of-district matter, the Court's satisfied that the

1    government intends to file the appeal.  They've

2    expressed their intention to do so.  I think that a

3    stay is appropriate in this case.

4              I agree, however, with Mr. Farmer that a

5    delay till Thursday is unnecessary, given the

6    circumstances here.  I'm going to grant the stay until

7    close of business, till 5 o'clock tomorrow.  That will

8    give the government the day to address whatever they

9    feel like they need to do.  I'm satisfied that the

10   government's in a position to be able to do that in

11   light of the previous litigation in this case.  And as

12   I note, because this is an out-of-district case, it's

13   candidly a little bit unusual that we are generally

14   making these decisions anyway, but certainly

15   Ms. Eisenhart had the right to ask this court to

16   consider it.

17             I've done that, I've made my ruling, but

18   I think it's appropriate to grant the government's

19   motion for a stay.  I'll stay my ruling until

20   5:00 p.m. Central standard time tomorrow.

21             Again, thank you to the parties.  I

22   appreciate everyone's participation by video

23   conference today.  Thank you for your efforts and

24   advocacy in this case.

25             Mr. Kurtzman, is there anything else

172

1   further from the government's standpoint that we need

2   to do in this matter today?

3            MR. KURTZMAN:  No, Your Honor.

4            THE COURT:  Very good.  Thank you, sir.

5            Mr. Farmer, anything else for your

6   client?

7            MR. FARMER:  No, Your Honor.  Thank you.

8            THE COURT:  All right.  Very good.  We'll

9   be in recess.

10           **\*\*\*END OF ELECTRONIC RECORDING\*\*\***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3          I, Roxann Harkins, Official Court Reporter

4    for the United States District Court for the Middle

5    District of Tennessee, in Nashville, do hereby

6    certify:

7               That I transcribed from **electronic**

8    **recording** the proceedings held via video conference on

9    January 25, 2021, in the matter of UNITED STATES OF

10   AMERICA v. LISA EISENHART, Case No. 3:21-mj-2679;

11              that said proceedings in connection with the

12   hearing were reduced to typewritten form by me; and

13   that the foregoing transcript is a true and accurate

14   transcript of said proceedings.

15

16              This is the 2nd day of February, 2021.

17

18                   s/ Roxann Harkins_____
                     ROXANN HARKINS, RPR, CRR
19                   Official Court Reporter

20

21

22

23

24

25